IN THE CIRCUIT COURT FOR MONTGOMERY COUNTY MARYLAND

BRETT KIMBERLIN,
  8100 Beech Tree Rd
  Bethesda, MD 20817

     Plaintiff,

     v.

Hulu Inc.,
2500 Broadway, 2nd Floor
Santa Monica, CA. 90404

Disney+ Inc.,
500 South Buena Vista Street
Mail Code 7830
Burbank, CA 91521

Netflix
121 Albright Way
Los Gatos, CA 95032

Netflix Australia
1-7 Wellington St
Chippendale, New South Wales 2008

Apple TV+
One Apple Park Way
Cupertino, CA 95014

Umbrella Home Entertainment
Unit 13/79-83 High Street
Kew VIC 3101 Australia

Anna Vincent,
1 Mulberry Road
Glenside, South Australia, 5065

Southern Light Alliance Films Pty Ltd
Adelaide Studios
1 Mulberry Road
Glenside, South Australia, 5065

*Amended Complaint*

No.  C-15-CV-25-002733

**RECEIVED**

MAY 3 0 2025

Clerk of the Circuit Court
Montgomery County, Md.

1

Adam Kamien,
Suite 75, 61 Marlborough Street
Surry Hills, New South Wales 2010

Luke Rynderman,
Suite 75, 61 Marlborough Street
Surry Hills, New South Wales 2010

## AMENDED COMPLAINT FOR DAMAGES

A lie is a lie even when made by a billion dollar company with a name recognized by almost every literate person on the globe. Defendants Disney+ and its affiliate Hulu, Netflix, Apple TV+, Umbrella Entertainment, Anna Vincent, Southern Light Alliance Films, and others lied when they portrayed Plaintiff Brett Kimberlin as a murderer of five people. Defendants Adam Kamien and Luke Rynderman, the creative directors of a documentary film called "The Speedway Murders," created these lies to promote their ambition, build a portfolio as documentary filmmakers, attract large numbers of viewers, and make substantial profits, commercially and personally. All the Defendants agreed to publish these lies this with utter disregard for the life and livelihood of Plaintiff, an innocent person, and in doing so, engaged in defamation *per se*, under law and violated other Maryland civil torts.

This is an action by Plaintiff against Defendants Disney+, Inc. and Hulu Inc, Netflix, Anna Vincent, Southern Light Alliance Films and others for defamation, aggravated by deception, misrepresentation, intentional infliction of emotional distress, negligence, gross negligence, and violations of Plaintiff's right of privacy, arising out of false promises made to the Plaintiff by some of the Defendants and

2

the falsehoods presented in the film, "The Speedway Murders." The lies that Defendants have promoted in the film to millions of people worldwide include that Plaintiff was involved in the murder of four teenagers and another woman in Speedway, Indiana between July and October 1978. Defendants were aware that these claims were false, and took steps to disguise their intent in using the Plaintiff's likeness and filmed comments, because they believed it would make their film more compelling and commercially viable resulting in a wider audience and greater profits.

Disney+ and Hulu, Netflix, and Apple TV, are professional and sophisticated commercial entertainment content providers with combined assets of hundreds of billions of dollars; yet they conducted no due diligence before releasing a film that promoted unsubstantiated accusations of capital crimes against Plaintiff. These Defendants, including the writers and directors, the producers, and the film companies who distributed this film, never investigated whether Plaintiff was ever investigated, suspected or convicted of any of the murders (which he was not), yet they presented rumor and innuendo, by actors and persons not credible or knowledgeable, that he was involved in these crimes. The streaming companies never talked with Plaintiff or had fact checkers determine if the false accusations were true. They never conducted an independent or legal defamation review. They did nothing to determine whether any of the false statements or portrayals of his involvement in the murders were accurate. They did nothing to confirm whether Defendant Vincent's production, which falsely accused Plaintiff of capital murder in

a state with the death penalty for such crimes, was accurate. As a result of Defendants' malicious lies, malfeasance and extremely reckless misconduct, Plaintiff has been harmed. People who have watched the film have contacted him and his family in shock at the allegations and Plaintiff has suffered opprobrium. The Defendants knew and had reason to believe that Plaintiff would be damaged as a result of the *per se* defamatory statements in their film yet they released the film in order to gain viewers and money.

### Introduction

1.  Plaintiff was wrongfully convicted of a crime in 1981 that occurred in the town of Speedway, Indiana. The first trial ended in a hung jury, nine to three for acquittal. The retrial was marked by gross police misconduct, perjured testimony, planted evidence, a spiked jury, hypnosis of six government witnesses, jury misconduct, and false microscopic hair evidence. In 2019, one of the chief prosecution witnesses, State Police Detective Brooke Appleby, admitted to Pulitzer Prize winning reporter Dan Luzadder that he engaged in multiple incidents of official misconduct and committed perjury in order to convict Plaintiff of these crimes in violation of constitutional safeguards.

