## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| BRETT KIMBERLIN,<br><br>       Plaintiff,<br><br>  v.<br><br>HULU, INC., DISNEY+ INC., NETFLIX, NETFLIX AUSTRALIA, APPLE TV+, UMBRELLA HOME ENTERTAINMENT, ANNA VINCENT, SOUTHERN LIGHT ALLIANCE FILMS PTY LTD., ADAM KAMIEN, and LUKE RYNDERMAN<br><br>       Defendants. | No. 8:25-cv-02389 |

**MEMORANDUM OF POINTS AND AUTHORITIES OF DEFENDANTS HULU, LLC, THE WALT DISNEY COMPANY, INC., NETFLIX, INC., NETFLIX AUSTRALIA PTY. LTD., AND APPLE INC. IN SUPPORT OF THEIR <u>MOTION TO DISMISS</u>**

DAVIS WRIGHT TREMAINE LLP
Nathan Siegel (#11169)
1301 K Street NW
Suite 500 East
Washington, D.C. 20005
(202) 973-4237
nathansiegel@dwt.com

Amanda B. Levine (*pro hac vice*)
Ryan Hicks (*pro hac vice*)
1251 Avenue of the Americas, 21st Floor
New York, NY 10020
(212) 489-8230
amandalevine@dwt.com
ryanhicks@dwt.com

*Attorneys for Defendants Hulu, LLC, The Walt Disney Company, Inc., Netflix, Inc., Netflix Australia Pty. Ltd., and Apple Inc.*

## TABLE OF CONTENTS

Page

I.     INTRODUCTION ...................................................................................................... 1

II.    STATEMENT OF FACTS ........................................................................................ 3

   A.   Plaintiff Brett Kimberlin and the 1978 Speedway Crime Spree ......................... 3

   B.   The U.S. Distributor Defendants License the Documentary .............................. 5

   C.   The Documentary ................................................................................................. 8

   D.   The Current Lawsuit .......................................................................................... 10

III.   ARGUMENT ........................................................................................................... 10

   A.   THIS COURT LACKS PERSONAL JURISDICTION OVER THE U.S. DISTRIBUTOR
        DEFENDANTS ................................................................................................... 10

      1.   There Is No General Jurisdiction Over These Defendants ........................... 11

      2.   There Is No Specific Jurisdiction Over These Defendants ........................... 12

         a.   The U.S. Distributor Defendants Did Not Manifest an Intent to Target Maryland .. 13

         b.   Plaintiff's Residence Cannot Confer Specific Jurisdiction ...................... 16

   B.   PLAINTIFF FAILS TO PLEAD A DEFAMATION CLAIM AGAINST THE U.S.
        DISTRIBUTOR DEFENDANTS ...................................................................... 17

      1.   Plaintiff Is a Limited-Purpose Public Figure ............................................... 18

         a.   The Speedway Crime Spree Is a Public Controversy .............................. 19

         b.   Plaintiff Played a Significant Role in This Public Controversy ............... 20

      2.   Plaintiff Does Not Plausibly Plead Actual Malice ....................................... 21

   C.   PLAINTIFF'S TAG-ALONG CLAIMS ALSO FAIL ...................................... 24

      1.   Plaintiff Fails to Plead IIED ......................................................................... 25

      2.   Plaintiff Fails to Plead Negligence .............................................................. 27

      3.   Plaintiff Fails to Plead Invasion of Privacy ................................................. 27

      4.   Plaintiff Fails to Plead Fraudulent Misrepresentation ................................. 29

IV.   CONCLUSION ........................................................................................................ 30

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Adewami v. Arise Media Inc. (Nigeria)*,
  2024 WL 3161746 (D. Md. June 25, 2024) ............................................................................. 16

*AdvanFort Co. v. Int'l Registries, Inc.*,
  2015 WL 2238076 (E.D. Va. May 12, 2015), *amended by*, 2015 WL 4254988 (E.D. Va. July
  13, 2015) ................................................................................................................................... 4

*AdvanFort Co. v. Maritime Executive, LLC*,
  2015 WL 4603090 (E.D. Va. July 28, 2015) ........................................................................... 23

*Agyapong v. Loud Silence Media LLC*,
  2022 WL 21827624 (E.D. Va. Mar. 21, 2022) ........................................................................ 22

*Alexander v. Avenue*,
  473 F. Supp. 3d 551 (E.D. Va. 2020) ...................................................................................... 15

*ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*,
  293 F.3d 707 (4th Cir. 2002) ................................................................................................... 12

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ............................................................................................................ 22, 23

*Barnhart v. Pasiano Publ'ns, LLC*,
  457 F. Supp. 2d 590 (D. Md. 2006) ......................................................................................... 29

*Besen v. Parents & Friends of Ex-Gays, Inc.*,
  2012 WL 1440183 (E.D. Va. Apr. 25, 2012) ............................................................... 19, 20, 22

*Boladian v. UMG Recordings, Inc.*,
  123 F. App'x 165 (6th Cir. 2005) ............................................................................................ 24

*Bose Corp. v. Consumers Union of U.S., Inc.*,
  466 U.S. 485 (1984) ................................................................................................................. 17

*Bradacs v. Haley*,
  58 F. Supp. 3d 499 (D.S.C. 2014) .............................................................................................. 4

*Bristol-Myers Squibb Co. v. Super. Ct. of Cal.*,
  582 U.S. 255 (2017) ................................................................................................................. 11

*Brown v. Bd. of Educ. of Prince George's Cty.*,
  2022 WL 888424 (D. Md. Mar. 25, 2022) ............................................................................... 22

*Brown v. Showtime Networks, Inc.*,
    394 F. Supp. 3d 418 (S.D.N.Y. 2019)......................................................................................28

*Burger King Corp v. Rudzewicz*,
    471 U.S. 462 (1985)....................................................................................................11, 12

*Carr v. Forbes, Inc.*,
    259 F.3d 273 (4th Cir. 2001) ......................................................................................19, 20

*Chaiken v. VV Publ'g Corp.*,
    119 F.3d 1018 (2d Cir. 1997).............................................................................................14

*Chapin v. Knight-Ridder, Inc.*,
    993 F.2d 1087 (4th Cir. 1993) ..........................................................................................18

*Cubby, Inc. v. CompuServe, Inc.*,
    776 F. Supp. 135 (S.D.N.Y. 1991) ....................................................................................24

*Daimler AG v. Bauman*,
    571 U.S. 117 (2014)...........................................................................................................11

*Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*,
    472 U.S. 749 (1985)...........................................................................................................22

*Edwards v. Schwartz*,
    378 F. Supp. 3d 468 (W.D. Va. 2019) ...............................................................................19

*Elliot v. HBO Home Entm't Corp.*,
    2024 WL 5119283 (E.D. Mo. Sept. 30, 2024).....................................................................15

*Fairfax v. CBS Broad. Inc.*,
    534 F. Supp. 3d 581 (E.D. Va. 2020), *aff'd*, 2 F.4th 286 (4th Cir. 2021)...........................8, 22

*Fairfax v. CBS Corp.*,
    2 F.4th 286 (4th Cir. 2021) ................................................................................................22

*Faltas v. State Newspaper*,
    928 F. Supp. 637 (D.S.C. 1996), *aff'd*, 155 F.3d 557 (4th Cir. 1998).....................................23

*Fertel v. Davidson*,
    2013 WL 6842890 (D. Md. 2013) ......................................................................................13

*Fielding v. Hubert Burda Media, Inc.*,
    415 F.3d 419 (5th Cir. 2005) .............................................................................................14

*Food Lion, Inc. v. Cap. Cities/ABC, Inc.*,
    194 F.3d 505 (4th Cir. 1999) .............................................................................................25

*Fornshill v. Ruddy*,
   891 F. Supp. 1062 (D. Md. 1995), *aff'd*, 89 F.3d 828 (4th Cir. 1996) ...................................18

*Freyd v. Whitfield*,
   972 F. Supp. 940 (D. Md. 1997) ...........................................................................................18

*Frome v. Renner*,
   1997 WL 33308718 (C.D. Cal. Oct. 1, 1997) ........................................................................30

*Garrison v. Louisiana*,
   379 U.S. 64 (1964) .................................................................................................................22

*Gertz v. Robert Welch, Inc.*,
   418 U.S. 323 (1974) .........................................................................................................18, 22

*Gilmore v. Jones*,
   370 F. Supp. 3d 630 (W.D. Va. 2019) ...................................................................................20

*Goldstein v. Chestnut Ridge Volunteer Fire Co.*,
   218 F.3d 337 (4th Cir. 2000) .................................................................................................27

*Goodyear Dunlop Tires Ops., S.A. v. Brown*,
   564 U.S. 915 (2011) ...............................................................................................................11

*Hanks v. Wavy Broad., LLC*,
   2012 WL 405065 (E.D. Va. Feb. 8, 2012) .............................................................................22

*Harte-Hanks Commc'ns v. Connaughton*,
   491 U.S. 657 (1989) ...............................................................................................................24

*Harvey v. CNN*,
   520 F. Supp. 3d 693 (D. Md. 2021) ..........................................................................8, 19, 23

*Horton v. Cullen*,
   2024 WL 4169976 (D. Md. Sept. 12, 2024) ..........................................................................27

*Hussy v. Hous. Auth. of Balt. City*,
   2018 WL 1947049 (D. Md. Apr. 24, 2018) ...........................................................................26

*Hustler Magazine, Inc. v. Falwell*,
   485 U.S. 46 (1988) .................................................................................................................25

