**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| BRETT KIMBERLIN,<br><br>Plaintiff,<br><br>v.<br><br>HULU, INC., *et al.*,<br><br>And<br><br>Vertical Entertainment, LLC,<br>2120 Colorado Ave, #150<br>Santa Monica, CA 90404<br><br>SERVE:<br>C/O C T CORPORATION SYSTEM<br>330 N BRAND BLVD<br>GLENDALE, California<br>90064<br><br>Defendants. | Civil Action No. 25-cv-02389-LKG |

**FIRST AMENDED COMPLAINT**[1]

COMES now Plaintiff Brett Kimberlin, through undersigned Counsel, and respectfully files this First Amended Complaint. As explained herein, Plaintiff – through the wrongful conduct of the Defendants – in and after June 2024 (and continuing to the date of the filing of this First Amended Complaint), has been falsely accused and defamed as being an alleged murderer in relation to the tragic murders of four employees of a Burger Chef restaurant in Speedway, Indiana,

[1] Plaintiff files this First Amended Complaint pursuant to Fed. R. Civ. Proc. 15(a), and is filing such as of right because he is doing so within 21 days of the filing of the Motions to Dismiss by the Defendants who have entered appearances in this case (noting that Tuesday, November 11, 2025, was a Federal holiday and this Court was closed as a result). While Plaintiff previously filed an "Amended Complaint" – such was the same Amended Complaint he had filed in the Montgomery County Circuit Court prior to the removal of this case to this Court by the Defendants. After removal occurred, Plaintiff – who was proceeding pro se at the time – re-filed the state court "Amended Complaint" in this Court (ECF No. 4). As a result, Plaintiff has not previously filed an Amended Complaint in this Court for purposes of Rule 15.

in 1978. These allegations are completely false, were made with malice, and have caused severe damage to Plaintiff and the reputation that he has worked so hard, for so many years, to rebuild. As a result thereof, Plaintiff seeks justice, to include an award of compensatory damages and punitive damages.

## INTRODUCTION

A lie is a lie even when made by a billion-dollar company with a name recognized by almost every person on the globe. Defendants The Walt Disney Company, Inc. and its affiliate Hulu, LLC, Netflix, Inc., Netflix Australia Pty. Ltd., Apple, Inc., Umbrella Entertainment Pty. Ltd., Anna Vincent, Southern Light Alliance Films, Adam Kamien, and Luke Rynderman lied when they falsely portrayed Plaintiff Brett Kimberlin as a murderer of five people and/or when they published such lies with malice and/or in a negligent manner and otherwise engaged in the wrongful, tortious conduct set forth herein. Defendants Adam Kamien and Luke Rynderman, the creative directors of a documentary film called "The Speedway Murders," created these lies to promote their ambition; to build a portfolio as documentary filmmakers; to attract large numbers of viewers; and to make substantial profits, commercially and personally.

Plaintiff is not a public figure or a limited public figure.

Each of the Defendants, while acting with malice (i.e., with knowledge the statements at issue were false or with reckless disregard for the truth of such) or, at a minimum, with negligent disregard for the truth of the false statements contained in the docudrama at issue, orchestrated and/or agreed to publish these lies – and are continuing to do so as of the date of the filing of this First Amended Complaint - with complete disregard for the life and livelihood of Plaintiff, an innocent person, and in doing so, have caused him to suffer severe damage. People who have watched the film have contacted him and his family in shock at the allegations and Plaintiff has suffered opprobrium. The Defendants knew and had reason to believe that Plaintiff would be damaged as a result of the false and defamatory statements in their film, yet they released the film in order to gain viewers and money. Moreover, as explained herein, since at least the date when this lawsuit was filed (or shortly thereafter), upon learning of it and Plaintiff's allegations of

defamation and other wrongful conduct by the Defendants, certain of the Defendants have continued to publish the defamatory docudrama at issue, including but not limited to their subscribers in Maryland. Such conduct by those Defendants has not merely been passive in nature but rather, actively undertaken with the knowledge that Plaintiff lives and works in Maryland and further, with knowledge that the interview of Plaintiff shown in the docudrama (which was obtained by certain of the Defendants Rynderman and Kamian under false pretenses) was filmed at Plaintiff's home, in Maryland. Certain of the Defendants have continued to profit from the ongoing, daily publication of this defamatory material, to the great detriment and harm of Plaintiff.

As a result, Plaintiff seeks justice for the wrongful acts and damage that he has endured, **w**hich are continuing to this day.

**PARTIES**

1. The Walt Disney Company, Inc. ("Disney) is a Delaware corporation with its principal place of business in California. Disney owns Disney+ and as well as Hulu, LLC ("Hulu"). Upon information and belief, Disney retains full control over the content that is shown to its subscribers through the Disney+ and/or through Hulu.

2. Apple, Inc. ("Apple") is a California corporation with its principal place of business in California. Apple owns Apple TV+ as well as its application (Apple TV+). Apple, through Apple TV+ and its application for Apple TV+, upon information and belief, have thousands of subscribers who live and work in Maryland and earn millions of dollars in annual revenue from such customers. Further, upon information and belief, Apple TV+ earned revenue of approximately $2.2 billion in 2023, and Apple earned approximately $391 billion in revenue in 2024. Apple, either through Apple TV+ (subscription service for residential customers) or through the Apple TV+ application is continuing to publish – on a daily basis – "The Speedway Murders", to include to its paying customers who live and work in Maryland. Upon information and belief, Apple retains full control over the content of what is shown to its subscribers and viewers through its Apple TV+ application.

3. Netflix, Inc. ("Netflix"), which is a Delaware corporation with its principal place of business in California, and it owns Netflix Australia Pty. Ltd. ("Netflix Australia"). Netflix Australia is an Australian corporation with its principal place of business in New South Wales, Australia. Netflix, Inc. (along with other Netflix-owned entities) contracted with Umbrella Entertainment Pty. Ltd. For licensing rights to distribute The Speedway Murders through Netflix Australia, in Australia (and other territories outside the United States). Netflix, Inc. also contracted with Vertical Entertainment for licensing rights to distribute The Speedway Murders to its viewers within the United States, however, Plaintiff understands that to date, Netflix, Inc., has not distributed the docudrama through its streaming service that would be available to viewers in the United States. Upon information and belief, Netflix, Inc., profits heavily from the services provided to viewers through Netflix Australia (with revenues in excess of $1 billion annually) and Plaintiff submits that such would include revenue generated from viewers who have viewed The Speedway Murders. Upon information and belief, Netflix, Inc., retains full control over the content of what is shown to subscribers and viewers through Netflix Austrailia.

4. Disney, to include through Disney + and Hulu, upon information and belief, earns billions of dollars in revenue from customers throughout the United States, to include customers who live and work in Maryland. Plaintiff understands that Hulu alone generated $11.2 billion in revenue in 2023, primarily from its streaming platform. Further, upon information and belief, over 43 million people subscribe to Hulu, to include at least many thousands of people who live and work in Maryland. Disney, through Hulu, upon information and belief, earn at least millions of dollars annually in revenue from customers who live and work in Maryland. Disney, through Hulu, is continuing to publish – on a daily basis – the defamatory docudrama at issue ("The Speedway Murders"), to include to its paying customers who live and work in Maryland.