2.  At some point in 2018, Dan Luzadder was contacted by Australian film producers, Defendants Adam Kamien and Luke Rynderman, who indicated that they were interested in the story of Plaintiff's wrongful conviction and police corruption in Speedway, Indiana. They indicated that they wanted to pitch a series to sell to a streaming service and use some of the upfront money to conduct a deep

investigation into the police corruption that led to Plaintiff's wrongful conviction.
After some negotiations, Kaiman, Rynderman, Luzadder and a cameraman met
with Plaintiff and filmed him discussing the wrongful conviction he had long sought
to overturn. During that filming, Plaintiff stated categorically that he did not
commit any crimes in Speedway and that the four-month Speedway crime spree had
nothing to do with him.   In November 2018, Plaintiff signed an agreement with the
makers of the film giving them limited but exclusive rights to "my story" for a
period of 18 months. Defendants Kamien and Rynderman did not compensate
Plaintiff for those exclusive rights but instead dangled a promise that they needed
that much time in order to sell the movie to a streaming service which could help
exonerate Plaintiff and provide him with substantial income.  Plaintiff understood,
based on conversations with Defendants Kamien and Rynderman, that "my story"
was the story of Plaintiff's wrongful conviction and police corruption.  Plaintiff had
no reason whatsoever to agree to any story about murders for which he did not
commit and was never charged or even named as a suspect.

3. A month later, Kamien and Rynderman, without notifying Plaintiff or Dan
Luzadder, optioned their rights to their planned series to Defendants Anna Vincent
and Southern Light Alliance Films ("SLA") which never secured any new release
from Plaintiff or ever had any contact with him for use of the Kamien/Rynderman
footage.  In fact, Plaintiff never even heard of them before the film's release on June
21, 2024, more than five years later. Dan Luzadder, however pursued an earlier
legal action against Kamien and Rynderman because they misled him.  That legal

action, which resulted in a settlement restricting use of film footage in which Mr.

Luzadder had initially participated and other material provided by him, did not

involve Plaintiff because Plaintiff was never contacted at all by any of the

Defendants after November 2018.

    4. On July 13, 2022, Dan Luzadder told Defendant Vincent in an email that she

could not use any material pertaining to Plaintiff in the film:

> From: Dan Luzadder < *****gmail.com>
> Sent: Wednesday, July 13, 2022 4:04 am
> To: Anna Vincent < anna*****.com>
> Subject: Re: ! Australian Documentary
>
> Thank you Anna - I appreciate that, but as I noted when we talked none of
> the material pertaining to Brett Kimberlin may be used, nothing pertaining
> to material obtained from my investigative files may be used. This was
> outlined by counsel from Denver in the attached - but never executed -
> proposed settlement agreement. If you want to proceed to an updated
> settlement that frames the above resolution, I will contact my new counsel in
> Oregon to follow up.
>
> I wish you good luck with your art film, but I am adamantly opposed to any
> mention or appearance in your film or use of my material information as
> noted; any remuneration, as reflected in this draft settlement agreement,
> anticipates coverage of my legal and related expenses.
>
> What I  want is your commitment that those materials and interviews will
> not appear in your documentary, (since they were obtained by
> misrepresentation). If anything does appear,  Mr. Greenlee will face
> a  complaint for disbarment through the Indiana Judicial Disciplinary
> Commission at the point he accepts any funds from this project - since he
> used his status as a licensed attorney to obtain confidential information,
> access to Mr. Kimberlin, etc., under false pretenses.
>
> Kind regards,
> Dan Luzadder

Despite Dan Luzadder's firm position prohibiting the use of any material pertaining

to Plaintiff, Defendant Vincent never contacted Plaintiff to inform him of her plans

to abandon a series about Plaintiff's wrongful conviction in favor of a full length film about murders, or ask him to use footage taken by Defendants Rynderman and Kamien, Defendant Vincent did not seek a new release or agreement with Plaintiff despite the fact that Plaintiff's 18-month exclusive agreement with Rynderman and Kamien had expired years earlier. In fact, Defendant Vincent intentionally hid her plans from Plaintiff because she knew that he would not have anything to do with such a film.

5. In June of 2024, Dan Luzadder was contacted by Defendant Vincent and advised that she had used Plaintiff's footage for an entirely new film called "The Speedway Murders" that had nothing to do with Plaintiff's wrongful conviction. Mr. Luzadder told her that such use would violate all prior agreements and representations, and would result in legal action by Plaintiff. At no time did Defendant Vincent ever contact Plaintiff prior to the film's release. At no time did Defendant Vincent seek any agreement with Plaintiff to use the Kamien/Rynderman footage. At no time was Plaintiff ever compensated for his appearance in the film.