*Interphase Garment Sols., LLC v. Fox Television Stations, Inc.*,
   566 F. Supp. 2d 460 (D. Md. 2008) ......................................................................................25

*La Luna Enters., Inc. v. CBS Corp.*,
   74 F. Supp. 2d 384 (S.D.N.Y. 1999) .....................................................................................30

*Lerman v. Flynt Distrib. Co.*,
    745 F.2d 123 (2d Cir. 1984)................................................................................24

*Malone v. Breggin*,
    726 F. Supp. 3d 555 (W.D. Va. 2024) .................................................................15

*Marcone v. Penthouse Int'l. Mag. For Men*,
    754 F.2d 1072 (3d Cir. 1985)..............................................................................19

*Masson v. New Yorker Mag., Inc.*,
    501 U.S. 496 (1991)............................................................................................22

*Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*,
    674 F.3d 369 (4th Cir. 2012) ..............................................................................23

*McCullough v. Gannett, Co.*,
    2023 WL 3075940 (E.D. Va. Apr. 25, 2023) ......................................................22

*Moldea v. N.Y. Times Co.*,
    22 F.3d 310 (D.C. Cir. 1994)..............................................................................25

*Monge v. Univ. of Pa.*,
    674 F. Supp. 3d 195 (E.D. Pa. 2023) ..................................................................19

*Noonan v. Winston Co.*,
    135 F.3d 85 (1st Cir. 1998)..................................................................................14

*Olukoya v. Sowore*,
    2019 WL 3501567 (D. Md. Aug. 1, 2019) ..........................................................25

*Parisi v. Sinclair*,
    774 F. Supp. 2d 310 (D.D.C. 2011).....................................................................24

*Prince v. Intercept*,
    634 F. Supp. 3d 114 (S.D.N.Y. 2022)..................................................................19

*Reuber v. Litton Indus., Inc.*,
    1986 WL 3370 (D. Md. Mar. 14, 1986)...............................................................26

*Ruffin-Steinback v. dePasse*,
    82 F. Supp. 2d 723 (E.D. Mich. 2000), *aff'd*, 267 F.3d 457 (6th Cir. 2001), *aff'd*, 257 F.3d
    457 (6th Cir. 2001)..............................................................................................28

*Saudi v. Northrop Grumman Corp.*,
    427 F.3d 271 (4th Cir. 2005) ..............................................................................12

*Schiller v. Viacom, Inc.*,
    2016 WL 9280239 (S.D. Fla. Apr. 4, 2016) ........................................................19

*Smith v. California*,
   361 U.S. 147 (1959) ................................................................................................24

*Snyder v. Phelps*,
   562 U.S. 443 (2011) ................................................................................................27

*St. Amant v. Thompson*,
   390 U.S. 727 (1968) ................................................................................................22

*Stover v. O'Connell Assocs., Inc.*,
   84 F.3d 132 (4th Cir. 1996) ...................................................................................11

*Tani v. Washington Post*,
   2009 WL 8652384 (D. Md. June 18, 2009), *aff'd*, 352 F. App'x 792 (4th Cir. 2009) ............25

*Virtuality L.L.C. v. Bata Ltd.*,
   138 F. Supp. 2d 677 (D. Md. 2001) .......................................................................13

*Walden v. Fiore*,
   571 U.S. 277 (2014) ................................................................................................16

*Wharton v. Columbia Pictures Indus., Inc.*,
   907 F. Supp. 144 (D. Md. 1995) ............................................................................26

*Williams v. Newsweek, Inc.*,
   63 F. Supp. 2d 734 (E.D. Va. 1999), *aff'd* 202 F.3d 262 (4th Cir. 1999) ................28

*Yehuda v. Montgomery Cty., MD*,
   2025 WL 1237355 (D. Md. Apr. 29, 2025) ...........................................................27

*Young v. New Haven Advoc.*,
   315 F.3d 256 (4th Cir. 2002) ...................................................................11, 13, 16

**State Cases**

*Batson v. Shiflett*,
   325 Md. 684 (1992) ................................................................................................26

*De Havilland v. FX Networks, LLC*,
   21 Cal. App. 5th 845 (2018) ...................................................................................28

*Gourdine v. Crews*,
   405 Md. 722 (2008) ................................................................................................30

*Hamilton v. Ford Motor Credit Co.*,
   66 Md. App. 46 (1986) ...........................................................................................26

*Harris v. Jones*,
   281 Md. 560 (1977) ................................................................................................25

*Homsy v. King World Ent., Inc.*,
    1997 WL 52154 (Tex. Ct. App. Feb. 6, 1997) ........................................................................ 30

*Lawrence v. A.S. Abell Co.*,
    299 Md. 697 (1984) ............................................................................................................... 28

*Lohan v. Take-Two Interactive Software, Inc.*,
    31 N.Y.3d 111 (2018), *aff'd*, 31 N.Y.3d 988 (2018) .............................................................. 28

*Mixer v. Farmer*,
    215 Md. App. 536 (2013) ....................................................................................................... 26

*Nails v. S & R, Inc.*,
    334 Md. 398 (1994) ............................................................................................................... 29

*Patton v. U.S. Rugby Football*,
    381 Md. 627 (2004) ............................................................................................................... 27

*Phillips v. Wash. Mag., Inc.*,
    58 Md. App. 30 (1984) ........................................................................................................... 22

*Piscatelli v. Van Smith*,
    424 Md. 294 (2012) ............................................................................................................... 17

*Raskin v. Swann*,
    216 Ga. App. 478 (1995) ....................................................................................................... 30

*Tripoli v. Boston Herald-Traveler Corp.*,
    359 Mass. 150 (1971) ............................................................................................................ 19

**Federal Statutes**

28 U.S.C. § 1332 ........................................................................................................................... 10

**Rules**

Fed. R. Civ. P. 12(b)(6) ................................................................................................................... 4

**Constitutional Provisions**

U.S. Const. amend. I ................................................................................................... 18, 25, 28, 29

**Other Authorities**

AFF 2023, *Adelaide Film Festival 18-19 Oct. 2023,* available at*:* https://www.adelaide
    filmfestival.org/about/archive/aff-2023 .................................................................................... 6

Defendants Hulu, LLC (incorrectly sued as "Hulu, Inc.") ("Hulu"), The Walt Disney Company, Inc. (incorrectly sued as "Disney+ Inc.") ("Disney"), Netflix, Inc. (incorrectly sued as "Netflix"), Netflix Australia Pty. Ltd. (incorrectly sued as "Netflix Australia") (together with Netflix, Inc., "Netflix"), and Apple Inc. (incorrectly sued as "Apple TV+") ("Apple") (collectively, the "U.S. Distributor Defendants") respectfully submit this memorandum of law in support of their joint motion to dismiss the Amended Complaint ("AC").

## I.     INTRODUCTION

This lawsuit arises out of *The Speedway Murders*, a documentary that recounts the unsolved murder of four teenagers who worked at a fast-food restaurant chain (Burger Chef) in Speedway, Indiana in 1978 (the "Documentary").  As the Documentary explains, the Burger Chef murders were part of a notorious crime spree in Speedway, which included a series of bombings and another unsolved murder.  One eight-minute segment of the 100-minute Documentary discusses Plaintiff, who was convicted of the bombings and has long been the subject of public discussion concerning the crime spree.

Plaintiff now brings this lawsuit against almost a dozen entities and persons with any alleged connection to the Documentary, treating them all as if they were one.  That includes the U.S. Distributor Defendants, whose relationship to the Documentary is no more than that of a bookstore to any one of the books on its shelves.  Plaintiff's claims against the U.S. Distributor Defendants fail at the outset for at least three reasons.

*First*, this Court lacks personal jurisdiction over each U.S. Distributor Defendant.  Because none of these Defendants is incorporated in Maryland or has its principal place of business here, the Court cannot exercise general jurisdiction.  Further, none of the U.S. Distributor Defendants manifested an intent to target Maryland, as is required for the Court to exercise specific

jurisdiction. None of the U.S. Distributor Defendants had any involvement in creating the Documentary; each one merely licensed it for distribution after it had already been released. Netflix merely made the Documentary available for subscribers in Australia and New Zealand and, thus, no one in Maryland can even watch the Documentary on Netflix. Apple listed the Documentary to buy or rent in its Apple TV app, and *fewer than fifty individuals* with Maryland billing addresses bought or rented it. Hulu simply placed the Documentary on its streaming service, making it available to all Hulu subscribers nationally, with no conduct aimed at Maryland. Nor does the Documentary itself ever mention Maryland; it focuses entirely on events in Indiana. The only tie this case has to Maryland is that Plaintiff now resides here. Under well-established jurisdictional principles, that is insufficient for this Court to exercise jurisdiction over the U.S. Distributor Defendants.

*Second*, the AC fails to adequately plead a defamation claim against the U.S. Distributor Defendants. Plaintiff is a public figure for purposes of this case because he thrust himself into public debate over a long-standing controversy. The 1978 Speedway crime spree has long been an on-going public controversy, and even today continues to be the subject of news coverage. Plaintiff has for decades thrust himself into the center of this issue, publicly proclaiming his innocence in newspaper and magazine articles, television interviews and even a full-length biography, and alleging that he was framed by the criminal justice system.