7. Umbrella Entertainment Pty. Ltd. ("Umbrella") is located at Unit 18, 71 Victoria Crescent, Abbotsford VIC 3067 Australia. Umbrella distributes films primarily in Australia

and it is currently distributing "The Speedway Murders" in Australia and upon information and belief, it is receiving significant revenue therefrom. Plaintiff also understands that Umbrella's distribution of The Speedway Murders is not solely limited to Australia, because:

- On the listing for The Speedway Murders on Umbrella's website, it has a tab that says "Watch Now." From that tab, four options appear for streaming platforms to use to watch the docudrama: Fletch; Apple TV; Google Play; and Prime Video (i.e., Amazon Prime). Some or all of these streaming platforms are available to viewers in the United States, to include persons who live in Maryland.
- Additionally, on the page on Umbrella's website for The Speedway Murders, viewers are presented with the option to watch the trailer for the docudrama by clicking on an icon on the screen – image of the docudrama; once done, the viewer can then watch the trailer on Umbrella's YouTube page (at no charge); this is available to viewers in the United States, including persons who live in Maryland.
- The Speedway Murders is available for sale on Amazon.com, at this link: https://www.amazon.com/s?k=Speedway+Murders&crid=X4XWG0WC25DE&sprefix=speedway+murders%2Caps%2C102&ref=nb_sb_noss_2

  Upon information and belief, Umbrella has contracted with Amazon to sell The Speedway Murders through Amazon's website (as part of Amazon Prime).
- The Speedway Murders is also promoted by Umbrella on YouTube, as it featured the Trailer for the docudrama at this link (which indicates that 32,000 views of such occurred): https://www.youtube.com/watch?v=eEZ0UuDK8RM
- Additionally, Umbrella's YouTube page has some 172,000 subscribers.

  In each instance, in relation to the accessibility of The Speedway Murders on Umbrella's You Tube channel, it is available to viewers in the United States, including to persons who live in Maryland.

8. Anna Vincent[2] is a film producer based in Adelaide, Australia. Her film company, Southern Light Alliance Films Pty Ltd ("Southern Light"), is located in Adelaide, Australia. She is a producer and executive producer with recent credits, to include: 'The Speedway Murders' Hulu (USA) and Netflix (Aus); Helen Mirren's 'Golda' (Berlin 2023); 'The Miracle Club' with Kathy Bates, Laura Linney and Maggie Smith (Tribeca 2023); sci·fi. 'I Am Mother' with Hilary Swank and Rose Byrne (Sundance 2019); docudrama 'Demonic' (Cannes 2019); family drama 'Chasing Wonders' (Starz); 'Making a Mark' (Winner 2019 ADG Best Director); Scott Hicks' feature 'Highly Strung' (AFF 2016); and break-out body-image documentary 'Embrace' (SFF, NZIFF 2016) and follow-up 'Embrace Kids' (2023). As the producer of "The Speedway Murders," she has earned and continues to earn income from the film (the amount of which, upon information and belief, is substantial).

9. Luke Rynderman[3] is a screenwriter and director at Suite 75, 61 Marlborough Street, Surry Hills, New South Wales 2010. Defendant Rynderman, along with Defendant Kamien, directed The Speedway Murders. Defendant Rynderman, along with Defendant Kamien, filmed The Speedway Murders in the United States, including the interview of Plaintiff that is depicted therein, which occurred at Plaintiff's home in Maryland (which they obtained under false pretenses and misrepresentations to Plaintiff).

10. Adam Kamien is an Australian film director and screenwriter Suite 75, 61 Marlborough Street, Surry Hills, New South Wales 2010. Defendant Kamien, along with Defendant Rynderman, directed The Speedway Murders.

11. Vertical Entertainment, LLC ("Vertical"), is located at 2120 Colorado Ave, #150, Santa Monica, CA 90404. Vertical licenses the rights for distribution of films to distributors in the United States and upon information and belief, has received and is continuing to receive money for the distribution of The Speedway Murders, which it contracted for distribution within the United

---

[2] To date, despite having been personally served with the Summons and the Amended Complaint (ECF No. 4), Defendants Vincent and Southern Light have not filed any response thereto. Plaintiff will promptly move for entry of a default judgment against them.

[3] To date, despite having made several attempts at service, Defendants Rynderman and Kamien are attempting to evade service and have not entered an appearance in this case. Plaintiff will separately address this issue for the Court through a separate filing and request.

States with Apple, Netflix, and Disney/Hulu. Vertical publicized The Speedway Murders through its You Tube channel (available at: https://www.youtube.com/watch?v=NVZpzExaCyE). The trailer for the docudrama there lists it as having received 66,000 views, and Vertical's YouTube channel apparently has more than 120,000 subscribers. It also uses its logo as the trailer's face page, and it has the trailer on its Facebook page: https://www.facebook.com/watch/?v=1498789744319815.

## JURISDICTION AND VENUE

12. In relation to the issue of this Court's jurisdiction over the Defendants, Plaintiff notes the following:

- the interview of Plaintiff, which was shown in The Speedway Murders (which was, according to Plaintiff, obtained under false pretenses – through misrepresentations by Defendants Rynderman and Kamien), occurred at Plaintiff's home in Maryland;
- upon information and belief, each of the Defendants knew that such interview of Plaintiff, as depicted in The Speedway Murders, was taken at Plaintiff's home in Maryland at or prior to the time that they publicized The Speedway Murders (and Plaintiff notes that they have known such since at least they learned that this lawsuit was filed and saw the allegations in the Complaint and determined to continue publishing the false and defamatory statements against Plaintiff contained therein);
- Defendants Rynderman and Kamien interviewed and filmed Plaintiff at his home in Maryland (which interview is depicted in The Speedway Murders);
- Defendant Vincent and her company, Southern Light, worked with Defendants Rynderman and Kamien to produce The Speedway Murders, and they knew – at the time of their work on such – that Plaintiff lived and worked in Maryland and further, that he was depicted in the docudrama while in his home in Maryland; and
- Moreover, Defendant Vincent had separately agreed not to use any footage from the interview of Plaintiff at his home, prior to the publication of The Speedway Murders in

Indiana in June 2024.

13. Maryland's long-arm statute provides in relevant part as follows:

(b) A court may exercise personal jurisdiction over a person, who directly or by an agent:

(1) Transacts any business or performs any character of work or service in the State;

(2) Contracts to supply goods, food, services, or manufactured products in the State;

(3) Causes tortious injury in the State by an act or omission in the State;

(4) Causes tortious injury in the State or outside of the State by an act or omission outside the State if he regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from goods, food, services, or manufactured products used or consumed in the State;

(5) Has an interest in, uses, or possesses real property in the State; or

(6) Contracts to insure or act as surety for, or on, any person, property, risk, contract, obligation, or agreement located, executed, or to be performed within the State at the time the contract is made, unless the parties otherwise provide in writing.

(c)

(1)

(i) In this subsection the following terms have the meanings indicated.

(ii) "Computer information" has the meaning stated in § 22-102 of the Commercial Law Article.

(iii) "Computer program" has the meaning stated in § 22-102 of the Commercial Law Article.

(2) The provisions of this section apply to computer information and computer programs in the same manner as they apply to goods and services. Md. Courts and Judicial Proceedings Code Ann. § 6-103

Based upon such, and also based upon the conduct of each of the Defendants as alleged in this First Amended Complaint, Plaintiff submits that this Court has personal jurisdiction over each of the Defendants.

14. Plaintiff also submits that venue is proper in this Court under 28 U.S.C. §

1891(b)(2) – (3). Additionally, Plaintiff submits that venue over the foreign Defendants is proper under 28 U.S.C. § 1391(c).