6. On June 22, 2024, Dan Luzadder sent the following email to Defendant Vincent:

> From: Dan Luzadder <*******@gmail.com>
> Date: Saturday, 22 June 2024 at 1:17 pm
> To: Anna Vincent <*******@annavincent.com>
> Subject: Your film
>
> Anna

Just heard about your accusation about Kimberlin in your film. Sounds like you violated our legal agreement, and your directors lied to us, (which would be evidence of malice under US libel law.)

Seems certain you never brought this accusation to Brett for response before you aired it, or I would have heard about it.

I would expect Kimberlin will sue you ... unless you have something more than this sources unsubstantiated accusations. I'll certainly support that if he does.

Incredibly irresponsible. I doubt you even realize what you've done here.

Dan Luzadder

7. On June 21, 2024, "The Speedway Murders" debuted at select theaters, and was streamed on Apple TV+, Prime Video and On Demand. There was also a screening of the film that day at 7:00 p.m. at Landmark's Glendale 12 Theatre, 6102 N. Rural St., Indianapolis. Dan Luzadder and others informed Plaintiff that the film had been released and that it defamed him by falsely accusing him of murder. This is when he discovered that the Defendants had defamed him and committed the other torts set forth in this Complaint. Plaintiff felt betrayed, abused, cheated, misled, and suckered by Defendants Kamien and Rynderman.

8. At some point, Defendants Vincent and SLA signed an agreement with Defendant's Disney+ and Hulu to stream the film to a global audience. It has since been featured on the home page of Hulu and the other named streaming platforms, and its trailer, promotion materials, and film have been viewed tens of millions of times.

9. Hulu is a paid streaming service that earns money from the streaming of films. It must continually add new members to replace canceled memberships and grow its business. To do so, it consistently provides members with new compelling content choices that keep their customers and compete with competitors. It earns revenue through paid subscribers and from advertisements presented on its streaming service, consumer products and other various sources.

10. After Hulu released the film, it was released by Netflix though Netflix Australia, Apple TV, and others streaming and DVD companies.

11. Defendants Kamien and Rynderman have promoted the film on various social media sites including YouTube, Reddit, and LinkedIn.   In an interview on YouTube, they repeated the defamatory statements that Plaintiff was "implicated" in the murders and postulated that the all the murders were committed to coverup other crimes.  https://www.youtube.com/watch?v=eJIMg_pE_mM They made these false accusations even though they knew that he was wrongfully convicted of one crime and had nothing to do with the other crimes.

12. None of the Defendants ever compensated Plaintiff for the use of his name, likeness, or footage.

### Defamatory Statements In The Film

13. "The Speedway Murders" is a docuseries about the unsolved murders of four teenagers who worked at a Speedway, Indiana Burger Chef restaurant in November, 1978.  In the film, the producers resurrected the victims as ghosts and had them try to figure out who killed them.  In the process, the producers

intertwined interviews with other live sources to try to dramatize three different theories. One of those theories, based on no evidence whatsoever, was that Plaintiff committed the murders as part of a marijuana deal gone bad. To bolster this theory, Defendants Vincent, Kamien and Rynderman chose to allow ghost actors and individuals with no direct knowledge to air suppositions and speculation, and falsely accuse Plaintiff of another unsolved murder that occurred four months earlier in the same town of Speedway. Moreover, despite having strong evidence that Plaintiff was wrongly convicted of the "Speedway Bombings," the Defendants chose to use that wrongful conviction to bolster their theory without any mention of the exonerating evidence. While the producers and directors of the film used a brief clip of Plaintiff making a blanket denial of his involvement in any of the Speedway crimes in 1978, they failed to include facts of which these Defendants were aware, regarding the reasons the Plaintiff was never involved in any way in the crimes of which those chose to accuse him.

14. Plaintiff was never a suspect by law enforcement in any of the murders, he was never questioned by any law enforcement official about the murders, he was never called before a grand jury investigating the murders, and he was never charged with the murders.

15. There has never been a single shred of evidence that Plaintiff had anything to do with these five unsolved murders, and "The Speedway Murders" film did not provide a single shred of evidence. Instead, the Defendants created a concocted theory articulated by resurrected ghosts of victims, who Plaintiff never met or

knew, along with false statements by individuals who Plaintiff never met or knew, to directly accuse Plaintiff of five murders. Defendants Vincent, Kamien, and Rynderman made a conscious decision to use unsubstantiated speculation and defamatory statements through others to defame Plaintiff in order to convince viewers that Plaintiff was involved with the murders. Further, they were made aware of the Plaintiff's innocence in these crimes while initially working under written agreements, later dissolved by settlement restricting access to material, with aforementioned investigative reporter Dan Luzadder.

## The Parties

16. Disney+ is an affiliate of Disney incorporated, announced in 2017 and it includes the entertainment streaming service, Hulu. It has over 152 million subscribers with 2023 generated revenue of $8.4 billion, app downloads over 350 million, a content library of 7,500 TV episodes and 500 films, and spent $16 billion on streaming content by 2024. It is receiving income from "The Speedway Murders."