As a public figure, to plead a defamation claim, Plaintiff is required to plausibly plead that each Defendant acted with "actual malice"—*i.e.*, knowledge that the challenged statements were false or a high-degree of awareness of their probable falsity—which is a burden Plaintiff does not, and cannot possibly, meet. It is well-settled that distributors of books and films have no duty to investigate the content of each one of the thousands of books, films, or other publications they

2

distribute.  And, even if distributors did have such a duty (which they do not), allegedly failing to investigate is legally insufficient to plead actual malice.  Accordingly, the AC fails to plausibly plead a defamation claim against the U.S. Distributor Defendants.

*Third*, Plaintiff's tag-along claims for intentional infliction of emotional distress ("IIED"), negligence, gross negligence, invasion of privacy, and fraud fail because they are little more than a defamation claim in disguise and because they independently lack merit as a matter of law.

For all of these reasons, the claims against the U.S. Distributor Defendants should be dismissed with prejudice.

## II.    STATEMENT OF FACTS

### A.  Plaintiff Brett Kimberlin and the 1978 Speedway Crime Spree

Plaintiff spent seventeen years in prison after being convicted of the "Speedway bombings"—a series of eight bombings in Speedway, Indiana in 1978.  *See* AC ¶ 1.  The bombings proved to be the second event in the "four[-]month Speedway crime spree" in 1978.  *Id*. ¶ 2  Previously, a grandmother named Julia Scyphers was murdered at her home.  *Id*. at 2-3; ¶¶ 13, 32.  A few months after the bombings, four teenagers who worked at a Burger Chef fast-food restaurant were abducted and murdered.  *Id*.

The notorious Speedway crime spree has long been the subject of public attention and controversy.  That is especially so because neither the Burger Chef nor Scyphers murders were ever solved, and Plaintiff has long maintained that he was wrongfully convicted of the bombings.  *Id*. ¶ 1.  As the record demonstrates, the media has extensively reported on the crimes, both at the time they were committed and since.  *See* Declaration of Nathan Siegel ("Siegel Declaration")

Exs. A-R.[1]  Indeed, an article in the *Chicago Reader* claimed that, by 1983, "260 newspaper stories and numerous broadcast news reports had already appeared on the Scyphers killing, the bombings, [and] the Burger Chef murders," as well as on Plaintiff's prior drug arrest.  *See id.* Ex. A.

To this day, the local news media in Indiana continues to air and publish reports discussing the crimes, and law enforcement authorities provide updates.  *See e.g., id.* Exs. B-Q.  In 2017, *The Indianapolis Star* reported that, "[a]lmost four decades later," there was still a detective assigned to the Burger Chef murders, "the case [wa]s still being debated."  *See id.* Ex. F.  More recently, numerous true crime podcasters have also explored it.  *See id.* Ex. H.  Media coverage has often included harsh criticism of local law enforcement for their handling of the case.  *See id.* Exs. F-G.

 Once Plaintiff was arrested for the bombings in 1979, there was immediate public discussion about his possible involvement in the other Speedway crimes.  For example, the media reported heavily on a theory that Plaintiff committed the bombings to distract from the Scyphers murder.  *See id.* Exs. A at 32; I; K at 113.  Bill Bowman, a reported associate of Plaintiff's, was arrested for the Scyphers murder.  *Id.* Ex. I; *see also id.* Ex. A at 9.  Following these arrests, local newspapers reported that police were "probing for possible connections" between the Scyphers murder, the Speedway bombings, and the Burger Chef murders.  *See id.* Ex. I.  *The Indianapolis Star* juxtaposed photos of Plaintiff and Bowman with composite sketches of the individuals wanted for questioning in connection with the Burger Chef murders.  *See id.*  Neither Plaintiff nor Bowman was ultimately charged with that crime.

---

[1] The Court can take judicial notice of media articles on a motion to dismiss under Rule 12(b)(6) not "for the truth of what is reported" therein but "for facts such that a fact was printed, or . . . that a fact was widely known."  *Bradacs v. Haley*, 58 F. Supp. 3d 499, 511 (D.S.C. 2014); *see also AdvanFort Co. v. Int'l Registries, Inc.*, 2015 WL 2238076, at *10 n.10 (E.D. Va. May 12, 2015) ("A court may take judicial notice of newspaper articles at the motion to dismiss stage when the articles discuss the subject matter of the case."), *amended by*, 2015 WL 4254988 (E.D. Va. July 13, 2015).

Since his conviction for the bombings, Plaintiff has vigorously and publicly maintained his innocence of any wrongdoing, claiming the FBI framed him as the bomber after previously arresting him for drug trafficking and that his trial was "marked by gross police misconduct, perjured testimony, planted evidence, [and] a spiked jury." AC ¶ 1; *see also* Siegel Decl. Exs. A at 9, 32, 33, 35; P. At least one major daily newspaper published Plaintiff's jailhouse letter proclaiming his innocence. *See id.* Ex. J. As part of his campaign, Plaintiff built relationships with multiple journalists, with Plaintiff even referring to himself as a "media mogul."[2] Another investigative reporter was so taken with Plaintiff's story that he spent the better part of a decade extensively interviewing Plaintiff, conducting research, and then writing about Plaintiff's battle with the criminal justice system—first in a lengthy profile in *The New Yorker* and subsequently in a 1996 biography entitled *Citizen K: The Deeply Weird American Journey of Brett Kimberlin*. *See* Siegel Decl. Ex. L.

In addition to making his case in the media, Plaintiff has also sought to use the courts to advance his cause, filing dozens of lawsuits against journalists, federal agents, witnesses, and attorneys to further make his case that he was wrongfully convicted. *See* Siegel Decl. Ex. M. And, after he was released from prison, Plaintiff founded two non-profit organizations through which he continues to further what he says is his mission of correcting government corruption and advancing civil rights, working with "whistleblowers, social media, law enforcement officials, and members of Congress" to shed light on the issue. *Id.* Ex. S; *see also id.* Exs. N and T.

## B.  The U.S. Distributor Defendants License the Documentary

---

[2] *See* Siegel Decl. Ex. K at 62; L at 9 ("By 1992, [Kimberlin] had acquired considerable skill at dealing with the press. There were times when he seemed impelled by a belief that there was no such thing as enough publicity; at other times, he would in a peremptory way decline interview requests"); Ex. R (while in prison, Plaintiff "checked in [with the newspaper] by pay phone," and relayed latest developments in his appeal of his convictions in the Speedway bombings).

*The Speedway Murders* is a 100-minute Documentary directed by Defendants Adam Kamien and Luke Rynderman and produced by Defendant Anna Vincent through her production company, Defendant Southern Light Alliance Films Pty Ltd., all of whom are Australian residents. *See* AC ¶¶ 21-23.  On October 20, 2023, the Documentary was screened at the Adelaide Film Festival in Australia.[3]  On June 21, 2024, the Documentary debuted in select theaters across the United States.  AC ¶ 7.  The completed Documentary was also licensed to media distribution companies, including the U.S. Distributor Defendants via film distribution companies Defendant Umbrella Home Entertainment ("Umbrella") and non-party Vertical Entertainment, LLC ("Vertical").

Like many content providers, the U.S. Distributor Defendants distribute hundreds of movies, documentaries, television programs, and other audiovisual content to the public on the Internet.  But that content becomes available to the public in quite different ways.  At times, each Defendant commissions and/or produces original content.  *See* Declaration of Vitto Lazatin ¶ 6; Declaration of Jamie Glinsky ¶ 9; Declaration of Miguel Sanqui ¶ 7.  If they do, may have some involvement in the production of their original content. *See* Lazatin Decl. ¶ 6; Glinsky Decl. ¶ 9; Sanqui Decl. ¶ 7.

But more often, each U.S. Distributor Defendant simply licenses pre-existing content that was produced by others, which they do not modify.  *See* Lazatin Decl. ¶ 7; Glinsky Decl. ¶ 7; Sanqui Decl. ¶ 8.  For example, anyone wanting to watch episodes of the hit NBC television series *The Office* may also access it on Hulu or Amazon Prime Video as a subscriber or buy it on demand on the Apple TV app.  Often, such content is licensed from third-party distribution companies in

---

[3] *See* AFF 2023, *Adelaide Film Festival 18-19 Oct. 2023,* available at*:* https://www.adelaide filmfestival.org/about/archive/aff-2023.

bulk.  In other words, a single licensing agreement may cover multiple different films and programs.  *See* Lazatin Decl. ¶ 7; Glinsky Decl. ¶ 7; Sanqui Decl. ¶ 8.  That is how each U.S. Distributor Defendant came to distribute *The Speedway Murders.  See* Lazatin Decl. ¶ 7; Glinsky Decl. ¶ 12; Sanqui Decl. ¶ 8.

Netflix is a subscription streaming service.  *See* Lazatin Decl. ¶ 5.  Netflix Australia operates the Netflix service in Australia and New Zealand.  *Id.* ¶ 4.  Netflix licensed the Documentary and other titles from Defendant Umbrella via a September 3, 2024 amendment to an earlier licensing agreement.  *Id.* ¶ 9.  Notably, the amendment limited the Documentary's distribution territory to only Australia and New Zealand.  *Id.* ¶ 10.  As a result, Netflix has never made *The Speedway Murders* available to U.S. subscribers, including any subscribers in Maryland.  *Id.* ¶ 11.