**FACTS**

15. Plaintiff was wrongfully convicted of a crime in 1981 that occurred in the town of Speedway, Indiana. The first trial ended in a hung jury, nine to three for acquittal. The retrial was marked by gross police misconduct, perjured testimony, planted evidence, a spiked jury, hypnosis of six government witnesses, jury misconduct, and false microscopic hair evidence. In 2019, one of the chief prosecution witnesses, State Police Detective Brooke Appleby, admitted to Pulitzer Prize winning reporter Dan Luzadder that he engaged in multiple incidents of official misconduct and committed perjury in order to convict Plaintiff of these crimes in violation of constitutional safeguards.

16. At some point in 2018, Dan Luzadder was contacted by Australian film producers, Defendants Adam Kamien and Luke Rynderman, who indicated that they were interested in the story of Plaintiff's wrongful conviction and police corruption in Speedway, Indiana. They indicated that they wanted to pitch a series to sell to a streaming service and use some of the upfront money to conduct a deep investigation into the police corruption that led to Plaintiff's wrongful. conviction. After some negotiations, Kaiman, Rynderman, Luzadder and a cameraman met with Plaintiff and filmed him discussing the wrongful conviction he had long sought to overturn. During that filming, Plaintiff stated categorically that he did not commit any crimes in Speedway and that the four-month Speedway crime spree had nothing to do with him. In November 2018, Plaintiff signed an agreement with the makers of the film giving them limited but exclusive rights to "my story" for a period of 18 months. Defendants Kamien and Ryndennan did not compensate Plaintiff for those exclusive rights but instead dangled a promise that they needed that much time in order to sell the movie to a streaming service which could help exonerate Plaintiff and provide him with substantial income. Plaintiff understood, based on conversations with Defendants Kamien and Rynderman, that "my story"

was the story of Plaintiff's wrongful conviction and police corruption. Plaintiff had no reason whatsoever to agree to any story about murders for which he did not commit and was never charged or even named as a suspect.

17. A month later, Kamien and Rynderman, without notifying Plaintiff or Dan Luzadder, optioned their rights to their planned series to Defendants Anna Vincent and Southern Light Alliance Films ("SLA") which never secured any new release from Plaintiff or ever had any contact with him for use of the Kamien/Rynderman footage. In fact, Plaintiff never even heard of them before the film's release on June 21, 2024, more than five years later. Dan Luzadder, however pursued an earlier legal action against Kamien and Rynderman because they misled him. That legal action, which resulted in a settlement restricting use of film footage in which Mr. Luzadder had initially participated and other material provided by him, did not involve Plaintiff because Plaintiff was never contacted at all by any of the Defendants after November 2018.

18. On July 13, 2022, Dan Luzadder told Defendant Vincent in an email that she could not use any material pertaining to Plaintiff in the film: From:

> Dan Luzadder < *****gmail.com>
> Sent: Wednesday, July 13, 2022 4:04 am
> To: Anna Vincent< anna*****.com>
> Subject: Re: ! Australian Documentary
>
> Thank you Anna - I appreciate that, but as I noted when we talked none of the material pertaining to Brett Kimberlin may be used, nothing pertaining to material obtained from my investigative files may be used. This was outlined by counsel from Denver in the attached - but never executed - proposed settlement agreement. If you want to proceed to an updated settlement that frames the above resolution, I will contact my new counsel in Oregon to follow up.
>
> I wish you good luck with your art film, but I am adamantly opposed to any mention or appearance in your film or use of my material information as noted; any remuneration, as reflected in this draft settlement agreement, anticipates coverage of my legal and related expenses.
>
> What I want is your commitment that those materials and interviews will not appear in your documentary, (since they were obtained by misrepresentation). If anything does appear, Mr. Greenlee will face a complaint for disbarment through the Indiana Judicial Disciplinary Commission at the point he accepts any funds from this project - since he

used his status as a licensed attorney to obtain confidential information, access to Mr. Kimberlin, etc., under false pretenses.

Kind regards,
Dan Luzadder

Despite Dan Luzadder's firm position prohibiting the use of any material pertaining to Plaintiff, Defendant Vincent never contacted Plaintiff to inform him of her plans to abandon a series about Plaintiffs wrongful conviction in favor of a full length film about the murders, or ask him to use footage taken by Defendants Rynderman and Kamien, Defendant Vincent did not seek a new release or agreement with Plaintiff despite the fact that Plaintiff's 18-month exclusive agreement with Rynderman and Kamien had expired years earlier. In fact, Defendant Vincent intentionally hid her plans from Plaintiff because she knew that he would not have anything to do with such a film.

19. In June of 2024, Dan Luzadder was contacted by Defendant Vincent and advised that she had used Plaintiffs footage for an entirely new film called "The Speedway Murders" that had nothing to do with Plaintiff's wrongful conviction. Mr. Luzadder told her that such use would violate all prior agreements and representations, and would result in legal action by Plaintiff. At no time did Defendant Vincent ever contact Plaintiff prior to the film's release. At no time did Defendant Vincent seek any agreement with Plaintiff to use the Kamien/Rynderman footage. At no time was Plaintiff ever compensated for his appearance in the film.

20. On June 22, 2024, Dan Luzadder sent the following email to Defendant Vincent:

From: Dan Luzadder <*******@gmail.com>
Date: Saturday, 22 June 2024 at 1:17 pm
To: Anna Vincent <*******@annavincent.com>
Subject: Your film

Anna

Just heard about your accusation about Kimberlin in your film. Sounds like you violated our legal agreement, and your directors lied to us, (which would be evidence of malice under US libel law. )

Seems certain you never brought this accusation to Brett for response before you aired it, or I would have heard about it.

> I would expect Kimberlin will sue you ... unless you have something more than this sources unsubstantiated accusations. I'll certainly support that if he does.
>
> Incredibly irresponsible. I doubt you even realize what you've done here.
>
> Dan Luzadder

21. On June 21, 2024, "The Speedway Murders" debuted at select theaters, and was streamed on Apple TV+, Prime Video and On Demand. There was also a screening of the film that day at 7:00 p.m. at Landmark's Glendale 12 Theatre, 6102 N. Rural St., Indianapolis. Dan Luzadder and others informed Plaintiff that the film had been released and that it defamed him by falsely accusing him of murder. This is when he discovered that the Defendants had defamed him and committed the other torts set forth in this Complaint. Plaintiff felt betrayed, abused, cheated, misled, and suckered by Defendants Kamien and Rynderman.

22. At some point, Defendants Vincent and SLA signed an agreement with Defendant's Disney+ and Hulu to stream the film to a global audience. It has since been featured on the home page of Hulu and the other named streaming platforms, and its trailer, promotion materials, and, upon information and belief, the film has been viewed at least thousands of times.

23. Hulu is a paid streaming service that earns money from the streaming of films. It must continually add new members to replace canceled memberships and grow its business. To do so, it consistently provides members with new compelling content choices that keep their customers and compete with competitors. It earns revenue through paid subscribers and from advertisements presented on its streaming service, consumer products and other various sources.

24. After Hulu released the film, it was released by Netflix though Netflix Australia, Apple TV (through its application), and other streaming and DVD companies.

25. Defendants Kamien and Rynderman have promoted the film on various social media sites including YouTube, Reddit, and LinkedIn. In an interview on YouTube, they

repeated the defamatory statements that Plaintiff was "implicated" in the murders and postulated that the murders were committed to coverup other crimes. https://www.youtube.com/watch?v=eJIMg_pE_mM They made these false accusations even though they knew that he was wrongfully convicted of one crime and had nothing to do with the other crimes.