17. Hulu generated $11.2 billion revenue in 2023, mostly from its streaming platform. Over 43 million people subscribe to Hulu, with 4.4 million of those to Hulu's Live TV service. Disney valued the app at $15.8 billion in 2019 and Hulu's current value is $40 billion. It is receiving income from "The Speedway Murders."

18. Netflix Australia is a part of Defendant Netflix, Inc. a Delaware corporation with a principal place of business at 121 Albright Way, Los Gatos, California, 95032. Netflix is a producer and distributor of content with over 260 million paid subscribers and a market cap of $283 billion. Netflix Inc. owns the Netflix Australia

11

streaming platform which streamed "The Speedway Murders" in Australia, and it acquires, licenses and produces content, including original programming, in order to offer its members unlimited viewing of video entertainment. Netflix Australia earned more than $1.1 billion from Australian customers last year and shifted more than $1 billion – 92 per cent – of that to its US parent company.  It is receiving income from "The Speedway Murders."

19. Apple TV+ in 2023 had revenue of $2.2 billion, is owned by parent company Apple with more than $391 billion in revenue in 2024.  Apple TV+ is currently streaming "The Speedway Murders" through paid subscriptions and purchases.

20. Umbrella Home Entertainment is located at Unit 13/79-83 High Street, Kew VIC 3101 Australia which distributes films including through DVD and Blu Ray. It is currently distributing "The Speedway Murders" in Australia and receiving revenue therefrom.

21. Anna Vincent is a film producer based in Adelaide, Australia.  Her film company, Southern Light Alliance Films Pty Ltd, is located in Adelaide, Australia. She is a producer and executive producer with recent credits 'The Speedway Murders' Hulu (USA) and Netflix (Aus); Helen Mirren's 'Golda' (Berlin 2023); 'The Miracle Club' with Kathy Bates, Laura Linney and Maggie Smith (Tribeca 2023); sci-fi 'I Am Mother' with Hilary Swank and Rose Byrne (Sundance 2019); docudrama 'Demonic' (Cannes 2019); family drama 'Chasing Wonders' (Starz); 'Making a Mark' (Winner 2019 ADG Best Director); Scott Hicks' feature 'Highly Strung' (AFF 2016); and break-out body-image documentary 'Embrace' (SFF, NZIFF

2016) and follow-up 'Embrace Kids' (2023). As the producer of "The Speedway Murders," she has earned and continues to earn income from the film.

22. Luke Rynderman is a screenwriter and director at Suite 75, 61 Marlborough Street, Surry Hills, New South Wales 2010.

23. Adam Kamien is an Australian film director and screenwriter Suite 75, 61 Marlborough Street, Surry Hills, New South Wales 2010.

### Per Se Defamation

24. All of the following depictions that accuse the Plaintiff of capital murder are false and as such are defamation, per se. At 45:06 of "The Speedway Murders," Ginger Anderson states: "Brett Kimberlin. Brett Kimberlin is who I think is behind it all, if it's drug related, it's Brett Kimberlin." The film then segues to an unsolved murder that occurred four months earlier, with a voiceover stating that "authorities speculate that the bombings were to distract them from investigating a murder, the victim a Speedway grandmother who reportedly had threatened to blow the whistle on Kimberlin's drug dealing." The film then describes how a man had shot her while looking at items at her garage sale. Ginger Anderson then states: "Julia Scyphers was the mother of a girl that was dating Brett Kimberlin. And she didn't like the relationship and wanted her daughter to break up with Brett Kimberlin. And Brett Kimberlin didn't like that and I don't know this for sure but I think Brett Kimberlin had Bill Bowman kill Julia Scyphers. Her husband witnessed it, but he died before anything could be taken to trial."

13



25. At 46:06 in the film, a lady named Deanna Delong states: "I think he [Brett Kimberlin] is evil and he has no conscience, but I think monsters still feel and I don't think he has any feelings."

26. At 46:25, Ginger Anderson then states: "if there's anyone to be scared of, it's Brett Kimberlin, even today."

27. At 48:30 in the film, one of the teen ghost actors said that Plaintiff drove through the Burger Chef pick up window, and footage from the film showed an actor who resembled Plaintiff doing that: "Brett Kimberlin was kind of a boogey man in Speedway, a bunch of folks think that it was him who killed us, [and then holding a photo of Plaintiff next to a police sketch of a suspect she said],"he's a dead ringer for the sketch of the clean-shaven man." And the film showed her handing a burger through the window to the actor resembling Brett Kimberlin.