Apple runs the Apple TV app, an application that allows users to watch, rent, or buy television shows and movies on demand.  *See* Glinsky Decl. ¶ 6.  Third-party distributor Vertical (as well as Umbrella, for purposes of distribution in Australia and New Zealand) entered into distribution agreements with Apple, pursuant to which they distribute their catalogues of content on the Apple TV app in different territories.  *Id.* ¶¶ 11-12.  The Documentary was made available on the Apple TV app in the United States on June 21, 2024.  *Id.* ¶ 13.  As of the time this lawsuit was filed, the Documentary had only been rented or purchased forty-eight times by persons with Maryland credit card billing addresses.  *Id.* ¶ 15.  Apple separately has a subscription streaming service, Apple TV+, through which it streams its Apple Originals.  *Id.* ¶ 9.  The Documentary was never made available for streaming Apple's subscription streaming service and was not an Apple Original.  *Id.* ¶ 14.

Hulu is a subscription streaming service.  Sanqui Decl. ¶ 5.  On April 15, 2024, Hulu

entered into an agreement with Vertical pursuant to which Hulu licensed eight titles, including the Documentary. *See id.* ¶ 10. Under this agreement, Hulu made the Documentary available to subscribers anywhere in the United States. *See id.* ¶ 10. According to Hulu's records, as of the date this lawsuit was filed, only 1.2% of users who accessed the Documentary had Maryland addresses. *See id.* ¶ 14.

Because the Documentary was licensed as a completed film to each of the U.S. Distributor Defendants, they had no involvement in researching, developing, producing, or creating it. *See* Lazatin Decl. ¶ 12; Glinsky Decl. ¶ 16; Sanqui Decl. ¶ 12.

### C. The Documentary

At its outset, the Documentary describes Speedway as a "sleepy little suburb" that was "rocked by crime" in 1978. *See* Siegel Decl. Ex. O at 05:10.[4] The Documentary interviews local detectives assigned to investigate the Burger Chef murders, who explain that various theories have emerged as to who could be responsible for the killings. As one former detective noted, "[a]ll these theories are out there and at one time had validity. But the reason they all exist is there was a lot of crazy shit going on in Indianapolis in 1978." *Id.* at 14:19. The Documentary then examines four different theories, using interviews, archival footage, and actors playing ghosts of the victims to explore each theory's relative merits.

One theory—featured in an eight-minute segment titled "The Speedway Bomber"— discusses Plaintiff. *See* Siegel Decl. Ex. O at 41:21-49:51. The segment begins by playing

---

[4] A copy of the Documentary is attached hereto as Exhibit O to the Siegel Declaration; a physical copy will be filed with the Court. The Court can consider the contents of the Documentary on this Motion because it is incorporated by reference into the AC. *See Harvey v. CNN*, 520 F. Supp. 3d 693, 709 (D. Md. 2021); *Fairfax v. CBS Broad. Inc.*, 534 F. Supp. 3d 581, 585 n.2 (E.D. Va. 2020) (complaint in defamation action incorporates challenged broadcast where, as here, it "references and cites" that broadcast), *aff'd*, 2 F.4th 286, 295 (4th Cir. 2021).

8

historical news footage, which explains that in September 1978 there was a series of bombings in Speedway. *Id.* at 42:22. The Documentary then explores whether Plaintiff might have also committed the Burger Chef murders. It interviews a local reporter who explains that Plaintiff was in the "background" of the case because his bombing crimes were "so off the wall and didn't make any sense" in the same way that the Burger Chef murders "didn't make any sense." *Id.* at 44:45.

The Documentary then plays additional historical news footage, which states, "authorities speculate the bombings were to distract them from investigating the murder" of a grandmother, Julia Scyphers, who "reportedly had threatened to blow the whistle on Kimberlin's drug dealing." *Id.* at 45:10. In accordance with this news report, a local resident, Gillian Anderson, speculates that she "do[esn't] know this for sure" but she "thinks" Plaintiff had Brett Bowman kill Scyphers. *Id.* at 45:31. While this interview is occurring, the screen displays newspaper articles that recount these theories. *Id.*

The Documentary then turns to excerpts from an interview with Plaintiff, in which he unequivocally denies any involvement in anything, stating:

> I had absolutely nothing to do with the Speedway bombings. I did not commit them. I did not build them. I did not manufacture them. I did not detonate them. I had absolutely nothing do with the death of Julia Scyphers. I had nothing to do with the Burger Chef murders at all. I did not know those people. I'd never been to that Burger Chef at all. That's just flat-out fact. It was police putting this garbage lies, false narrative, fake news as they call it nowadays into the media. And they had my pictures with stories involving the Burger Chef murders and somehow saying that I was involved. It was like 'Twilight Zone.'

*See id.* at 47:36. While Plaintiff appears to be interviewed at his home, its location is incidental and is not identified in the Documentary. Interspersed with Plaintiff's interview is other news footage, which reinforces that Plaintiff has continually maintained his innocence. *See id.* Ultimately, the segment concludes with an actor playing one of the Burger Chef victims identifying "problems" with the theory of Plaintiff's involvement, including that Plaintiff would have no

motive for the crime.  *See id.* at 48:33-49:51.

The Documentary mentions Plaintiff only one other time.  In the last theory explored, in a segment titled, "The Forty Year Old Secret," the Documentary interviews a man named Tim Boyer.  Boyer claims that his friend, Jeff Reed, confessed to the Burger Chef murders.  *Id.* at 01:17:10.  Boyer claims that Reed went to the Burger Chef on the night of November 17 to collect money owed to Plaintiff for the sale of marijuana.  *Id.* at 01:20:29.  Boyer never claims that Reed carried out the murders at Plaintiff's behest or that Plaintiff even knew anything about the murders. Rather, according to Boyer, the murders occurred spontaneously as the result of one of the victims threatening Reed.  *Id.*

### D. The Current Lawsuit

On May 28, 2025, Plaintiff filed this lawsuit in the Circuit Court for Montgomery County, Maryland.  *See* ECF No. 1-1.  On May 30, 2025, Plaintiff filed the AC, which brings claims against the U.S. Distributor Defendants as well as the Documentary's directors, producers, and an Australian distributor (collectively, "Defendants").  *See* ECF No. 4.  In the AC, Plaintiff alleges the same six claims against all Defendants based on the same set of alleged facts.  On July 22, 2025, the U.S. Distributor Defendants, with the consent of the remaining Defendants, removed the case to this Court under 28 U.S.C. § 1332.  *See* ECF No. 1.  This Motion follows.

## III.    ARGUMENT

### A.  THIS COURT LACKS PERSONAL JURISDICTION OVER THE U.S. DISTRIBUTOR DEFENDANTS

As a threshold matter, the Court should dismiss this action against these Defendants because it cannot exercise personal jurisdiction over them.  "Because the limits of Maryland's statutory authorization for the exercise of personal jurisdiction are coterminous with the limits of the Due Process Clause, the statutory inquiry necessarily merges with the constitutional inquiry,

and the two inquiries essentially become one." *Stover v. O'Connell Assocs., Inc.*, 84 F.3d 132, 135–36 (4th Cir. 1996). The inquiry asks whether the defendant "has sufficient minimum contacts with [the forum] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Young v. New Haven Advoc.*, 315 F.3d 256, 261 (4th Cir. 2002).

Personal jurisdiction based on minimum contacts can be either "general" or "specific." General jurisdiction exists only where a defendant has "continuous and systematic" contacts that "render [it] essentially at home in the forum State." *Goodyear Dunlop Tires Ops., S.A. v. Brown*, 564 U.S. 915, 919 (2011). Specific jurisdiction, on the other hand, requires a showing that "the defendant has 'purposefully directed' his activities at residents of the forum and the litigation results from alleged injuries that arise out of or relate to those activities." *Burger King Corp v. Rudzewicz*, 471 U.S. 462, 472 (1985). Each defendant's conduct must be analyzed separately and individually. *See Bristol-Myers Squibb Co. v. Super. Ct. of Cal.*, 582 U.S. 255, 268 (2017).

Here, exercising jurisdiction over any of the U.S. Distributor Defendants would "offend traditional notions of fair play and substantial justice," as none of these Defendants is "at home" in Maryland or took any action targeted at Maryland in connection with the Documentary.

### 1.    There Is No General Jurisdiction Over These Defendants

As the U.S. Supreme Court has explained, "[o]nly a limited set of affiliations with a forum will render a defendant amenable to all-purpose jurisdiction there." *Daimler AG v. Bauman*, 571 U.S. 117, 139 (2014). For a corporation, "the place of incorporation and principal place of business are paradigm . . . bases for general jurisdiction." *Id.* at 137; *see also Goodyear*, 564 U.S. at 925 (explaining the only time the Court found general jurisdiction outside a corporation's place of incorporation or principal place of business is when the corporation effectively moved its headquarters to the forum state on a temporary basis during World War II).

Here, Plaintiff cannot come close to meeting these stringent requirements. Hulu is a

Delaware limited liability company with its principal place of business in California.  *See* ECF No. 13.  None of Hulu's members is incorporated or has its principal place of business in Maryland. *Id*.  Disney and Netflix are both Delaware corporations with their principal places of business in California.  *See* ECF No. 10; Lazatin Decl. ¶ 3.  Netflix Australia is an Australian corporation with its principal place of business in New South Wales, Australia.  Lazatin Decl. ¶ 4.  And Apple is a California corporation with its principal place of business in California.  Glinsky Decl. ¶ 4. Accordingly, this Court cannot exercise general jurisdiction over any U.S. Distributor Defendant.