26. None of the Defendants ever compensated Plaintiff for the use of his name, likeness, or footage.

**Defamatory Statements In The Film**

27. "The Speedway Murders" is a docuseries about the unsolved murders of four teenagers who worked at a Speedway, Indiana, Burger Chef restaurant in November, 1978. In the film, the producers resurrected the victims as ghosts and had them try to figure out who killed them. In the process, the producers intertwined interviews with other live sources to try to dramatize three different theories. One of those theories, based on no evidence whatsoever, was that Plaintiff committed the murders as part of a marijuana deal gone bad. To bolster this theory, Defendants Vincent, Kamien and Rynderman chose to allow ghost actors and individuals with no direct knowledge to air suppositions and speculation, and falsely accuse Plaintiff of another unsolved murder that occurred four months earlier in the same town of Speedway. Moreover, despite having strong evidence that Plaintiff was wrongly convicted of the "Speedway Bombings," the Defendants chose to use that wrongful conviction to bolster their theory without any mention of the exonerating evidence. While the producers and directors of the film used a brief clip of Plaintiff making a blanket denial of his involvement in any of the Speedway crimes in 1978, they failed to include facts of which these Defendants were aware, regarding the reasons the Plaintiff was never involved in any way in the crimes of which those chose to accuse him.

28. Plaintiff was never a suspect by law enforcement in any of the murders, he was never questioned by any law enforcement official about the murders, he was never called before a grand jury investigating the murders, and be was never charged with the murders.

29. There has never been a single shred of evidence that Plaintiff had anything to

do with these five unsolved murders, and "The Speedway Murders" film did not provide a single shred of evidence. Instead, the Defendants created (and published) a concocted theory articulated by resurrected ghosts of victims, who Plaintiff never met or knew, along with false statements by individuals who Plaintiff never met or knew, to directly accuse Plaintiff of five murders. Acting willfully - with malice and with reckless disregard for the truth - Defendants Vincent (and her company, Southeran Light), Kamien, and Rynderman made a conscious decision to use unsubstantiated speculation and defamatory statements through others to defame Plaintiff in order to convince viewers that Plaintiff was involved with the murders. Further, they were made aware of the Plaintiff's innocence in these crimes while initially working under written agreements, later dissolved by settlement restricting access to material, with aforementioned investigative reporter Dan Luzadder.

**Defendants – Through "The Speedway Murders" -**
**Falsey Accused Plaintiff of Five Murders**

30. All of the following depictions that accuse the Plaintiff – either directly or by implication - of capital murder are false and as such are defamatory *per se*. At 45:06 of "The Speedway Murders" Ginger Anderson states: "Brett Kimberlin. Brett Kimberlin is who I think is behind it all, if it's drug related, it's Brett Kimberlin." The film then segues to an unsolved murder that occurred four months earlier, with a voiceover stating that "authorities speculate that the bombings were to distract them from investigating a murder, the victim a Speedway grandmother who reportedly had threatened to blow the whistle on Kimberlin's drug dealing." The film then describes how a man had shot her while looking at items at her garage sale. Ginger Anderson then states: "Julia Scyphers was the mother of a girl that was dating Brett Kimberlin. And she didn't like the relationship and wanted her daughter to break up with Brett Kimberlin. And Brett Kimberlin didn't like that and I don't know this for sure but I think Brett Kimberlin had Bill Bowman kill Julia Scyphers. Her husband witnessed it, but he died before anything could be taken to trial."




31. At 46:06 in the film, a lady named Deanna Delong states: "I think he [Brett Kimberlin) is evil and he has no conscience, but I think monsters still feel and I don't think he has any feelings."

32. At 46:25, Ginger Anderson then states: "if there's anyone to be scared of, it's Brett Kimberlin, even today."

33. At 43:30 in the film, one of the teen ghost actors said that Plaintiff drove through the Burger Chef pick up window, and footage from the film showed an actor who resembled Plaintiff doing that: "Brett Kimberlin was kind of a boogey man in Speedway, a bunch of folks think that it was him who killed us, [and then holding a photo of Plaintiff next to a police sketch of a suspect she said],"he's a dead ringer for the sketch of the clean-shaven man." And the film showed her handing a burger through the window to the actor resembling Brett Kimberlin.



34. At 1:20.46 in the film a man named Tim Boyer said that Jeff Reed went to the Burger Chef to collect a debt "owed to Brett Kimberlin ... who a lot of us were getting marijuana at the time. While trying to collect the debt, an individual came running at him in a threatening way Jeff in his usual fashion knocked him out and thought he may have killed him and after doing so things began going totally sideways and everyone's adrenaline would jump in and straight panic. He said he put the guy in the back of the van and at this point he tried to gather his thoughts and he sees all the people in the Burger Chef staring out the window and so in the frantic state he was in he collects the employees and he said he stuck them in the cooler there to kinda contain them so he could get his thoughts together about what he was actually going to do..." Reed ended up taking them for a ride and "hurt [killed] the people."




35. At the end of the film, text states that the directors turned over Tim Boyer's statement to law enforcement authorities as if his false and defamatory statement amounted to an important break in the case that implicated Plaintiff in the murders. The Defendants had ample reason via their aborted work with reporter Dan Luzadder to know these assertions were false and of no value to authorities; their flagrant and cynical use of a brutal crime for their own promotion, using discredited information, and their failure to tell viewers of those contradictions, illustrates their malice and reckless disregard for the truth.

36. The Indiana State prosecutors never considered the information provided by Defendants Kamien and Rynderman credible and never opened an investigation based on it.

37. "The Speedway Murders" tells the viewer that Brett Kimberlin was involved directly or indirectly in five murders over four months in Speedway, Indiana in 1978. To do this, the directors used fabricated scenes, false screenwriter narratives, and false statements from people Plaintiff never knew, knew of, and never met. The directors never asked Plaintiff if he knew Tim Boyer because they knew that he did not, despite Boyer

falsely stating that he bought marijuana from Plaintiff. The directors never asked if Plaintiff knew Jeff Reed because they knew that the answer would have been "no." The directors never asked Plaintiff he had ever been to the Speedway Burger Chef because they knew he had not. The Defendants, after obtaining film of the Plaintiff under false pretenses, never contacted or communicated with him again.

38. The directors falsely stated that Plaintiff was dating the daughter of Julia Scyphers and that he killed her because he·was afraid that Scyphers was going to blow the whistle on his marijuana dealing. This is a total fabrication to make it appear that he had a motive to kill her. Ms. Scyphers had absolutely no knowledge of any business activities involving Plaintiff and he had no motive to kill her. He was never dating her daughter, who was merely a friend of the Plaintiff. There is not and has never been a shred of evidence anywhere that Plaintiff had anything to do with that murder.

39. The directors had Ginger Anderson falsely state that Plaintiff hired Bill Bowman to murder Julia Scyphers and made the viewer think that he was never tried because Mr. Scyphers died before trial. They made this false portrayal to make it appear that Bowman and Plaintiff only got away with murder because the eyewitness died. However, Bowman had a confirmed alibi in another state when the murder occurred. Plaintiff was never considered a suspect by the police, was never questioned by the police, was never called before a grand jury, and was never charged for anything to do with the Scyphers because he had nothing to do with it. The Defendants knew or should have known with reasonable due diligence that neither Bill Bowman nor Plaintiff had anything to do with that murder, most particularly because it was publicly reported at the time. They made this false accusation in order to make it appear to the viewer that Plaintiff killed the Burger Chef employees.

40. The directors, by having Tim Boyer as the final person in the film falsely accuse Plaintiff of involvement in the Burger Chef murders and stating that they gave

his statement to law enforcement, left the viewer believing that Plaintiff was involved with those murders. In Indiana, a person convicted of such murders would be given the death penalty.