28. At 1:20.46 in the film a man named Tim Boyer said that Jeff Reed went to
the Burger Chef to collect a debt "owed to Brett Kimberlin ... who a lot of us were
getting marijuana at the time. While trying to collect the debt, an individual came
running at him in a threatening way Jeff in his usual fashion knocked him out and
thought he may have killed him and after doing so things began going totally
sideways and everyone's adrenaline would jump in and straight panic. He said he
put the guy in the back of the van and at this point he tried to gather his thoughts
and he sees all the people in the Burger Chef staring out the window and so in the
frantic state he was in he collects the employees and he said he stuck them in the
cooler there to kinda contain them so he could get his thoughts together about what
he was actually going to do..."  Reed ended up taking them for a ride and "hurt
[killed] the people."



29. At the end of the film, text states that the directors turned over Tim Boyer's statement to law enforcement authorities as if his false and defamatory statement amounted to an important break in the case that implicated Plaintiff in the murders. The Defendants had ample reason via their aborted work with reporter Dan Luzadder to know these assertions were false and of no value to authorities; their flagrant and cynical use of a brutal crime for their own promotion, using discredited information, and their failure to tell viewers of those contradictions, illustrates their malice and reckless disregard for the truth.

Allen Pruitt died in 2022. Despite retracting much of his 1981 statement, he remained adamant he saw Jeff Reed, Tim Willoughby and an orange van.

Jeff Reed died in 2011. Despite an exhaustive search by police and numerous reported sightings, Tim Willoughby has never been found.

The filmmakers have turned over Tim Boyer's account of Jeff Reed's confession to the Marion County Prosecutor's Office.

30. The Indiana State prosecutors never considered the information provided by Defendants Kamien and Rynderman credible and never opened an investigation based on it.

31. "The Speedway Murders" tells the viewer that Brett Kimberlin was involved directly or indirectly in five murders over four months in Speedway, Indiana in 1978. To do this, the directors used fabricated scenes, false screenwriter narratives, and false statements from people Plaintiff never knew, knew of, and never met. The directors never asked Plaintiff if he knew Tim Boyer because they knew that he did not, despite Boyer falsely stating that he bought marijuana from Plaintiff. The directors never asked if Plaintiff knew Jeff Reed because they knew that the answer would have been "no." The directors never asked Plaintiff he had ever been to the Speedway Burger Chef because they knew he had not. The Defendants, after obtaining film of the Plaintiff under false pretenses never contacted or communicated with him again.

32. The directors falsely stated that Plaintiff was dating the daughter of Julia Scyphers and that he killed her because he was afraid that Scyphers was going to blow the whistle on his marijuana dealing. This is a total fabrication to make it appear that he had a motive to kill her. Ms. Scyphers had absolutely no knowledge of any business activities involving Plaintiff and he had no motive to kill her. He was never dating her daughter, who was merely a friend of the Plaintiff. There is not and has never been a shred of evidence anywhere that Plaintiff had anything to do with that murder.

33. The directors had Ginger Anderson falsely state that Plaintiff hired Bill Bowman to murder Julia Scyphers and made the viewer think that he was never tried because Mr. Scyphers died before trial. They made this false portrayal to make it appear that Bowman and Plaintiff only got away with murder because the eyewitness died. However, Bowman had a confirmed alibi in another state when the murder occurred. Plaintiff was never considered a suspect by the police, was never questioned by the police, was never called before a grand jury, and was never charged for anything to do with the Scyphers because he had nothing to do with it. The Defendants knew or should have known with reasonable due diligence that neither Bill Bowman nor Plaintiff had anything to do with that murder, most particularly because it was publicly reported at the time. They made this false accusation in order to make it appear to the viewer that Plaintiff killed the Burger Chef employees.

18

34. The directors, by having Tim Boyer as the final person in the film falsely accuse Plaintiff of involvement in the Burger Chef murders and stating that they gave his statement to law enforcement, left the viewer believing that Plaintiff was involved with those murders. In Indiana, a person convicted of such murders would be given the death penalty.

35. Defendants Kamien and Rynderman promoted the film as solving the murders. In the media publication IndieWire.com, the headline says:

| GOT A TIP? | **Indie**Wire | NEWSLETTERS |
| --- | --- | --- |
| ≡ | NEWS  FILM  TV  AWARDS  VIDEO  FUTURE OF FILMMAKING | 🔍 |

EXCLUSIVE

## 'The Speedway Murders' Trailer: These Filmmakers May Have Finally Figured Out Who Killed the Burger Chef Teens

Documentarians Luke Rynderman and Adam Kamien handed over new evidence to the Marion County Prosecutor's Office.

In the article, it says:

> "The Speedway Murders," written (it's reenactment-heavy) and directed by Luke Rynderman and Adam Kamien, walks audiences through four divergent theories, each pretty compelling and viable in its own right. You'll want to stick around for the final one, when the filmmakers get a second-hand confession from the close friend of a now-deceased lead suspect. Rynderman and Kamien have turned over the new evidence to the Marion County Prosecutor's Office. We'll see if anything comes from it.

That final theory is set forth in the film through Tim Boyer who falsely states that the Burger Chef employees were killed over a marijuana debt owed to Plaintiff.