### 2. There Is No Specific Jurisdiction Over These Defendants

There is similarly no basis for the Court to exercise specific jurisdiction.  To establish specific jurisdiction, a plaintiff must show that "the defendant has 'purposefully directed' his activities at residents of the forum and the litigation results from alleged injuries that 'arise out of or relate to' those activities." *Burger King,* 471 U.S. at 472–73; *see also Saudi v. Northrop Grumman Corp.*, 427 F.3d 271, 276 (4th Cir. 2005) ("A court may exercise specific jurisdiction 'when the cause of action arises out of the defendant's contacts with the forum.'") (internal quotations omitted).  Specific jurisdiction is thus only proper when "(1) [t]he defendant 'purposefully avail[ed]' itself of the privilege of conducting activities in the State; (2) [t]he plaintiffs' claims arise out of those activities directed at the State; and (3) [t]he exercise of personal jurisdiction would be constitutionally 'reasonable.'" *ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*, 293 F.3d 707, 712 (4th Cir. 2002).

In the context of media content available on the Internet, the Fourth Circuit has recognized that specific jurisdiction may be based on "an out-of-state person's Internet activity directed at [the forum state] and causing injury that gives rise to a potential claim cognizable in [that state]." *ALS Scan*, 293 F.3d at 711.  Critically, however, the mere "act of placing information on the Internet is not sufficient by itself to subject[ ] that person to personal jurisdiction in each State in which the

information is accessed." *Young*, 315 F.3d at 263. Were it otherwise, "a person placing information on the Internet would be subject to personal jurisdiction in every State, and the traditional due process principles governing a State's jurisdiction over persons outside of its borders would be subverted." *Id.*; *Virtuality L.L.C. v. Bata Ltd.*, 138 F. Supp. 2d 677, 684–85 (D. Md. 2001) (the possibility of "nationwide jurisdiction over . . . anyone who posts a web page" is "alarming") (internal quotations omitted). Thus, when examining specific jurisdiction based upon online content, courts ask whether the publisher "manifested an intent to direct their website content" to an audience in the state. *Young*, 315 F.3d at 263.

In *Young*, for example, the Fourth Circuit held that a Virginia District Court could not exercise specific jurisdiction over newspapers that posted articles online that were accessible in Virginia. The court explained, "[s]omething more than posting and accessibility is needed to indicate that the [newspapers] purposefully (albeit electronically) directed [their] activity in a substantial way to the forum state[]." *Id.* at 263. The complained-of articles "reported on and encouraged a public debate in Connecticut" and "Connecticut, not Virginia, was the focal point of the articles." *Id* at 264. The newspapers thus "did not post materials on the Internet with the manifest intent of targeting Virginia readers." *Id.* Importantly, the Court held there was no personal jurisdiction even though the plaintiff was a Virginia resident and the events involving the plaintiff that the article reported about occurred in Virginia. *Id.*; *see also Fertel v. Davidson*, 2013 WL 6842890, at *4 (D. Md. 2013) (refusing to exercise specific jurisdiction when there was "nothing in [defendant's] internet posts to suggest that they were meant for a Maryland audience, as opposed to a national or even a global audience").

      a.      **The U.S. Distributor Defendants Did Not Manifest an Intent to Target Maryland**

Here, as in *Young*, none of these Defendants made the Documentary available online with

the specific intention of targeting Maryland viewers.  As to Netflix and Netflix Australia, the Documentary was not even available in the United States—only in Australia and New Zealand. *See* Lazatin Decl. ¶ 11.  Clearly, if no Maryland viewer could watch the Documentary on Netflix, then Netflix necessarily could not have manifested an intent to target Maryland.

Apple, in turn, simply placed the Documentary on its Apple TV app, where it could be bought or rented by any individual in the United States along with thousands of other titles.  *See* Glinsky Declaration ¶ 13.  Thus, there is no evidence that Apple intended to target a Maryland audience, as opposed to a national audience.  Moreover, only *48 individuals* with Maryland billing addresses bought or rented the Documentary through Apple as of the date this case was filed.  *See id.* ¶ 15.  So even if mere availability on the Internet might suffice to confer jurisdiction (which it does not), this is far too insubstantial a distribution to establish jurisdiction over Apple.  *See Fielding v. Hubert Burda Media, Inc.*, 415 F.3d 419, 426 (5th Cir. 2005) (finding purposeful distribution in Texas of 70 copies of newspaper by one defendant and 60 copies by another was insufficient to establish personal jurisdiction); *Noonan v. Winston Co.*, 135 F.3d 85, 91 (1st Cir. 1998) (no personal jurisdiction over libel claim where only 305 copies of magazine at issue circulated in forum state; court recognized, "[t]his small distribution, by itself, does not merit a finding that Massachusetts was the focal point of the events in question"); *Chaiken v. VV Publ'g Corp.*, 119 F.3d 1018, 1029 (2d Cir. 1997) (rejecting jurisdiction over Israeli newspaper where sales in state were a "tiny fraction of its total circulation[,]" explaining, "[w]e doubt that four copies per day, or even the 183 copies of the Sunday edition, constitute the 'substantial number of copies' that makes it fair to exercise jurisdiction over a non-resident publisher").

Hulu made the Documentary available for streaming to members of its subscription service, which include subscribers in every state.  *See* Sanqui Decl. ¶ 13.  Simply placing the

Documentary on Hulu, where it could reach citizens across the United States, is conduct aimed at a national audience, not a Maryland audience. And, of all the Hulu subscribers who streamed the Documentary, only 1.2% were located in Maryland. *See id.* ¶ 14.

In this way, the present case resembles *Malone v. Breggin*, 726 F. Supp. 3d 555 (W.D. Va. 2024). There, the plaintiff brought a defamation lawsuit stemming from allegedly false statements that the defendants published on their websites, including in paid subscription radio and Internet shows. The plaintiff alleged that personal jurisdiction existed in Virginia courts because he was a Virginia citizen and defendants "publish[ed] false and defamatory statements into Virginia to subscribers and users who pa[id]" for the "unlawful content." *Id*. at 559. The court disagreed. It explained, "[n]othing in the Complaint or in [the] briefing supports that Defendants intended to purposefully direct in a substantial way their electronic activity toward Virginia, or to target and focus on Virginia readers." *Id*. at 562. It noted that the defendants' websites and broadcasts focused on "national rather than Virginia-specific issues" and were "not designed to attract or serve a Virginia audience." *Id*. at 563. And that there were subscribers in Virginia did not "show anything other than that these messages and statements were merely posted and accessible online in Virginia—as well as anywhere else in the world—which is insufficient to support a showing of specific personal jurisdiction." *Id.*; *see also Alexander v. Avenue*, 473 F. Supp. 3d 551, 558 (E.D. Va. 2020) (refusing to exercise specific personal jurisdiction in defamation action because "Adweek's Virginia subscribership—1.2 percent of its paid subscribers—is random, fortuitous, and attenuated given that . . . Adweek caters to a 'nationwide marketplace of consumers'"); *Elliot v. HBO Home Entm't Corp.*, 2024 WL 5119283, at *6-7 (E.D. Mo. Sept. 30, 2024) (refusing to exercise specific jurisdiction over HBO in defamation action stemming from documentary series available to subscribers in Missouri). Here too, simply placing the Documentary on the Hulu

15

service is not purposefully directing activity to Maryland, specifically.

> **b.**    **Plaintiff's Residence Cannot Confer Specific Jurisdiction**

In the AC, Plaintiff does not plead why a Maryland court can exercise jurisdiction over any of the Defendants.  In the case caption, however, Plaintiff indicates that he lives at a Maryland address and thus is presumably a Maryland citizen.  *See* AC p.1.  But Plaintiff's location alone cannot create personal jurisdiction over the U.S. Distributor Defendants, as it is well-established that non-resident defendants do not open themselves up to suit in a state simply by publishing content online about a state resident.  *Young*, 315 F.3d at 261-62.  In other words, "the plaintiff cannot be the only link between the defendant and the forum[,]" and a "mere injury to a forum resident is not a sufficient connection to the forum."  *Walden v. Fiore*, 571 U.S. 277, 289–90 (2014).

Consistent with *Young,* this principle was recently applied in *Adewami v. Arise Media Inc. (Nigeria)*, 2024 WL 3161746 (D. Md. June 25, 2024).  There, a pastor of a church headquartered in Maryland sued a Nigerian news organization for libel stemming from a news report, available online, which claimed the pastor was "charging congregants . . . to grant them a fly to heaven." *Id.* at *1.  The court held that it lacked personal jurisdiction over the news organization because "the mere fact that the information was available on the Internet is not sufficient to demonstrate targeting" Maryland.  *Id.* at *4.  It explained that the "thrust and content" of the publication was not targeted to a Maryland audience as it "never once mentions the State of Maryland."  *Id.*  And while the plaintiff alleged he suffered injuries in Maryland, this was not enough to establish specific jurisdiction—"although the place that the plaintiff feels the alleged injury is plainly relevant to the [jurisdictional] inquiry, it must ultimately be accompanied by the defendant's own [sufficient minimum] contacts with the state if jurisdiction . . . is to be upheld."  *Id.*

Here, too, while Plaintiff may now reside in Maryland, nothing about the Documentary is

targeted at Maryland.  As indicated by the title itself, the Documentary is focused on crimes in Speedway, Indiana and their lasting impact on that community.  Although Plaintiff was interviewed for the Documentary (presumably at his home in Maryland), none of the U.S. Distributor Defendants had anything to do with that interview, which, according to the AC, was conducted by Kamien and Rynderman in 2018—six years before the U.S. Distributor Defendants licensed the completed Documentary.  *See* AC ¶ 2; Lazatin Decl. ¶ 12; Glinsky Decl. ¶ 13; Sanqui Decl. ¶ 12.  Moreover, only two minutes of that interview appear in the Documentary, the interview discusses events in Indiana, and the interview never mentions Maryland.  *See* Siegel Decl. Ex. O at 46:34.