41. Defendants Kamien and Rynderman promoted the film as solving the murders. In the media publication IndieWire.com, the headline says:

GOT A TIP? IndieWire NEWSLETTERS

NEWS FILM TV AWARDS VIDEO FUTURE OF FILMMAKING

EXCLUSIVE

**'The Speedway Murders' Trailer: These Filmmakers May Have Finally Figured Out Who Killed the Burger Chef Teens**

Documentarians Luke Rynderman and Adam Kamien handed over new evidence to the Marion County Prosecutor's Office.

In the article, it says:

> "The Speedway Murders," written (it's reenactment-heavy) and directed by Luke Rynderman and Adam Kamien, walks audiences through four divergent theories, each pretty compelling and viable in its own right. You'll want to stick around for the final one, when the filmmakers get a second-hand confession from the close friend of a now-deceased lead suspect. Rynderman and Kamien have turned over the new evidence to the Marion County Prosecutor's Office. We'll see if anything comes from it.

That final theory is set forth in the film through Tim Boyer who falsely states that the Burger Chef employees were killed over a marijuana debt owed to Plaintiff.

42. Viewers who watched "The Speedway Murders" were left with the belief that Plaintiff was involved in the murders of five people. In fact, online reviews of the film indicate that viewers believed that Plaintiff was involved.

> **Debby D Browning**
> Penny Kottaridis they bring up Brett Kimberlins name as a possible suspect in the movie. I've seen it. It was very interesting. My dad was an IPD detective at the time. Not sure if he was involved. His beat was eagledale in the mid 60s before he made detective so its a possibility. The movie doesn't shine a very good light on the investigation they did. It's a good watch.

43. In an online Question and Answer session with Defendants Kamien and Rynderman, they continued to exploit and defame Plaintiff. In fact, they called the information from Tim Boyer "shocking" and "explosive," and said that it "is very difficult to rule any [information] completely in or out."

- **Good_Difference_2837** • l'.· age

  This is a nightmare of a story, and here's hoping that you do the victims some form of justice. This is an off-the-wall question, but because the Burger Chef murders occurred around the same time and exact place: Have you explored any connections to the Speedway Bombings?

  **SpeedwayMurdersMovie** OP • 1v ago

  We have. We interviewed Brett Kimberlin who was convicted of the Speedway Bombings for the film

  5 Reply Award Share ···

  **SpeedwayMurdersMovie** OP • 1y aqo

  Our aim was for the drama elements to complement the unscripted parts. Our characters are there so the audience can get a sense of the kind of people they were (that was really important to us), but also to deliver information

  Our hope is that someone somewhere has some information that can really change the face of the investigation

  The most shocking thing was the information we got from the new witness we found. I don't want to spoil the film for people, but it was explosive in our view

  We worked closely with the families to make sure our characters were as faithful as possible. We kept them abreast of the approach and they've been really supportive. We hope everyone sees the film, but ultimately, theirs are the only opinions that matter to us

  Theresa (Ruth Shelton's sister) and retired detective Jim Cramer are the two that stand out, but there were so many others who were so generous with their time

  ◊ 9 ◊ Q Reply Q Award R Share

a. **SpeedwayMurdersMovie** OP • 1y □go

  We present the evidence as we found it. We'd prefer for people to make up their own minds. I'm not trying to avoid the question, but part of what makes this case interesting is just how much compelling information there is. It's very difficult to rule any completely in or out. We still talk about it endlessly, riffing about scenarios and hypotheticals

  i. 4 ◊ 0 Reply Q Award R Share

Because Defendants knew that Plaintiff was not involved with the murders, there was no reason whatsoever to accuse him directly or indirectly of being involved in those murders other than to help promote the film at Plaintiff's expense. Defamatory statements are not "compelling information." By stating that it is "very difficult for rule any [information]

completely in or out," these Defendants validated the film's defamatory statements and imputations.

44. Plaintiff was never a suspect in the Burger Chef murders, was never questioned by the police, was never investigated, was never called before any grand jury, and was never charged in the case. Plaintiff did not know any of the victims in that case or any of their friends or relatives, or anyone portrayed, interviewed or named in the film. The Defendants knew or should have known with reasonable due diligence that Plaintiff had nothing to do with the Burger Chef murders.

45. Defendants falsely accused Plaintiff of murders in order to get more views and sales. As Netflix stated in a recent 10·K filed with the SEC: "If we do not grow as expected ... operations may be adversely impacted. If we are unable to successfully compete with current and new competitors in providing *compelling content,* retaining our existing members and attracting new members, our business will be adversely affected. Netflix 10-K at p. 4 (emphasis added). To ensure that Netflix continued to meet its shareholders' "growth expectations" and to satisfy its desperate need for "compelling content," Netflix and the other Defendants maliciously defamed Plaintiff.

**Ongoing Publication**

46. As alleged above, The Speedway Murders and the false and defamatory statements of and concerning Plaintiff contained therein was first published in the United States on June 21, 2024. Defendants Rynderman, Kamien, Vincent, and Southern Light created this production, while knowing that its contents concerning Plaintiff were false, while acting with reckless disregard for the truth of such, or at a minimum, while acting in a negligent manner.

47. From there, Defendants Umbrella and Vertical – while acting with malice towards Plaintiff or at a minimum, in a negligent manner towards him, sold the licensing

rights to Netflix, Disney, and Apple.

48. Through the distributors (i.e., Netflix Australia (and in turn, Netflix), Disney and Hulu, and Apple), The Speedway Murders is continuing to be published, on a daily basis, through the various platforms that they operate for profit.

**Creation, Aiding and Abetting, and Targeting Plaintiff**

49. As alleged above, Defendants Rynderman, Kamien, Vincent, and Southern Light created The Speedway Murders, while knowing that its contents concerning Plaintiff were false, while acting with reckless disregard for the truth of such, or at a minimum, while acting in a negligent manner.

50. Thereafter, Defendants Umbrella and Vertical, while acting with malice towards Plaintiff or at a minimum, in a negligent manner towards him, sold the licensing rights to Netflix, Disney, and Apple. These Defendants had an affirmative duty to ensure that the creative products that they purchased the licensing rights did not contain false and defamatory statements like the false and statements contained in The Speedway Murders about Plaintiff. To be sure, the agreements that Umbrella and Vertical have signed with Netlifx, Apple, and Disney reflect such obligation on their part, through the representations that they provided therein (and because the existence of such unlawful content in the production provides the distributors grounds to revoke their agreements with Umbrella and Vertical).

51. As alleged above, Umbrella and Vertical have promoted The Speedway Murders through their social media accounts. Between such direct efforts and publication, and also through the key step in the chain of distribution and publication that they each played in aiding and abetting the large distributors in publishing such, they are liable for the false and defamatory statements against Plaintiff which are contained therein.

52. Defendants Netflix Australia and Netflix are liable for the false and defamatory statements made against Plaintiff in The Speedway Murders to the extent it has bene published by Netflix Australia.

53. Defendants Disney, Hulu, and Apple are also liable for the false and defamatory statements made against Plaintiff in the docudrama for the thousands of times, cumulatively, it has been published through their respective streaming platforms.

54.Upon information and belief, Defendants Disney, Hulu, and Apple intentionally target viewers and prospective viewers of The Speedway Murders who live in Maryland, through traditional marketing and advertising and various technological means, including technological tools such as the use of algorithms and artificial intelligence, to identify viewers and prospective viewers who live in Maryland who likely would be interested in viewing The Speedway Murders.

55.Similarly, Netflix Australia undoubtedly uses similar technology to target viewers and prospective viewers who may have an interest in viewing it.