36. Viewers who watched "The Speedway Murders" were left with the belief that Plaintiff was involved in the murders of five people.  In fact, online reviews of the film indicate that viewers believed that Plaintiff was involved.



**Debby D Browning**
Penny Kottaridisthey bring up Brett Kimberlins name as a possible suspect in the movie. I've seen it. It was very interesting. My dad was an IPD detective at the time. Not sure if he was involved. His beat was eagledale in the mid 60s before he made detective so its a possibility. The movie doesn't shine a very good light on the investigation they did. It's a good watch.

37. In an online Question and Answer session with Defendants Kamien and Rynderman, they continued to exploit and defame Plaintiff.  In fact, they called the information from Tim Boyer "shocking" and "explosive," and said that it "is very difficult to rule any [information] completely in or out."



**Good_Difference_2837** · 1y ago

This is a nightmare of a story, and here's hoping that you do the victims some form of justice. This is an off-the-wall question, but because the Burger Chef murders occurred around the same time and exact place: Have you explored any connections to the Speedway Bombings?

⊖  ⬆ 3 ⬇    ◯ Reply    Q Award    ↗ Share    ⋯

**SpeedwayMurdersMovie** OP · 1y ago

We have. We interviewed Brett Kimberlin who was convicted of the Speedway Bombings for the film

⊖  ⬆ 5 ⬇    ◯ Reply    Q Award    ↗ Share    ⋯

 **SpeedwayMurdersMovie** OP · 1y ago

Our aim was for the drama elements to complement the unscripted parts. Our characters are there so the audience can get a sense of the kind of people they were (that was really important to us), but also to deliver information

Our hope is that someone somewhere has some information that can really change the face of the investigation

The most shocking thing was the information we got from the new witness we found. I don't want to spoil the film for people, but it was explosive in our view

We worked closely with the families to make sure our characters were as faithful as possible. We kept them abreast of the approach and they've been really supportive. We hope everyone sees the film, but ultimately, theirs are the only opinions that matter to us

Theresa (Ruth Shelton's sister) and retired detective Jim Cramer are the two that stand out, but there were so many others who were so generous with their time

 ⇧ 9 ⇩     ◯ Reply     ⌂ Award     ⬈ Share     ⋯

 **SpeedwayMurdersMovie** OP · 1y ago

We present the evidence as we found it. We'd prefer for people to make up their own minds. I'm not trying to avoid the question, but part of what makes this case interesting is just how much compelling information there is. It's very difficult to rule any completely in or out. We still talk about it endlessly, riffing about scenarios and hypotheticals

⇧ 4 ⇩     ◯ Reply     ⌂ Award     ⬈ Share     ⋯

38.  Because Defendants knew that Plaintiff was not involved with the murders, there was no reason whatsoever to accuse him directly or indirectly of being involved in those murders other than to help promote the film at Plaintiff's expense. Defamatory statements are not "compelling information." By stating that it is "very difficult for rule any [information] completely in or out," these Defendants validated the film's defamatory statements and imputations.

39.  Plaintiff was never a suspect in the Burger Chef murders, was never questioned by the police, was never investigated, was never called before any grand jury, and was never charged in the case. Plaintiff did not know any of the victims in

21

that case or any of their friends or relatives, or anyone portrayed, interviewed or named in the film. The Defendants knew or should have known with reasonable due diligence that Plaintiff had nothing to do with the Burger Chef murders.

40. Defendants falsely accused Plaintiff of murders in order to get more views and sales. As Netflix stated in a recent 10-K filed with the SEC: "If we do not grow as expected . . . operations may be adversely impacted. If we are unable to successfully compete with current and new competitors in providing *compelling content*, retaining our existing members and attracting new members, our business will be adversely affected. Netflix 10-K at p. 4 (emphasis added). To ensure that Netflix continued to meet its shareholders' "growth expectations" and to satisfy its desperate need for "compelling content," Netflix and the other Defendants maliciously defamed Plaintiff.

**FIRST CAUSE OF ACTION**

**DEFAMATION *PER SE***

41. In the film, "The Speedway Murders," the Defendants in various capacities, falsely and repeatedly accused Plaintiff, either directly, indirectly or in concert with others, of the murders of five people. There is not a single shred of evidence to support these false claims.

42. These false statements were viewed millions of times on Defendants' streaming and distribution services. In addition, Defendants Kamien and Rynderman repeated these false claims while promoting the film on YouTube and elsewhere.

43. The millions of viewers who watched "The Speedway Murders" reasonably understood that the statements made about Plaintiff portrayed him as a dangerous and twisted killer. The Defendants failed to use reasonable care to determine the whether these statements were truthful. Defendants' wrongful conduct accusing him of capital crimes was a substantial factor in causing harm to Plaintiff's reputation, and caused shock, shame, ridicule, mortification, and damage to Plaintiff. Defendants' wrongful conduct was done with malice and evil intent and constitutes defamation *per se*. The statements of Defendants Kamien and Rynderman promoting the film confirmed the per se defamation because they falsely said Plaintiff was implicated in the murders and that the false Tim Boyer statements were "shocking," "explosive," and "compelling."