At bottom, none of the U.S. Distributor Defendants would have any reason to believe that—merely by licensing a documentary focused entirely on crime in Indiana for distribution either across the entire United States (in the case of Hulu and Apple) or in Australia and New Zealand (in the case of Netflix)—they would be subject to a lawsuit in Maryland.  Accordingly, because this Court cannot exercise jurisdiction over the U.S. Distributor Defendants, the AC should be dismissed as to them.

### B. PLAINTIFF FAILS TO PLEAD A DEFAMATION CLAIM AGAINST THE U.S. DISTRIBUTOR DEFENDANTS

Even if this Court could exercise personal jurisdiction over any of the U.S. Distributor Defendants, Plaintiff's defamation claim against these Defendants still fails as a matter of law.  To plead a defamation claim, a plaintiff "must allege specific facts establishing four elements . . . (1) that the defendant made a defamatory statement to a third person, (2) that the statement was false, (3) that the defendant was legally at fault in making the statement, and (4) that the plaintiff thereby suffered harm."  *Piscatelli v. Van Smith*, 424 Md. 294, 306 (2012).  Where the plaintiff is a public figure, the relevant fault standard is constitutional actual malice.  *Bose Corp. v. Consumers Union*

*of U.S., Inc.*, 466 U.S. 485, 511 n.30 (1984).

As the Fourth Circuit has recognized, "where the defendant is a member of the press, the plaintiff is a public figure, or the subject matter of the supposed libel touches on a matter of public concern[,]" "the constitutional protection of the press reaches its apogee." *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1092 (4th Cir. 1993). Early adjudication in such cases is therefore appropriate because even the cost of defending a meritless claim can chill First Amendment rights. *See Fornshill v. Ruddy*, 891 F. Supp. 1062, 1074 (D. Md. 1995), *aff'd*, 89 F.3d 828 (4th Cir. 1996).

Here, because Plaintiff is a limited purpose public figure and does not—and could never—plead or prove that the U.S. Distributor Defendants acted with actual malice, his defamation claim against these Defendants must be dismissed with prejudice.

### 1. Plaintiff Is a Limited-Purpose Public Figure

Plaintiff is a classic example of a limited-purpose public figure because he has sought out and received significant public attention concerning his relationship to the Speedway crime spree and what he maintains is his status as the victim of a corrupt law enforcement system.

The U.S. Supreme Court has delineated two types of "public figure" defamation plaintiffs. A general-purpose public figure is someone who has "assumed [a] role[] of especial prominence in the affairs of society." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 345 (1974). A limited-purpose public figure, by contrast, is someone who "voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues." *Id.* at 351-52. When assessing whether an individual is a limited-purpose public figure, the court must first decide whether a particular "public controversy" existed and then must determine "whether the nature and extent of the [plaintiff's] participation in the controversy was sufficient to justify public figure status." *Freyd v. Whitfield*, 972 F. Supp. 940, 943–44 (D. Md. 1997). "Whether a person has achieved the status of a limited-purpose public figure is a question of law."

*Carr v. Forbes, Inc.*, 259 F.3d 273, 278 (4th Cir. 2001).  Accordingly, courts regularly make this determination on motions to dismiss, based upon on documents, like media reports, of which the Court can take judicial notice.  *See e.g., Besen v. Parents & Friends of Ex-Gays, Inc.*, 2012 WL 1440183, at *3–5 (E.D. Va. Apr. 25, 2012) (director of non-profit advocating for LGBT rights deemed limited-purpose public figure on issue of whether one's "sexual orientation can be changed"); *Harvey,* 520 F. Supp. 3d at 724 (senior advisor to ranking member of the House Permanent Select Committee on Intelligence and former member of the National Security Council was public figure).[5]

### a.    The Speedway Crime Spree Is a Public Controversy

The Speedway crime spree that occurred between July and November 1978 is a "public controversy," defined by the Fourth Circuit as "a dispute that in fact has received public attention because its ramifications will be felt by persons who are not direct participants." *Carr*, 259 F.3d at 279.  Courts across the country have recognized that significant crimes are public controversies. *See, e.g.*, *Marcone v. Penthouse Int'l. Mag. For Men*, 754 F.2d 1072, 1083 (3d Cir. 1985) (nationwide drug trafficking operation was public controversy); *Monge v. Univ. of Pa.*, 674 F. Supp. 3d 195, 206 (E.D. Pa. 2023) (MOVE bombing was public controversy); *Schiller v. Viacom, Inc.*, 2016 WL 9280239, at *6 (S.D. Fla. Apr. 4, 2016) ("Plaintiff's kidnapping, crime, and subsequent criminal sentencing was a public controversy, as these were 'highly publicized' events subject to substantial media coverage."); *Tripoli v. Boston Herald-Traveler Corp.*, 359 Mass. 150, 156 (1971) (Plymouth mail robbery was public controversy as it "[i]nvolved a huge sum of money"

---

[5] *See also Edwards v. Schwartz*, 378 F. Supp. 3d 468, 507 (W.D. Va. 2019) (professor involved in exposing Flint, Michigan water crisis was limited purpose public figure regarding said crisis); *Prince v. Intercept*, 634 F. Supp. 3d 114, 134, 138 (S.D.N.Y. 2022) (private military contractor who wrote articles and gave interviews was limited purpose public figure regarding the issue of using private military contractors in foreign conflicts).

and "[r]eceived national attention").

Here, the more than four decades of public attention the crime spree has received reflects its lasting ramifications for the broader community. And to this day, the crime spree prompts debate and discussion about the competence and integrity of the justice system. Indeed, as of 1983, there had already been over 260 "newspaper stories and numerous broadcast news reports" about the Speedway crime spree, *see* Siegel Decl. Ex. A at 34, and, since that time, the media has continued to report on the crimes, *see id.* Exs. B-M; P. Accordingly, the Speedway crime spree is a public controversy.

<div align="center">

**b.    Plaintiff Played a Significant Role in This Public Controversy**

</div>

Plaintiff's significant role in the Speedway crime spree requires treating him as a limited-purpose public figure in this case. When determining if "the plaintiff has thrust himself into a controversy to the extent necessary to trigger limited-purpose public figure status[,]" courts in the Fourth Circuit consider whether:

> (1) the plaintiff has access to channels of effective communication, (2) the plaintiff voluntarily assumed a role of special prominence in the controversy, (3) the plaintiff sought to influence the resolution of the controversy, (4) the controversy existed prior to the publication of the defamatory statements, and (5) the plaintiff retained public figure status at the time of the alleged defamation.

*Carr*, 259 F.3d 273 at 280.

In *Besen*, for example, the court used these factors to determine that the plaintiff—the chief spokesperson for a non-profit advocacy group—was a limited purpose public figure on the issue of gay rights and equality. 2012 WL 1440183 at *4–5. As the court explained, the "very purpose" of the plaintiff's organization was to influence public opinion about a public controversy, and the plaintiff's numerous "publications" and "media appearances" meant that he had "avenues through which he could refute and counter any falsehoods or misrepresentations in [the defendant's] comments." *Id.* at *5; *see also Gilmore v. Jones*, 370 F. Supp. 3d 630, 668 (W.D. Va. 2019)

<div align="center">20</div>

(plaintiff who claimed to be defamed by characterization as a "Deep State operative" was limited-purpose public figure where he gave several interviews and wrote editorial about the controversy at issue).  Here, Plaintiff's public advocacy far eclipses what these courts deemed sufficient to establish limited purpose public figure status.

As an initial matter, the public controversy over the Speedway crime spree began decades before the Documentary was published.  Since that time, Plaintiff has regularly thrust himself into this controversy, seeking to influence public opinion about how it should be resolved, including through extensive access to the media.  *See generally* Siegel Decl. Exs. K at 62; L at 9; R.  In addition to proclaiming his innocence regarding any crime, Plaintiff has publicly held himself out as a victim of a broadly corrupt criminal justice system, which he maintains framed him for the bombings and maliciously leaked suggestions that he might be connected to the other crimes.  *See* Siegel Decl. Exs. A at 9, 32, 33; I; L at 111; P; Q.  Dubbing himself a "media mogul," as recently as a few years ago, Plaintiff gave interviews to promote his continued efforts to appeal his conviction.  *See id.* Ex. K at 62; L.  A 2012 *Salon* profile surveyed the history of Plaintiff's connections to the crime spree, described him as "fairly brilliant at self-promotion," and opined that his activism had made him "the most prominent villain of the right-wing blogosphere" at that point in time.  *See* Siegel Decl. Ex. Q.

In short, because Plaintiff has spent the last forty years inviting public scrutiny of his relationship to the Speedway crime spree and the justice system's response, and he continues to use his own experiences with that system as a launching pad for civil-rights causes more broadly, he is unquestionably a limited-purpose public figure in a lawsuit stemming from a Documentary exploring those events.