56. In other words, these distributors are not akin to a large, retail bookstore, which places a given book on its shelf and leaves it to consumers to come in and find it. Rather, through the use of traditional and high tech marketing technological tools, these distributors undoubtedly "push" the publication of The Speedway Murders to certain viewers and prospective viewers who are likely to be interested in viewing it (to include those who live in Maryland, at least through the targeted efforts of Disney, Apple, and Hulu). Through such efforts, these distributors are targeting Plaintiff while knowing that he lives in Maryland and also while knowing that the allegations against him The Speedway Murders are false and defamatory.

57. As a result, while Umbrella, Vertical, and the U.S. Distributors (as well as Netflix Australia) did not create The Speedway Viewers, they are liable for defamation and certain of the other wrongful and tortious acts alleged in this First Amended Complaint. At a minimum, even if – for example – a large distributor such as Hulu did not actively know that The Speedway Murders contained false and defamatory statements against Plaintiff when it initially published such on its platform, since at least the filing of

this lawsuit (and Hulu's leadership becoming aware of such), Hulu has not taken down The Speedway Murders or otherwise stopped publicizing it. As such, Hulu and the other distributors have continued to publish the false and defamatory docudrama, and through such, are targeting Plaintiff with the false and defamatory statements contained therein. They have acted, and are continuing to act, with malice and reckless disregard for the truth of the false statements contained therein, and at a minimum, have acted in a negligent manner towards Plaintiff.

**Plaintiff is not a Public Figure or a Limited Public Figure in Relation to The Speedway Murders**

58. Plaintiff lives a quiet life as a husband and father in Maryland. He primarily works to help promote the career of his daughter, Kelise Kimberlin, who is a singer, and he also provides significant work on behalf of a nonprofit organization that he and Kelsie lead, to help support the people of Ukraine in the ongoing war against Russia.

59. Plaintiff has never sought out publicity concerning the issue of the tragic killings of the five people discussed in The Speedway Murders. He was not prosecuted for such and to his knowledge, was never a suspect in the murders.44. Plaintiff has never filed a lawsuit in relation to The Speedway Murders (aside from the present case, which he concluded he had to pursue). Plaintiff also has never sought to be interviewed about these murders and rarely responded to questions from a reporter about such.

**COUNT I**
**DEFAMATION**
***Per Se and Per Quod***
**(Against All Defendants)**

60. In support of Count I, Plaintiff incorporates the foregoing allegations in Paragraphs 1 – 59 as if fully set forth herein.

61. In "The Speedway Murders," Defendants in various capacities, falsely and repeatedly accused Plaintiff, either directly, indirectly or in concert with others, of the murders of five people.

62. The false and defamatory statements are set forth above, in Paragraphs 30 – 41, *supra*. As explained in those paragraphs, through multiple false statements, Defendants Rynderman, Kamien, Vincent, and Southern Light falsely accused Plaintiff of being responsible for the murders of the four employees of the Burger Chef restaurant in Speedway, Indiana, as well as the murder of Julia Scyphers.

63. These false statements are made directly as well as indirectly, by implication. Through the mosaic of these false statements, these Defendants falsely accused Plaintiff of murder.

64. These allegations against Plaintiff are false.

65. These false statements against Plaintiff are defamatory per se, as they constitute an allegation that Plaintiff committed the crime of murder.

66. Even if these false statements against Plaintiff – even if they are deemed not to constitute defamation per se – are defamatory *per quod,* and Plaintiff has suffered significant damage to his reputation as a result thereof.

67. Defendants Rynderman, Kamien, Vincent, and Southern Light fabricated these false statements and obtained Plaintiff's participation in the film that was ultimately shown by lying to him about the purpose of the film that they were making. In sum, they never told Plaintiff that the film they were making, and wanted him to be interviewed for, was about the Speedway Murders. Rather, they lied to him and said it was to focus on his being wrongfully convicted of the bombings (which was the case).

68. In so doing, Defendants Rynderman, Kamien, Vincent, and Southern Light acted with malice, as they knew the statements at issue were false when they published them. Moreover, they acted with reckless disregard for the truth thereof, as they did not take any reasonable steps to try and verify the truth thereof (which if they had engaged

in such efforts, it would have been irrefutably clear that the statements were false).

69. At a minimum, these Defendants acted in a grossly negligent and alternatively, a negligent manner towards Plaintiff; they violated their duty of fairness and candor to him, and such violation caused Plaintiff to suffer significant damage.

70. Thereafter, Defendants Umbrella and Vertical had an affirmative duty to ensure that the content of The Speedway Murders, for which they purchased the licensing rights, did not contain false and defamatory statements like the false and statements contained about Plaintiff. To be sure, the agreements that Umbrella and Vertical have signed with Netlifx, Apple, and Disney reflect such obligation on their part, through the representations that they provided therein (and because the existence of such unlawful content in the production provides the distributors grounds to revoke their agreements with Umbrella and Vertical).

71. As alleged above, Umbrella and Vertical have promoted The Speedway Murders through their social media accounts. Between such direct efforts and publication, and also through the key step in the chain of distribution and publication that they each played in aiding and abetting the large distributors in publishing such, they are liable for the false and defamatory statements against Plaintiff which are contained therein.

72. Defendants Netflix Australia and Netflix are liable for the false and defamatory statements made against Plaintiff in The Speedway Murders to the extent it has bene published by Netflix Australia.

73. Defendants Disney, Hulu, and Apple are also liable for the false and defamatory statements made against Plaintiff in the docudrama for the thousands of times, cumulatively, it has been published through their respective streaming platforms.

74.Upon information and belief, Defendants Disney, Hulu, and Apple intentionally target viewers and prospective viewers of The Speedway Murders who live in Maryland, through various technological means, including technological tools such as the use of algorithms and artificial intelligence, to identify viewers and prospective viewers who live

in Maryland who likely would be interested in viewing The Speedway Murders.

75.Similarly, Netflix Australia undoubtedly uses similar technology to target viewers and prospective viewers who may have an interest in viewing it.

76. In other words, these distributors are not akin to a large, retail bookstore, which places a given book on its shelf and leaves it to consumers to come in and find it. Rather, through the use of technological tools, these distributors undoubtedly "push" the publication of The Speedway Murders to certain viewers and prospective viewers who are likely to be interested in viewing it (to include those who live in Maryland, at least through the targeted efforts of Disney, Apple, and Hulu). Through such efforts, these distributors are targeting Plaintiff while knowing that he lives in Maryland and also while knowing that the allegations against him The Speedway Murders are false and defamatory.

77. As a result, while Umbrella, Vertical, and the U.S. Distributors (as well as Netflix Australia) did not create The Speedway Viewers, they are liable for defamation through its continuous, ongoing publication. At a minimum, even if – for example – a large distributor such as Hulu did not actively know that The Speedway Murders contained false and defamatory statements against Plaintiff when it initially published such on its platform, since at least the filing of this lawsuit (and Hulu's leadership becoming aware of such), Hulu has not taken down The Speedway Murders or otherwise stopped publicizing it. As such, Hulu and the other distributors have continued to publish the false and defamatory docudrama, and through such, are targeting Plaintiff with the false and defamatory statements contained therein. They have acted, and are continuing to act, with malice and reckless disregard for the truth of the false statements contained therein, and at a minimum, have acted in a grossly negligent or alternatively, in a negligent manner towards Plaintiff.

78. Because of the Defendants' willful, wrongful acts of defamation towards him, he has been severely damaged. Plaintiff's reputation – which he has scrupulously tried to

rebuild over these many years – has now been completely destroyed. Plaintiff and/or his family have lost economic opportunities as a result of the ongoing, malicious conduct of the Defendants and such will certainly continue, as the defamation is ongoing and widespread.