44. Accordingly, Plaintiff has been seriously damaged reputationally, mentally and emotionally. Said damages, exceed $50 million. In addition, because Defendants' conduct was so outrageous, Plaintiff seeks punitive damages in an amount that will punish Defendants from ever engaging in similar conduct and an amount and that will deprive Defendants of all benefit, financial or otherwise, of their defamatory statements.

## SECOND CAUSE OF ACTION

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

45. Defendants' conduct herein was extreme and outrageous with the intention of causing, or recklessly disregarding the probability of causing, emotional distress to Plaintiff. Defendants' conduct was "extreme and outrageous" as defined under

23

Maryland law as behavior that is beyond the bounds of normal decency, is atrocious and utterly shocking to a reasonable person and "completely violate human dignity." The Defendants falsely accused Plaintiff of multiple counts of capital murder in which the death penalty is the punishment. This is so shocking that it is beyond the pale in a civilized society.

46. Plaintiff's severe and extreme emotional distress was directly and proximately caused by Defendants' outrageous conduct. Such conduct was intended to inflict injury on Plaintiff and was done with knowledge that injury would result to Plaintiff. Plaintiff has been seriously damaged reputationally, mentally and emotionally. Said damages exceed $50 million.

47. In addition, because Defendants' conduct was so outrageous, Plaintiff seeks punitive damages in an amount that will punish Defendants from ever engaging in said conduct and deprive them of all benefit, financial or otherwise, of their outrageous conduct, in an amount believed to be in excess of an additional $20 million.

## THIRD CAUSE OF ACTON

## NEGLIGENCE

48. Defendants owed Plaintiff a duty of care to accurately represent him in "The Speedway Murders" which they billed and promoted as film to solve murders that occurred in Speedway, Indiana in 1978. Defendants breached their duty of care by lying repeatedly about Plaintiff and falsely accusing him of capital murder. Defendants further breached their duty of care by having ghost actors read scripts

written by Defendants Kamien, Rynderman and Vincent stating that Plaintiff killed them, and by having a ghost, Ginger Anderson and Tim Boyer falsely state that Plaintiff was a murderer. Defendants' further breached their duty by having a ghost hold Plaintiff's photo next to a sketch of a murder suspect and saying they had an uncanny resemblance and then having an actor resembling Plaintiff drive a car through the Burger Chef pick up window. Defendants breached their duty by using video taken of Plaintiff in 2018 for one purpose, to be used for the entirely different and sinister purpose of accusing him of capital murder. All of these actions were intended to leave the viewer with the belief that Plaintiff was a murderer.

49. As a result of Defendants' breaches, Plaintiff has been severely damaged. Since being falsely accused of five unsolved murders, Plaintiff has experienced among other things intense panic, fear, anxiety, sleeplessness, and despair. Plaintiff is more mindful of his security and has become inhumanly cautious. It was foreseeable to the Defendants in this day and age of online information that false allegations of capital murder would cause these damages. This is a case of barbarous and outrageous conduct intended to cause Plaintiff mental and emotional distress. Plaintiff has suffered severe emotional distress as a result of Defendants' negligence.

## FOURTH CAUSE OF ACTION
## GROSS NEGLIGENCE

50. Defendants' acts, when viewed objectively from any reasonable person's standpoint, involved an extreme risk considering the probability and magnitude of

potential harm to Plaintiff, especially in today's political and societal atmosphere. Each of the Defendants had actual subjective awareness of the risk involved, but nevertheless proceeded in conscious indifference to the rights, safety, and/or welfare of Plaintiff. As such, each of the Defendants' actions constitute gross negligence.

51. Plaintiff has been seriously damaged reputationally, mentally and emotionally by Defendants' gross negligence. Said damages exceed $20 million.  In addition, because Defendants' conduct was so outrageous, Plaintiff seeks punitive damages in an amount that will punish Defendants from ever engaging in said conduct and deprive them of all benefit, financial or otherwise, of their outrageous conduct, an amount believed to be in excess of an additional $50 million.

## FIFTH CAUSE OF ACTION
## INVASION OF PRIVACY

52. Defendants used Plaintiff's identity and likeness for commercial advantage without his consent, resulting in injury to Plaintiff. At all times Defendants knew that they did not have permission to use Plaintiff's identity or likeness for commercial purposes.