### 2.    Plaintiff Does Not Plausibly Plead Actual Malice

Limited-purpose public figures like Plaintiff can only recover for defamation upon a

showing of actual malice—*i.e.*, "[c]lear and convincing proof that the defamatory falsehood was made with knowledge of its falsity or with reckless disregard for the truth." *Gertz*, 418 U.S. at 342. "[R]eckless disregard" in this context does not mean mere negligence or even gross negligence. *Masson v. New Yorker Mag*., *Inc.*, 501 U.S. 496, 510 (1991). Indeed, it is not an objective standard at all. Rather, it means that the defendant must have actually "entertained serious doubts as to the truth of his [statement,]" *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968), or had a "high degree of awareness of [its] probable falsity[,]" *Garrison v. Louisiana*, 379 U.S. 64, 74 (1964). This is measured by what the defendant *actually* believed and not by what a "reasonably prudent man would have published, or would have investigated before publishing." *St. Amant*, 390 U.S. at 731 (emphasis added). When determining whether a defendant acted with actual malice, courts look to the defendant's state of mind at the time of the publication. *See Fairfax v. CBS Corp.*, 2 F.4th 286, 295 (4th Cir. 2021). Thus, a defendant's refusal to later retract or remove a publication is irrelevant. *Id.*

Actual malice is a "heavy burden." *Phillips v. Wash. Mag., Inc.*, 58 Md. App. 30, 35 (1984); *see also Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 768 (1985) (White, J., concurring) (actual malice standard is "exceedingly difficult to satisfy"). As a result, courts in the Fourth Circuit regularly grant motions to dismiss defamation actions for failure to plausibly plead actual malice. *See, e.g., Fairfax*, 2 F.4th at 295–96; *Brown v. Bd. of Educ. of Prince George's Cty.*, 2022 WL 888424, at *9 (D. Md. Mar. 25, 2022); *Besen,* 2012 WL 1440183 at *6; *McCullough v. Gannett, Co*., 2023 WL 3075940, at *15 (E.D. Va. Apr. 25, 2023); *Agyapong v. Loud Silence Media LLC*, 2022 WL 21827624, at *2 (E.D. Va. Mar. 21, 2022); *Hanks v. Wavy Broad., LLC*, 2012 WL 405065, at *13 (E.D. Va. Feb. 8, 2012). That is especially so since the U.S. Supreme Court's decision in *Ashcroft v. Iqbal*, 556 U.S. 662, 683 (2009), which concerned

the sufficiency of pleading facts that could plausibly establish the defendant's state of mind. Because the AC's allegations fall far short of plausibly pleading actual malice as to the U.S. Distributor Defendants, the Court should dismiss the defamation claim against them.

As an initial matter, Plaintiff merely asserts that all Defendants acted with "actual malice and reckless disregard for the truth." AC ¶ 29. But this does nothing to further Plaintiff's case for two reasons. *First*, "[s]ince the Supreme Court's decisions in *Iqbal* and *Twombly*, the Fourth Circuit has made it clear that conclusory allegations are insufficient to adequately plead knowledge of falsity or reckless disregard for the truth." *Harvey*, 520 F. Supp. 3d at 721–22. Plaintiff's claim, which is nothing more than a bare "recitation of the legal standard," *Mayfield v. Nat'l Ass'n for Stock Car Auto Racing*, *Inc*., 674 F.3d 369, 378 (4th Cir. 2012), is thus insufficient to plead actual malice as a matter of law. *Second*, "it is well established that actual malice must be proved with respect to *each* defendant." *AdvanFort Co. v. Maritime Executive, LLC*, 2015 WL 4603090, at *7 (E.D. Va. July 28, 2015); *Faltas v. State Newspaper*, 928 F. Supp. 637, 645 (D.S.C. 1996) ("Plaintiff must [] show by clear and convincing evidence that each defendant acted with actual malice."), *aff'd*, 155 F.3d 557 (4th Cir. 1998).

Here, however, Plaintiff co-mingles all ten Defendants, treating them as if they were one and the same. The AC pleads no facts that, for example, plausibly connect the U.S. Distributor Defendants to interviews with Plaintiff that purportedly occurred six years before the Documentary's distribution. Indeed, the notion that the half dozen independent media distribution companies and theater chain mentioned in the AC—including Amazon Prime Video, On Demand, and Landmark, along with the U.S. Distributor Defendants (AC ¶ 8)—all held and shared *any* state of mind (let alone actual malice) about the substance of this particular Documentary is implausible.

Indeed, the only specific allegation of actual malice that Plaintiff makes about the U.S.

Distributor Defendants is the passing allegation that they "never investigated whether Plaintiff was ever investigated, suspected or convicted of any of the murders." AC p.3. But even as a general matter, it is well-settled that "failure to investigate before publishing [without more] is not sufficient to establish reckless disregard." *Harte-Hanks Commc'ns v. Connaughton*, 491 U.S. 657, 688 (1989). This rule is applied even more forcefully in cases, like this one, involving distributor defendants. As courts have repeatedly held, "[t]he national distributor of hundreds of periodicals has no duty to monitor each issue of every periodical it distributes." *See e.g.*, *Lerman v. Flynt Distrib. Co.*, 745 F.2d 123, 139 (2d Cir. 1984). Holding otherwise would impose an "onerous" burden on a distributor and "could potentially have a chilling effect upon protected speech because retailers, in an abundance of caution, might stop selling some categories of artistic products . . . to avoid liability." *Boladian v. UMG Recordings, Inc.*, 123 F. App'x 165, 169 (6th Cir. 2005); *see also Parisi v. Sinclair*, 774 F. Supp. 2d 310, 319 (D.D.C. 2011) ("[B]y restricting [the bookseller] the public's access to reading matter would be restricted.") (quoting *Smith v. California*, 361 U.S. 147, 153 (1959)). Today, online platforms are the "functional equivalent of a more traditional news vendor." *Cubby, Inc. v. CompuServe, Inc.*, 776 F. Supp. 135, 140 (S.D.N.Y. 1991). Thus, any allegation that the U.S. Distributor Defendants did not investigate the content of the Documentary would be insufficient to plead actual malice as a matter of law.

For these reasons, Plaintiff has not plausibly pled—nor could he—that any U.S. Distributor Defendant acted with actual malice. Plaintiff's defamation claim against these Defendants should therefore be dismissed with prejudice.

### C.  PLAINTIFF'S TAG-ALONG CLAIMS ALSO FAIL

The AC's remaining claims for IIED, negligence, gross negligence, invasion of privacy, and fraud fare no better. *See* AC ¶¶ 45-59.

As a threshold matter, courts have consistently held that a plaintiff may not avoid the legal

24

requirements of defamation by re-styling the claim as another tort. *See, e.g., Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 56 (1988) (courts may not permit plaintiffs, through creative pleading, to invoke other torts as end-run around requirements of defamation law); *Food Lion, Inc. v. Cap. Cities/ABC, Inc.*, 194 F.3d 505, 522 (4th Cir. 1999) (rejecting plaintiff's attempt "to avoid the First Amendment limitations on defamation claims by seeking publication damages under non-reputational tort claims"); *Moldea v. N.Y. Times Co.*, 22 F.3d 310, 319-20 (D.C. Cir. 1994) ("[A] plaintiff may not use related causes of action to avoid the constitutional requisites of a defamation claim."). Applying these principles here, because Plaintiff cannot maintain a defamation claim against the U.S. Distributor Defendants, his tag-along claims similarly fail. *See, e.g.*, *Interphase Garment Sols., LLC v. Fox Television Stations*, *Inc.*, 566 F. Supp. 2d 460, 466 (D. Md. 2008) (dismissing IIED claim based on allegedly defamatory news broadcast); *Tani v. Washington Post*, 2009 WL 8652384, at *2 (D. Md. June 18, 2009) (where defamation is alleged, "there is no separate claim for negligent publication"), *aff'd*, 352 F. App'x 792 (4th Cir. 2009); *Olukoya v. Sowore*, 2019 WL 3501567, at *8 (D. Md. Aug. 1, 2019) ("Under Maryland law, [r]egardless of whether a declaration is styled as a defamation action or an invasion of privacy action, the same considerations and legal standards apply."); *Food Lion*, 194 F.3d at 522 (fraud may not be invoked to recover damages to reputation based on allegedly false television broadcast).

Even if these tag-along claims were not barred on that basis, Plaintiff fails to plead the requisite elements of each.

### 1.    Plaintiff Fails to Plead IIED

Under Maryland law, to state an IIED claim, Plaintiff must plead and prove that the U.S. Distributor Defendants engaged in conduct that was "1) [i]ntentional or reckless[,] 2) [e]xtreme and outrageous[,] 3) [t]here must be a causal connection between the wrongful conduct and the emotional distress[,] and 4) [t]he emotional distress must be severe." *Harris v. Jones*, 281 Md.

560, 566, (1977). Each element must be pled and proven "with particularity." *Wharton v. Columbia Pictures Indus., Inc*., 907 F. Supp. 144, 146 (D. Md. 1995). Recovery for emotional distress is "meted out sparingly." *Hamilton v. Ford Motor Credit Co.*, 66 Md. App. 46, 61 (1986); *see also Mixer v. Farmer*, 215 Md. App. 536, 548 (2013) ("The tort should be used sparingly and only for opprobrious behavior that includes truly outrageous conduct."). Plaintiff does not, and cannot, meet that pleading requirement.