79. As a result of the severe damage that Plaintiff has suffered, he seeks an award of compensatory damages, including but not limited to compensation for the severe damage to his reputation that has occurred; compensation for the severe emotional distress that he has suffered, which has impacted him emotionally and physically.

80. Plaintiff also seeks an award of punitive damages against the Defendants for their wrongful, malicious conduct against him which is ongoing. Defendants' conduct was undertaken with malice towards him and a reckless disregard fo the truth. In sum, the Defendants targeted him from the start, and such is continuing, to include by the large distributors who know of the false and defamatory content of The Speedway Murders, yet are continuing to publish such for profit, to include efforts to target viewers and prospective viewers in Maryland.

81. Plaintiff seeks an award of compensatory damages and punitive damages in an amount to be determined at trial, in excess of $50,000,000, jointly and severally against the Defendants.

82. Plaintiff also seeks an award of pre- and post-judgment interest, the costs of bringing this action, and to the extent applicable law would permit, recovery of his reasonable attorneys' fees.

83. Plaintiff also seeks an order from this Court, as a matter of equity, that all copies of The Speedway Murders be taken down, and that the Defendants be permanently enjoined from publishing such in the future.

**COUNT II**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
**(Against Defendants Rynderman, Kamien, Vincent, and Southern Light)**

84. In support of Count II, Plaintiff incorporates the foregoing allegations in Paragraphs 1 – 59 as if fully set forth herein.

85. As alleged above, Defendants Rynderman, Kamien, Vincent, and Southern Light fabricated these false statements and obtained Plaintiff's participation in the film that was ultimately shown by lying to him about the purpose of the film that they were making. In sum, they never told Plaintiff that the film they were making, and wanted him to be interviewed for, was about the Speedway Murders. Rather, they lied to him and said it was to focus on his being wrongfully convicted of the bombings (which was the case).

86. This conduct of Defendants Rynderman, Kamien, Vincent, and Southern Light was extreme and outrageous with the intention of causing, or recklessly disregarding the probability of causing, emotional distress to Plaintiff. Defendants' conduct was "extreme and outrageous" as defined under Maryland law as behavior that is beyond the bounds of normal decency, is atrocious and utterly shocking to a reasonable person and "completely violate human dignity." The Defendants falsely accused Plaintiff of multiple counts of capital murder in which the death penalty is the punishment. This is so shocking that it is beyond the pale in a civilized society.

87. Plaintiff has suffered severe and extreme emotional distress as a result thereof, which was directly and proximately caused by Defendants' outrageous conduct. Such conduct was intended to inflict injury on Plaintiff and was done with knowledge that injury would result to Plaintiff. Plaintiff has been seriously damaged reputationally, mentally and emotionally. Said damages exceed $50 million.

88. Plaintiff has experienced among other things intense panic, fear, anxiety, sleeplessness, and despair. Plaintiff is more mindful of his security and has become inhumanly cautious. It was foreseeable to the Defendants in this day and age of online

information that false allegations of capital murder would cause these damages. This is a case of barbarous and outrageous conduct intended to cause Plaintiff mental and emotional distress. Plaintiff has suffered severe emotional distress as a result of Defendants' negligence.

89. Because of the severe damage that Plaintiff has suffered because of Defendants' outrageous and wrongful, shocking conduct, he seeks an award of compensatory damages for the severe emotional distress that he has suffered, which has impacted him emotionally and physically.

90. Plaintiff also seeks an award of punitive damages against these Defendants for their wrongful, malicious conduct against him, the harm of which is ongoing. Defendants' conduct was undertaken with malice towards him and with the intent to cause him to suffer severe emotional distress and trauma. As a result, an award of punitive damages is necessary to punish these Defendants for their reprehensible conduct.

91. For Count II, Plaintiff seeks an award of compensatory damages and punitive damages in an amount to be determined at trial, in excess of $20,000,000, jointly and severally against the Defendants.

92. Plaintiff also seeks an award of pre- and post-judgment interest, the costs of bringing this action, and to the extent applicable law would permit, recovery of his reasonable attorneys' fees.

**COUNT III**
**NEGLIGENCE**
**(Against All Defendants)**

93. In support of Count III, Plaintiff incorporates the foregoing allegations in Paragraphs 1 – 59 as if fully set forth herein.

94. As alleged above, Defendants owed Plaintiff a duty of care to accurately represent him in "The Speedway Murders" which they billed and promoted as film to solve murders that occurred in Speedway, Indiana in 1978. Defendants breached their duty of care by lying repeatedly about

Plaintiff and falsely accusing him of capital murder. Defendants further breached their duty of care by having ghost actors read scripts written by Defendants Kamien, Rynderman and Vincent stating that Plaintiff killed them, and by having a ghost, Ginger Anderson and Tim Boyer falsely state that Plaintiff was a murderer. Defendants' further breached their duty by having a ghost hold Plaintiff's photo next to a sketch *of* a murder suspect and saying they had an uncanny resemblance and then having an actor resembling Plaintiff drive a car through the Burger Chef pick up window. Defendants breached their duty by using video taken of Plaintiff in 2018 for one purpose, to be used for the entirely different and sinister purpose of accusing him of capital murder. All of these actions were intended to leave the viewer with the belief that Plaintiff was a murderer.

95. As explained above, each of the Defendants breached that Defendants' specific duty of care towards Plaintiff. In sum, while each of the Defendants acted willfully and maliciously towards Plaintiff, as alleged above, Plaintiff pleads that at a minimum, each Defendant breached its own duty of care towards Plaintiff.

96.The breaches of the duty of care by each Defendant proximately caused severe damage and trauma to Plaintiff, as alleged above.

97.As a result of Defendants' breaches, Plaintiff has been severely damaged. Since being falsely accused of five unsolved murders, Plaintiff has experienced among other things intense panic, fear, anxiety, sleeplessness, and despair. Plaintiff is more mindful of his security and has become inhumanly cautious. It was foreseeable to the Defendants in this day and age of online information that false allegations of capital murder would cause these damages. This is a case of barbarous and outrageous conduct intended to cause Plaintiff mental and emotional distress. Plaintiff has suffered severe emotional distress as a result of Defendants' negligence.

**COUNT IV**
**GROSS NEGLIGENCE**
**(Against All Defendants)**

98. In support of Count IV, Plaintiff incorporates the foregoing allegations in Paragraphs 1 – 59 as if fully set forth herein.

99. The foregoing acts of each of the Defendants, when viewed objectively from any reasonable person's standpoint, involved an extreme risk considering the probability and magnitude of potential harm to Plaintiff, especially in today's political and societal atmosphere. Each of the Defendants had actual subjective awareness of the risk involved, but nevertheless proceeded in conscious indifference to the rights, safety, and/or welfare

of Plaintiff. As such, each of the Defendants' actions constitute gross negligence.

100. As explained above, Plaintiff has been severely damaged reputationally, mentally and emotionally by Defendants' gross negligence.

101. Because of the severe damage that Plaintiff has suffered because of Defendants' outrageous and wrongful, shocking conduct, he seeks an award of compensatory damages for the severe emotional distress that he has suffered, which has impacted him emotionally and physically.

102. Plaintiff also seeks an award of punitive damages against these Defendants for their reckless and malicious conduct against him, the harm of which is ongoing. Defendants' conduct was undertaken with malice towards him and with reckless disregard for the truth of the statements at issue, and with reckless disregard for his legal rights and for his health and well being. As a result, an award of punitive damages is necessary to punish these Defendants for their reprehensible conduct.