53. Defendants Kamien and Rynderman used a classic bait and switch move to deceive Plaintiff into allowing them to film him by falsely stating that they were investigating his wrongful conviction.  It was only because of this that he agreed to give them an 18-month exclusive to his story.  A month later, they optioned an entirely different story to Defendant Vincent without telling Plaintiff and without

getting permission to use his identity and likeness for commercial purposes in that different story. The release Plaintiff signed was for a film about his wrongful conviction and the release used the words "my story" with a title, "The Speedway Series." There is not a single word in the agreement about any crimes of murder. Then, after Plaintiff signed the release and appeared on video, these Defendants changed the name to "The Speedway Murders" and had nothing in the film about the evidence of his wrongful conviction. Moreover, they knowingly kept Plaintiff completely in the dark after he signed the release agreement, and intentionally concealed all of their work from Plaintiff for the next five and a half years. Plaintiff's exclusive to Defendants Kamien and Rynderman did not give them carte blanche to use his footage in any way they wanted, and it did not extend past 18 months, and it did not grant them the right to sell or convey his likeness to another party for use in a different movie that was released five and a half years later. These Defendants maliciously breached their duty to Plaintiff by acting with malice, deception, subterfuge, and wrongful intent to invade his privacy.

54. There is a direct connection between the use of Plaintiff's identity and likeness, and Defendants' commercial purposes. Plaintiff has suffered mental anguish caused by the unauthorized use of his identity and likeness without his permission in "The Speedway Murders."

55. Plaintiff is entitled to recover, and Defendants are each liable for, damages suffered by Plaintiff, including without limitation, profits from the unauthorized use

of his identity and likeness in the film. Maryland courts recognize the common law appropriation invasion of privacy tort.

## SIXTH CAUSE OF ACTION

## FRAUDULENT MISREPRESENTATION

56. Defendants Kamien and Rynderman used lies, deception and misrepresentations to induce him to sign the agreement allowing them to film him and to sign the 18-month exclusive for "my story." Within weeks after getting that footage and release agreement, they optioned a completely different film with a different title to Defendants Vincent and Southern Light Alliance Films and then had no contact with Plaintiff over the next five-plus years while they created the false narratives in "The Speedway Murders." Plaintiff never would have allowed the Defendants to film him or signed an agreement with these Defendants had they informed him that the film was not about his wrongful conviction. He never would have agreed to be part of a film where ghosts and ignorant people he did not know would accuse him of capital murder.

57. Defendants Kamien and Rynderman intentionally misrepresented their plans and the intended film to induce Plaintiff to sign a release agreement and allow the Defendants to film him. Plaintiff relied on those misrepresentations and would not have signed the agreement or allowed filming absent the misrepresentations.

28

58. Defendants Vincent, Disney+, Hulu, Apple TV+ and the other Defendants never conducted any due diligence to determine what Defendants Kamien and Rynderman told Plaintiff in order to get his footage and the signed release. Either Defendants Kamien and Rynderman told them about their fraudulent misrepresentation which would make them complicit, or they lied which would make them negligently liable.

59. Plaintiff has been seriously damaged reputationally, mentally and emotionally by Defendants' fraudulent misrepresentations. The Defendants used footage of him obtained through fraudulent misrepresentations to put him in a film seen by millions of people to accuse him of the capital murder of five people. Said damages exceed $20 million. In addition, because Defendants' conduct was so outrageous, Plaintiff seeks punitive damages in an amount that will punish Defendants from ever engaging in said conduct and deprive them of all benefit, financial or otherwise, of their outrageous conduct, an amount believed to be in excess of an additional $100 million.

## EXEMPLARY DAMAGES

60. The acts complained of herein and in the preceding paragraphs above were done willfully, unlawfully, maliciously, and in wanton disregard of the rights and feelings of Plaintiff and by reason thereof, Plaintiff demands punitive and compensatory damages.

## JURY DEMAND

61. Plaintiff requests a trial by jury on all claims.

29

## PRESERVATION NOTICE

62. Plaintiff requests that Defendants preserve any and all related evidence, reports, statements, notes, emails, text messages, communications, concerning the allegations herein. Defendants' failure to preserve relevant evidence may warrant a spoliation instruction at trial which creates a presumption that if the evidence was preserved, it would weigh against the respective party.

## PRAYER FOR RELIEF

63. WHEREFORE, Plaintiff requests a judgment against Defendants as follows:

A. Judgment against Defendants for actual damages, the sum to be determined at trial, but is believed to exceed $50 million;

B. Judgment against Defendants for compensatory damages in the maximum amount allowed by law, in an amount to exceed $50 million, including mental anguish, and loss of enjoyment of life;

C. Judgment against Defendants for all profits from "The Speedway Murders," in the maximum amount allowed by law, in an amount to exceed $50 million;

D. Judgment against Defendants for punitive damages in the maximum amount allowed under law, and believed to exceed $100 million;

E. Pre-judgment interest at the legally prescribed rate from the date of the violations until judgment as well as post-judgment interest as applicable;

F. Any other general relief to Plaintiff is just entitled.

Dated: May 28, 2025.

Brett Kimberlin

30