As to the "extreme and outrageous" element, it "is, in the first instance, for the court to determine" if the publication meets the test for outrageousness. *Batson v. Shiflett*, 325 Md. 684, 734 (1992). Here, the only conduct that Plaintiff cites as supposedly "outrageous" is that Defendants published the Documentary, which he claims falsely accused him of murder. *See* AC ¶ 45. While it does not accuse him, even if this constituted actionable defamation, it would still fall far short of the "extreme and outrageous" conduct necessary to support an IIED claim. *See Batson*, 325 Md. at 735 ("Even though we have held that petitioners' statements were defamatory, this conduct in no way satisfies our exacting standard for 'extreme and outrageous conduct.'"); *Reuber v. Litton Indus., Inc.*, 1986 WL 3370, at *13 (D. Md. Mar. 14, 1986) (holding, as a matter of law, that defendants' conduct would not "rise to the level of extreme and outrageous conduct" even assuming they had in fact leaked a false and defamatory letter with actual malice); *Hussy v. Hous. Auth. of Balt. City*, 2018 WL 1947049, at *4 (D. Md. Apr. 24, 2018) (finding conduct was not extreme or outrageous where the defendants accused the plaintiff of misconduct, which resulted in two criminal indictments). The Documentary merely recounts and explores events and theories about an important public controversy that has been around for decades. Accordingly, Plaintiff cannot meet his burden of establishing "extreme and outrageous" conduct.

Further, even if Plaintiff had adequately pled the elements of IIED, his claim would still be

barred because it violates the U.S. Supreme Court's holding in *Snyder v. Phelps*, 562 U.S. 443, 459 (2011), that speech on a matter of public concern cannot be the basis of liability for an IIED claim.  Statements related to crime and public safety are "quintessential matters of 'public concern[,]'" *Goldstein v. Chestnut Ridge Volunteer Fire Co.*, 218 F.3d 337, 353 (4th Cir. 2000), and the Documentary reports on crime in Speedway.  For this reason, too, the Court should dismiss Plaintiff's IIED claim against the U.S. Distributor Defendants.

### 2. Plaintiff Fails to Plead Negligence

To properly plead a claim for negligence or gross negligence, a plaintiff must allege facts to show: "(1) that the defendant was under a duty to protect the plaintiff from injury, (2) that the defendant breached that duty, (3) that the plaintiff suffered actual loss or injury, and (4) that the loss or injury proximately resulted from the defendant's breach of the duty." *Yehuda v. Montgomery Cty., MD*, 2025 WL 1237355, at *5 (D. Md. Apr. 29, 2025).  A "duty" is an "obligation to which the law will give recognition and effect, to conform to a particular standard of conduct toward another." *Patton v. U.S. Rugby Football*, 381 Md. 627, 636-37 (2004).

Here, Plaintiff claims that all Defendants breached their "duty of care" to accurately represent him in the Documentary.  AC ¶ 48.  But Plaintiff does not cite to any source for this "duty" and no such duty exists.  Indeed, even original content creators, like documentarians, owe no duty to the subjects of their reporting other than the requirements built into the defamation elements; otherwise, the First Amendment's restrictions on that tort would be meaningless. *See Horton v. Cullen*, 2024 WL 4169976, at *17-18 (D. Md. Sept. 12, 2024) (dismissing negligence claim based on allegedly defamatory statements where "[P]laintiff's articulation of a duty is not contemplated by law").

### 3. Plaintiff Fails to Plead Invasion of Privacy

The AC appears to allege a claim for the misappropriation branch of the tort of invasion of

privacy on the grounds that Plaintiff did not consent for his name or picture to be included in the Documentary.  This claim fails as a matter of law under both Maryland law and the First Amendment, because documentarians, biographers, journalists, historians, and others who explore real events do not need the permission of the people they discuss.  Otherwise, it would be impossible to publish anything other than self-serving versions of events authorized by the participants in those events.

"[F]reedom of speech and the press . . . transcends the right to privacy." *Lohan v. Take-Two Interactive Software, Inc*., 31 N.Y.3d 111, 120 (2018), *aff'd*, 31 N.Y.3d 988 (2018). Accordingly, the publication of news, which may include the names or likenesses of individuals without their consent, "is not appropriation." *Lawrence v. A.S. Abell Co.*, 299 Md. 697, 706 (1984).  "In fact, allowing an action simply for publication of a person's name or likeness in the news would probably be an unconstitutional violation of freedom of the press." *Id.*; *see also Williams v. Newsweek, Inc.*, 63 F. Supp. 2d 734, 735 (E.D. Va. 1999) (use of a person's name or likeness in reporting on "items that are 'newsworthy' or 'matters of public interest' . . . are not considered" to be a commercial purpose), *aff'd* 202 F.3d 262 (4th Cir. 1999).

Here, as explained in Section B.1(a), *supra*, the Documentary reports on a newsworthy topic of public interest.  For this very reason, numerous courts have dismissed claims for misappropriation (and the related right of publicity tort) targeting documentaries, docudramas, and other similar media. *See, e.g., Ruffin-Steinback v. dePasse*, 82 F. Supp. 2d 723, 731  (E.D. Mich. 2000), *aff'd*, 267 F.3d 457 (6th Cir. 2001) (no misappropriation when network aired mini-series based on lives of musical group members without their permission), *aff'd*, 257 F.3d 457 (6th Cir. 2001); *De Havilland v. FX Networks, LLC*, 21 Cal. App. 5th 845, 861 (2018) (no misappropriation for series that portrayed plaintiff as a character without permission); *Brown v. Showtime Networks,*

*Inc.*, 394 F. Supp. 3d 418, 437 (S.D.N.Y. 2019) ("Under the First Amendment, a right of publicity cause of action may not be maintained against expressive works, whether factual or fictional."). As such, the use of Plaintiff's name and likeness in the Documentary cannot support an invasion of privacy claim against the U.S. Distributor Defendants.

The AC's claims that Kamien and Rynderman used a "classic bait and switch move to deceive Plaintiff" into appearing in the Documentary, AC ¶ 53, has no bearing on this conclusion. *First*, these claims are unrelated to the U.S. Distributor Defendants, who Plaintiff does not allege were involved in procuring or conducting his interview. *Second*, for the reasons discussed above, whether Plaintiff did or did not effectively consent to appearing in the Documentary is irrelevant to his misappropriation claim because, as a matter of law, his consent was not required to refer to his name or show his picture. *Barnhart v. Pasiano Publ'ns, LLC*, 457 F. Supp. 2d 590, 596 n.4 (D. Md. 2006). Accordingly, Plaintiff's invasion of privacy claim must be dismissed as against the U.S. Distributor Defendants.

### 4. Plaintiff Fails to Plead Fraudulent Misrepresentation

Finally, to state a claim for fraudulent misrepresentation, a plaintiff must show:

(1) that the defendant made a false representation to the plaintiff, (2) that its falsity was either known to the defendant or that the representation was made with reckless indifference as to its truth, (3) that the misrepresentation was made for the purpose of defrauding the plaintiff, (4) that the plaintiff relied on the misrepresentation and had the right to rely on it, and (5) that the plaintiff suffered compensable injury resulting from the misrepresentation.

*Nails v. S & R, Inc*., 334 Md. 398, 415 (1994). Here, Plaintiff alleges that the film's directors misrepresented their purpose for seeking an interview with him, and he entered into a release based on these misrepresentations. AC ¶¶ 56-59. But these supposed misrepresentations occurred *six years* before the U.S. Distributor Defendants licensed the rights to distribute the Documentary. *See* AC ¶ 2. This allegation thus says nothing about the U.S. Distributor Defendants, who Plaintiff

admits "never talked with [him]."  AC p. 3.  Plaintiff cannot plead a fraudulent misrepresentation claim against parties that never made a representation to him in the first place, *see Gourdine v. Crews*, 405 Md. 722, 759 (2008) ("Clearly in order to sustain a cause of action based on fraud or deceit, the defendant must have made a false representation to the person defrauded.").

Moreover, courts have consistently held that allegedly being deceived into granting a media interview does not support a claim for fraud.  *See, e.g., La Luna Enters., Inc. v. CBS Corp.*, 74 F. Supp. 2d 384, 392 (S.D.N.Y. 1999) (dismissing fraud claim premised on allegation that reporter gained plaintiff's consent to film by misrepresenting nature of story); *Frome v. Renner*, 1997 WL 33308718, at *2–3 (C.D. Cal. Oct. 1, 1997) (dismissing fraud claim against reporter who allegedly obtained appointment through fraud); *Raskin v. Swann*, 216 Ga. App. 478, 479 (1995) ("[E]ven if we were to assume the allegations that the reporter deceived plaintiff and fraudulently induced him to give the interview were truthful . . . plaintiff's complaint fails to state a claim for which money damages may be awarded."); *Homsy v. King World Ent., Inc.*, 1997 WL 52154, at *5 (Tex. Ct. App. Feb. 6, 1997) (alleged fraudulent inducement of videotaped interview cannot support claim).

## IV.    CONCLUSION

For the foregoing reasons, the Court should dismiss the claims against the U.S. Distributor Defendants with prejudice.

Dated:  October 21, 2025

<div style="margin-left:40%">

Respectfully submitted,

DAVIS WRIGHT TREMAINE LLP

*/s/ Nathan Siegel*
Nathan Siegel (#11169)
1301 K Street NW, Suite 500 East
Washington, D.C. 20005
nathansiegel@dwt.com

Amanda B. Levine (*pro hac vice*)

</div>

Ryan Hicks (*pro hac vice*)
1251 Avenue of the Americas, 21st Floor
New York, NY 10020
amandalevine@dwt.com
ryanhicks@dwt.com

*Attorneys for the U.S. Distributor Defendants*