103. For Count IV, Plaintiff seeks an award of compensatory damages and punitive damages in an amount to be determined at trial, in excess of $20,000,000, jointly and severally against the Defendants.

104. Plaintiff also seeks an award of pre- and post-judgment interest, the costs of bringing this action, and to the extent applicable law would permit, recovery of his reasonable attorneys' fees.

**COUNT V**
**INVASION OF PRIVACY**

**(Against All Defendants)**

105. In support of Count V, Plaintiff incorporates the foregoing allegations in Paragraphs 1 – 59 as if fully set forth herein.

106. Defendants used Plaintiff's identity and likeness for commercial advantage without his consent, resulting in injury to Plaintiff. At all times, Defendants knew that they did not have permission to use Plaintiff's identity or likeness for commercial purposes.

107. Defendants Kamien and Rynderman used a classic bait and switch move to deceive Plaintiff into allowing them to film him by falsely stating that they were investigating his wrongful conviction. It was only because of this that he agreed to give them an 18-month exclusive to his story. A month later, they optioned an entirely different story to Defendant Vincent without telling Plaintiff and without getting permission to use his identity and likeness for commercial purposes in that different story. The release Plaintiff signed was for a film about his wrongful conviction and the release used the words "my story" with a title, "The Speedway Series." There is not a single word in the agreement about any crimes of murder. Then, after Plaintiff signed the release and appeared on video, these Defendants changed the name to "The Speedway Murders" and had nothing in the film about the evidence of his wrongful conviction. Moreover, they knowingly kept Plaintiff completely in the dark after he signed the release agreement, and intentionally concealed all of their work from Plaintiff for the next five and a half years.

108. Plaintiff's exclusive to Defendants Kamien and Rynderman did not give them *carte blanche* to use his footage in any way they wanted, and it did not extend past 18 months, and it did not grant them the right to sell or convey his likeness to another party for use in a different movie that was released five and a half years later.

109. These Defendants maliciously breached their duty to Plaintiff by acting with malice, deception, subterfuge, and wrongful intent to invade his privacy.

110. There is a direct connection between the use of Plaintiff's identity and likeness,

and Defendants' commercial purposes. As alleged above, Plaintiff has suffered severe mental anguish caused by the unauthorized use of his identity and likeness without his permission in "The Speedway Murders."

111. Plaintiff is entitled to recover, and Defendants are each liable for, damages suffered by Plaintiff, as well as, without limitation, profits from the unauthorized use of his identity and likeness in the film.

112. Because of the severe damage that Plaintiff has suffered because of Defendants' willful and malicious conduct, he seeks an award of compensatory damages for the severe emotional distress that he has suffered, which has impacted him emotionally and physically.

113. Plaintiff also seeks an award of punitive damages against Defendants for their reckless and malicious conduct against him, the harm of which is ongoing. Defendants' conduct was undertaken with malice towards him and with reckless disregard for the truth of the statements at issue, and with reckless disregard for his legal rights and for his health and well-being. As a result, an award of punitive damages is necessary to punish these Defendants for their reprehensible conduct.

114. For Count V, Plaintiff seeks an award of compensatory damages and punitive damages in an amount to be determined at trial, in excess of $20,000,000, jointly and severally against the Defendants.

115. Plaintiff also seeks an award of pre- and post-judgment interest, the costs of bringing this action, and to the extent applicable law would permit, recovery of his reasonable attorneys' fees.

**COUNT VI**
**FRAUDULENT MISREPRESENTATION**
**(Against Defendants Kamien, Rynderman, Vincent, and Southern Light)**

116. In support of Count VI, Plaintiff incorporates the foregoing allegations in

Paragraphs 1 – 59 as if fully set forth herein.

117. Defendants Kamien and Rynderman used lies, deception and misrepresentations to induce him to sign the agreement allowing them to film him and to sign the 18-month exclusive for "my story." Within weeks after getting that footage and release agreement, they optioned a completely different film with a different title to Defendants Vincent and Southern Light Alliance Films and then had no contact with Plaintiff over the next five-plus years while they created the false narratives in "The Speedway Murders." Plaintiff never would have allowed the Defendants to film him or signed an agreement with these Defendants had they informed him that the film was not about his wrongful conviction. He never would have agreed to be part of a film where ghosts and ignorant people he did not know would accuse him of capital murder.

118. Defendants Kamien and Rynderman intentionally misrepresented their plans and the intended film to induce Plaintiff to sign a release agreement and allow the Defendants to film him. Plaintiff relied on those misrepresentations and would not have signed the agreement or allowed filming -absent the misrepresentations. Upon information and belief, and based upon the circumstances of what occurred, it is clear that Defendants Vincent and Southern Light Alliance Films, Disney+, Hulu, Apple TV+ and the other Defendants never conducted any due diligence to determine what Defendants Kamien and Rynderman told Plaintiff in order to get his footage and the signed release. Either Defendants Kamien and Rynderman told them about their fraudulent misrepresentation which would make them complicit, or they lied which would make them negligently liable.

119. Plaintiff has been seriously damaged reputationally, mentally and emotionally by Defendants' fraudulent misrepresentations. The Defendants used footage of him obtained through :fraudulent misrepresentations to put him in a film seen by millions of people to accuse him of the capital murder of five people. Said

damages exceed $20 million. In addition, because Defendants' conduct was so outrageous, Plaintiff seeks punitive damages in an amount that will punish Defendants from ever engaging in said conduct and deprive them of all benefit, financial or otherwise, of their outrageous conduct, an amount believed to be in excess of an additional $100 million.

**PUNITIVE DAMAGES**

120. Plaintiff incorporates the foregoing allegations in Paragraphs 1 – 59 in relation to Count I as if fully set forth herein.

121. The acts complained of herein and in the preceding paragraphs above were done willfully, unlawfully, maliciously, and in wanton disregard of the rights and feelings of Plaintiff and by reason thereof, Plaintiff demands punitive and compensatory damages.

**JURY DEMAND**

122. Plaintiff requests a trial by jury on all claims.

**PRAYER FOR RELIEF**

123. WHEREFORE, Plaintiff requests a judgment against Defendants as follows:

A. Judgment against Defendants for actual damages, the sum to be determined at trial, but is believed to exceed $50 million;

B. Judgment against Defendants for compensatory damages in the maximum amount allowed by law, in an amount to exceed $50 million, including mental anguish, and loss of enjoyment of life;

C. Judgment against Defendants for all profits from "The Speedway Murders," in the maximum amount allowed by law, in an amount to exceed $50 million;

D. Judgment against Defendants for punitive damages in the maximum amount allowed under law, and believed to exceed **$100** million;

E. Pre-judgment interest at the legally prescribed rate from the date of the violations until judgment as well as post-judgment interest as applicable;

F. Any other general relief to Plaintiff is justly entitled.

Dated: November 17, 2025.

Respectfully Submitted,

____________/s/________________

John B. Flood, Bar No. 27925
Thaddeus Maciag (*pro hac vice* motion forthcoming)
Anthony J. Marcavage
(*pro hac vice* motion forthcoming)
Flood Law LLC
2600 Tower Oaks Blvd, Suite 290
Rockville, MD 20852
Tel.: (240) 403-2619
john@fmlaw.org
ted@fmlaw.org
anthony@fmlaw.org
*Counsel for Plaintiff*

**CERTIFICATE OF SERVICE**

I certify that on November 17, 2025, a copy of the foregoing was sent via the Court's ECF filing system to all counsel of record.

_____________/s/_______________
John B. Flood, Bar No. 27925