**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| BRETT KIMBERLIN,<br><br>Plaintiff,<br><br>v.<br><br>HULU, INC., *et al.*,<br><br>Defendants. | ) | Civil Action No. 25-cv-02389-LKG<br><br>Dated: September 17, 2026 |

**MEMORANDUM OPINION**

## I. INTRODUCTION

In this civil action, the Plaintiff, Brett Kimberlin, brings claims for, among other things, defamation, negligence, gross negligence and invasion of privacy, against the Defendants, The Walt Disney Company, Inc. ("Disney"), Hulu, LLC ("Hulu"), Netflix, Inc., Netflix Australia Pty., Ltd., Apple Inc. ("Apple") (collectively, the "Distributor Defendants"), Umbrella Entertainment Pty. Ltd. ("Umbrella"), Vertical Entertainment, LLC ("Vertical"), Anna Vincent, Southern Light Alliance Films, Adam Kamien and Luke Rynderman, arising from the production and distribution of a feature-length documentary entitled *The Speedway Murders*. *See generally* ECF No. 37. The Distributor Defendants, Defendant Umbrella and Defendant Vertical have each moved to dismiss the tort claims brought against them in the first amended complaint, pursuant to Fed. R. Civ. P. 12(b)(2) and 12(b)(6). ECF Nos. 47, 47-1, 49, 49-1, 60 and 60-1. These motions are fully briefed. ECF Nos. 47, 47-1, 49, 49-1, 60, 60-1, 83, 84, 85, 90 and 91. No hearing is necessary to resolve the motions. *See* L.R. 105.6 (D. Md. 2026). For the reasons that follow, the Court: (1) **GRANTS-in-PART** the Distributor Defendants' motion to dismiss (ECF No. 49); (2) **GRANTS-in-PART** Defendant Umbrella's motion to dismiss (ECF No. 47); (3) **GRANTS-in-PART** Defendant Vertical's motion to dismiss (ECF No. 60); and (4) **DISMISSES** Counts I, III, IV and V of the first amended complaint as to these Defendants. Fed. R. Civ. P. 12(b)(2).

## II. FACTUAL BACKGROUND AND PROCEDURAL HISTORY[1]

### A. Factual Background

In this civil action, the Plaintiff brings common law claims for defamation, negligence, gross negligence and invasion of privacy against the Distributor Defendants, Defendant Umbrella and Defendant Vertical, arising from the production and distribution of a feature-length documentary entitled *The Speedway Murders* ("The Documentary"). *See generally* ECF No. 37. Specifically, the Plaintiff asserts the following claims against these Defendants in the first amended complaint: (1) defamation *per se* and *per quod* (Count I); (2) negligence (Count III); (3) gross negligence (Count IV); and (4) invasion of privacy (Count V).[2] *Id.* at 24–34. As relief, the Plaintiff seeks, among other things, to recover monetary damages from the Defendants. *Id.* at Prayer for Relief.

The Parties

Plaintiff Brett Kimberlin is a resident of Maryland. ECF No. 37 at 1.

Defendant Umbrella is a proprietary limited company that is organized under the laws of Australia, registered to do business in New Zealand, and has its principal place of business located in Victoria, Australia. ECF No. 47-1 at 7.

Defendant Hulu, LLC is a Delaware limited liability company with its principal place of business located in California. ECF No. 49-1 at 19; ECF No. 13.

Defendant The Walt Disney Company, Inc. is a Delaware corporation, with its principal place of business located in California. ECF No. 49-1 at 19; ECF No. 10.

Defendant Apple Inc. is a California corporation with its principal place of business in California. ECF No. 49-1 at 19.

Defendant Vertical is a California limited liability company with its principal place of business located in California. ECF No. 60-1 at 3.

---

[1] The facts recited in this Memorandum Opinion are taken from the first amended complaint; Defendant Umbrella's motion to dismiss and the memorandum in support thereof; the Distributor Defendants' motion to dismiss and the memorandum in support thereof; and Defendant Vertical's motion to dismiss and the memorandum in support thereof. ECF Nos. 37, 47, 47-1, 49, 49-1, 60 and 60-1. Unless otherwise stated herein, the facts are undisputed.

[2] The Plaintiff also asserts claims for intentional infliction of emotional distress (Count II) and fraudulent misrepresentation (Count V) against Defendants Luke Rynderman, Adam Kamien, Anna Vincent and Southern Light Alliance Films. ECF No. 37 at ¶¶ 84-92 and 116-119. Defendants Netflix and Netflix Australia were dismissed from this case by stipulation on May 4, 2026. ECF No. 89.

The Documentary

As background, the Plaintiff is the subject of a documentary entitled, *The Speedway Murders*, which examines the unsolved 1978 murders of four teenagers at a Burger Chef restaurant located in Speedway, Indiana (the "Burger Chef Murders"). ECF No. 37 at ¶ 27. The Documentary contains an eight-minute segment discussing a theory that the Plaintiff—who was convicted of the related "Speedway bombings"—may have also been involved in the Burger Chef Murders and the murder of another individual, Julia Scyphers (the "Scyphers Murder"). *Id.* at ¶ 30. The Plaintiff has maintained his innocence of the Speedway bombings and these murders for several decades. *Id.* at 1-2.

In 2018, the Plaintiff was interviewed by Defendants Adam Kamien and Luke Rynderman at his home in Maryland, for what he understood would be a film project concerning his wrongful conviction of the Speedway bombings. *Id.* at ¶ 16. In connection with this interview, the Plaintiff signed a release granting Mr. Kamien and Mr. Rynderman an 18-month exclusive right to use his story. *Id.* at ¶¶ 16 and 107.

The Plaintiff alleges that Mr. Kamien and Mr. Rynderman subsequently, and, without his knowledge, optioned footage of the interview to Defendant Anna Vincent and her production company, Southern Light Alliance Films Pty Ltd., and that Ms. Vincent used the interview footage in the Documentary. *Id.* at ¶ 17. In this regard, the Plaintiff alleges that the Documentary devotes an eight-minute segment to a theory that, among other things, he may have been involved in the Burger Chef Murders and Scyphers Murders. *Id.* at ¶¶ 17-41.

In the first amended complaint, the Plaintiff alleges that the Documentary falsely and repeatedly accuses him, directly and by implication, of involvement in the Burger Chef Murders and Scyphers Murder, through statements attributed to interviewees, actors portraying the murder victims as "ghosts," and dramatized reenactments. *Id.* at ¶¶ 27-44 and 61-65. The Plaintiff also alleges that the Documentary is misleading, because: (1) he was never a suspect in connection with the Burger Chef Murders and Scyphers Murder; (2) he was never questioned by law enforcement about these murders; and (3) he was never charged in connection with either crime. *Id.* at ¶16. And so, the Plaintiff contends that Defendants Kamien, Rynderman, Vincent, and Southern Light Alliance Films fabricated these statements and obtained his participation in the Documentary through misrepresentations. *Id.* at ¶¶ 67–69.

While the Plaintiff acknowledges that the Distributor Defendants, Defendant Umbrella and Defendant Vertical had no role in making of the Documentary, he alleges that Defendants Umbrella and Vertical sold licensing rights for the Documentary to the Distributor Defendants, while acting with malice or, at a minimum, negligence, and that the Defendants have continued to publish the Documentary notwithstanding their knowledge that the film is false and defamatory. *Id.* at ¶¶ 47, 50, 57 and 77. And so, the Plaintiff contends that the continued publication of the Documentary establishes actual malice and supports his common law claims against these Defendants. *Id.* at ¶¶ 57, 77 and 94–114.

<u>Allegations Related To Personal Jurisdiction</u>

Relevant to the pending motions to dismiss, the Distributor Defendants, Defendant Umbrella and Defendant Vertical maintain that the Court lacks personal jurisdiction over them in this case, because the Plaintiff cannot establish either general, or specific personal jurisdiction in the State of Maryland. ECF Nos. 47, 49 and 60.

In this regard, it is undisputed that Defendant Umbrella is a proprietary limited company that is organized under the laws of Australia and has its principal place of business located in Victoria, Australia. ECF No. 47-1 at 7. It is also undisputed that Defendant Umbrella has no office, property, employees or bank accounts located in the State of Maryland, and that the company does not file taxes in Maryland. *Id.* at 8 (citing Harrison Decl. at ¶¶ 20-26); *see generally* ECF No. 84. In addition, it is undisputed that Defendant Umbrella licensed the Documentary to Netflix Australia and Apple Australia for streaming solely in Australia and New Zealand, and that all of Defendant Umbrella's work distributing the Documentary occurred in Australia. ECF No. 47-1 at 8 (citing Harrison Decl. at ¶¶ 10-13); *see generally* ECF No. 84. Lastly, it is undisputed that Defendant Umbrella promoted a trailer for the Documentary on its globally accessible website, YouTube page, and on social media accounts, and that the Umbrella-licensed version of the Documentary is not available in the United States through links found on its website and social media accounts. ECF No. 47-1 at 8 (citing Harrison Decl. at ¶¶ 15-17); *see generally* ECF No. 84.

The parties also agree that Defendant Hulu is a Delaware limited liability company with its principal place of business located in California. ECF No. 49-1 at 19; ECF No. 13. In this regard, it is undisputed that Hulu licensed the Documentary from Defendant Vertical and made

the Documentary available to its subscribers nationwide in the United States. *Id.* (citing Sanqui Decl. at ¶¶ 10 and 14-15); *see generally* ECF No. 83.

It is also undisputed that Defendant Disney is a Delaware corporation, with its principal place of business located in California. ECF No. 49-1 at 19; ECF No. 10; *see generally* ECF No. 83. The parties also agree that Defendant Apple is a California corporation with its principal place of business located in California. ECF No. 49-1 at 19; *see generally* ECF No. 83. In this regard, it is undisputed that: (1) Apple made the Documentary available for purchase or rental on its Apple TV application beginning June 21, 2024; (2) as of the date of the filing of this lawsuit, 48 individuals with Maryland billing addresses had purchased or rented the Documentary through Apple; and (3) Apple undertook no promotion or marketing of the Documentary specifically directed at Maryland. ECF No. 49-1 at 8 (citing Glinsky Decl. at ¶¶ 13 and 15-16); *see generally* ECF No. 83.

The parties also agree that Defendant Vertical is a California limited liability company with its principal place of business located in California. ECF No. 60-1 at 3; *see generally* ECF No. 85. It is also undisputed that Defendant Vertical obtained the rights to license the Documentary from Ringleader Film Pty. Ltd., through Ringleader's United Kingdom-based agent, and that Vertical was not involved in the creation or production of the Documentary. ECF No. 60-1 at 3 (citing Jarowey Decl. at ¶¶ 8 and 10); *see generally* ECF No. 85. The parties also agree that Defendant Vertical sub-licensed the Documentary to Hulu and Apple, for distribution to a nationwide audience in the United States, and that Defendant Vertical posted a trailer for the Documentary on its YouTube channel and Facebook page, which are both accessible nationally *via* the Internet. ECF No. 60-1 at 2–3 (citing Jarowey Decl. at ¶¶ 9 and 11); *see generally* ECF No. 85.

The Plaintiff alleges in the first amended complaint that the exercise of personal jurisdiction over these Defendants is warranted in this forum, because: (1) he resides in Maryland and (2) he was interviewed for the Documentary at his home in Maryland. ECF No. 37 at ¶¶ 12 and 16. The Plaintiff also alleges that the Distributor Defendants intentionally target viewers and prospective viewers in Maryland, through marketing, advertising, and algorithmic recommendation technology. ECF No. 37 at ¶¶ 54–56.

In this regard, the Plaintiff alleges that:

- Upon information and belief, Defendants Disney, Hulu, and Apple intentionally target viewers and prospective viewers of The Speedway Murders who live in Maryland, through traditional marketing and advertising and various technological means, including technological tools such as the use of algorithms and artificial intelligence, to identify viewers and prospective viewers who live in Maryland who likely would be interested in viewing The Speedway Murders.

- Similarly, Netflix Australia undoubtedly uses similar technology to target viewers and prospective viewers who may have an interest in viewing it.

- In other words, these distributors are not akin to a large, retail bookstore, which places a given book on its shelf and leaves it to consumers to come in and find it. Rather, through the use of traditional and high[-]tech marketing technological tools, these distributors undoubtedly "push" the publication of The Speedway Murders to certain viewers and prospective viewers who are likely to be interested in viewing it (to include those who live in Maryland, at least through the targeted efforts of Disney, Apple, and Hulu). Through such efforts, these distributors are targeting Plaintiff while knowing that he lives in Maryland and also while knowing that the allegations against him The Speedway Murders are false and defamatory."

- As a result, while . . . U.S. Distributors (as well as Netflix Australia) did not create The Speedway Viewers, they are liable for defamation and certain of the other wrongful and tortious acts alleged in this First Amended Complaint. At a minimum, even if – for example – a large distributor such as Hulu did not actively know that The Speedway Murders contained false and defamatory statements against Plaintiff when it initially published such on its platform, since at least the filing of this lawsuit (and Hulu's leadership becoming aware of such), Hulu has not taken down The Speedway Murders or otherwise stopped publicizing it. As such, Hulu and the other distributors have continued to publish the false and defamatory docudrama, and through such, are targeting Plaintiff with the false and defamatory statements contained therein. They have acted, and are continuing to act, with malice and reckless disregard for the truth of the false statements contained therein, and at a minimum, have acted in a negligent manner towards Plaintiff.

*Id.* at ¶¶ 54, 55, 56, 57 and 77.

The Plaintiff also alleges that:

- Umbrella Entertainment Pty. Ltd. ("Umbrella") is located at Unit 18, 71 Victoria Crescent, Abbotsford VIC 3067 Australia. Umbrella distributes films primarily in Australia and it is currently distributing "The Speedway Murders" in Australia and upon information and belief, it is receiving significant revenue therefrom. Plaintiff also understands that Umbrella's distribution of The Speedway Murders is not solely limited to Australia, because:

    - On the listing for The Speedway Murders on Umbrella's website, it had a tab that says[,] "Watch Now." From that tab, four options appear for streaming platforms to use to watch the docudrama: Fletch; Apple TV; Google Play; and Prime Video (i.e., Amazon Prime). Some or all of these streaming platforms are available to viewers in the United States, to include persons who live in Maryland.

    - Additionally, on the page on Umbrella's website for The Speedway Murders, viewers are presented with the option to watch the trailer for the docudrama by clicking on an icon on the screen – image of the docudrama; once done, the viewer can then watch the trailer on Umbrella's YouTube page (at no charge); this is available to viewers in the United States, including persons who live in Maryland.

    - The Speedway Murders is available for sale on Amazon.com, at this link: https://www.amazon.com/s?k=Speedway+Murders&crid=X4XWG0WC25DE&s prefix=speedway+murders%2Caps%2C102&ref=nb_sb_noss_2 Upon information and belief, Umbrella has contracted with Amazon to sell The Speedway Murders through Amazon's website (as part of Amazon Prime).

    - The Speedway Murders is also promoted by Umbrella on YouTube, as it featured the Trailer for the docudrama at this link (which indicates that 32,000 views of such occurred): https://www.youtube.com/watch?v=eEZ0UuDK8RM

    - Additionally, Umbrella's YouTube page has some 172,000 subscribers. In each instance, in relation to the

> accessibility of The Speedway Murders on Umbrella's You Tube channel, it is available to viewers in the United States, including to persons who live in Maryland.

*Id.* at ¶ 7.

Lastly, the Plaintiff alleges that:

- . . . Defendants . . . Vertical, while acting with malice towards Plaintiff or at a minimum, in a negligent manner towards him, sold the licensing rights to Netflix, Disney, and Apple. These Defendants had an affirmative duty to ensure that the creative products that they purchased the licensing rights did not contain false and defamatory statements like the false and statements contained in The Speedway Murders about Plaintiff. To be sure, the agreements that Umbrella and Vertical have signed with Netflix, Apple, and Disney reflect such obligation on their part, through the representations that they provided therein (and because the existence of such unlawful content in the production provides the distributors grounds to revoke their agreements with Umbrella and Vertical).

- . . . Vertical have promoted The Speedway Murders through their social media accounts. Between such direct efforts and publication, and also through the key step in the chain of distribution and publication that they each played in aiding and abetting the large distributors in publishing such, they are liable for the false and defamatory statements against Plaintiff which are contained therein.

- . . .Vertical . . . did not create The Speedway [Murders], they are liable for defamation and certain of the other wrongful and tortious acts alleged in this First Amended Complaint. At a minimum, even if – for example – a large distributor such as Hulu did not actively know that The Speedway Murders contained false and defamatory statements against Plaintiff when it initially published such on its platform, since at least the filing of this lawsuit (and Hulu's leadership becoming aware of such), Hulu has not taken down The Speedway Murders or otherwise stopped publicizing it. As such, Hulu and the other distributors have continued to publish the false and defamatory docudrama, and through such, are targeting Plaintiff with the false and defamatory statements contained therein. They have acted, and are continuing to act, with malice and reckless disregard for the truth of the false statements contained therein,

> and at a minimum, have acted in a negligent manner towards Plaintiff.

*Id.* at ¶¶ 50, 51 and 57. And so, the Plaintiff contends that the allegations in the first amended complaint are sufficient to establish personal jurisdiction over these Defendants. *See* ECF No. 85.

**B. Relevant Procedural History**

On May 28, 2025, the Plaintiff commenced this civil action in the Circuit Court for Montgomery County, Maryland. ECF No. 1-1. On July 22, 2025, the Defendants removed the case to this Court. ECF No. 1.

On November 17, 2025, the Plaintiff filed the first amended complaint. ECF No. 37. On January 12, 2026, Defendant Umbrella filed a renewed motion to dismiss the claims brought against it in the first amended complaint, pursuant to Fed. R. Civ. P. 12(b)(2) and (b)(6). ECF Nos. 47 and 47-1.

On January 12, 2026, the Distributor Defendants filed a motion to dismiss the claims brought against it in the first amended complaint, pursuant to Fed. R. Civ. P. 12(b)(2) and (b)(6). ECF Nos. 49, 49-1. On February 19, 2026, Defendant Vertical moved to dismiss the claims brought against it in the first amended complaint, pursuant to Fed. R. Civ. P. 12(b)(2) and (b)(6). ECF Nos. 60, 60-1.

On April 3, 2026, and April 4, 2026, the Plaintiff filed responses in opposition to the Defendants' respective motions to dismiss. ECF Nos. 83, 84 and 85.

On May 20, 2026, the Distributor Defendants and Defendant Umbrella filed their respective reply briefs. ECF Nos. 90 and 91.

The Defendants' motions to dismiss having been fully briefed, the Court resolves the pending motions.

## III. LEGAL STANDARDS

### A. Fed. R. Civ. P. 12(b)(2) And Personal Jurisdiction

A motion to dismiss for lack of personal jurisdiction, brought pursuant to Fed. R. Civ. P. 12(b)(2), "raises an issue for the [C]ourt to resolve, generally as a preliminary matter." *Grayson v. Anderson*, 816 F.3d 262, 267 (4th Cir. 2016). Given this, the burden is "on the plaintiff ultimately to prove the existence of a ground for [personal] jurisdiction by a preponderance of the evidence." *Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989).

To do so, a plaintiff need only make "a *prima facie* showing of personal jurisdiction to survive the jurisdictional challenge." *Grayson*, 816 F.3d at 268. In determining whether the plaintiff has made the requisite showing, the Court must consider all disputed facts and make reasonable inferences in favor of the plaintiff. *See Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 396 (4th Cir. 2003). And so, when deciding a motion brought pursuant to Fed. R. Civ. P. 12(b)(2), the Court may "rule solely on the basis of motion papers, supporting legal memoranda, affidavits, and the allegations in the complaint." *Maryland v. Exxon Mobil Corp.*, 406 F. Supp. 3d 420, 437 (D. Md. 2019) (citations omitted).

The Court may exercise either general personal jurisdiction—arising from a defendant's contacts with a forum state which are so systematic and continuous as to essentially place the defendant "at home"—or specific personal jurisdiction—arising from an "affiliation between the forum and the underlying controversy." *Ark. Nursing Home Acquisitions, LLC v. CFG Cmty. Bank*, 460 F. Supp. 3d 621, 639 (D. Md. 2020) (quoting *Bristol-Myers Squibb Co. v. Superior Ct. of Cal., San Francisco Cnty.*, 582 U.S. 255, 262-63 (2017)). To exercise specific personal jurisdiction over a non-Maryland resident defendant, two conditions must be satisfied: (1) the exercise of jurisdiction must be authorized under the State's long-arm statute and (2) the exercise of jurisdiction must comport with the due process requirements of the Fourteenth Amendment. *Carefirst of Md., Inc.*, 334 F.3d at 396. In this regard, Maryland's long-arm statute authorizes personal jurisdiction over a person, who directly or by an agent:

> (1) Transacts any business or performs any character of work or service in the State;
>
> (2) Contracts to supply goods, food, services, or manufactured products in the State;
>
> (3) Causes tortious injury in the State by an act or omission in the State;
>
> (4) Causes tortious injury in the State or outside of the State by an act or omission outside the State if he regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from goods, food, services, or manufactured products used or consumed in the State;
>
> (5) Has an interest in, uses, or possesses real property in the State; or
>
> (6) Contracts to insure or act as surety for, or on, any person, property, risk, contract, obligation, or agreement located, executed,

> or to be performed within the State at the time the contract is made, unless the parties otherwise provide in writing.

Md. Code Ann. § 6-103(b)(1)–(6).

The Fourth Circuit has held that "the limits of Maryland's statutory authorization for the exercise of personal jurisdiction are coterminous with the limits of the Due Process Clause, [and] the statutory inquiry necessarily merges with the constitutional inquiry, and the two inquiries essentially become one." *Stover v. O'Connell Assocs., Inc.*, 84 F.3d 132, 135-36 (4th Cir. 1996). The Fourth Circuit has also held that the exercise of specific personal jurisdiction requires consideration of: "(1) the extent to which the defendant has purposefully availed itself of the privilege of conducting activities in the state; (2) whether the plaintiff's claims arise out of those activities directed at the state; and (3) whether the exercise of personal jurisdiction would be constitutionally 'reasonable.'" *Carefirst of Md., Inc.*, 334 F.3d at 397 (citations omitted); *see also ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*, 293 F.3d 707, 712 (4th Cir. 2002) (applying the same three-part test to a defendant's Internet-based contacts with the forum).

In this regard, it is well-established that "the plaintiff cannot be the only link between the defendant and the forum," to establish personal jurisdiction over a defendant, and that a plaintiff's residence in, and alleged injury felt within, the forum state, standing alone, cannot support the exercise of specific personal jurisdiction over a non-resident defendant. *Walden v. Fiore*, 571 U.S. 277, 289-90 (2014); *see also ESAB Grp., Inc. v. Centricut, Inc.*, 126 F.3d 617, 626 (4th Cir. 1996) (holding that, "[t]o allow a court to find jurisdiction based solely on where the plaintiff feels the effect of the [alleged tort] would always make jurisdiction appropriate in a plaintiff's home state, for the plaintiff always feels the impact of the harm there"). In addition, while specific personal jurisdiction may rest on "an out-of-state person's Internet activity directed at [the forum state] and causing injury that gives rise to a potential claim cognizable in [that state]," *ALS Scan, Inc.*, 293 F.3d at 711, the mere "act of placing information on the Internet is not sufficient by itself to subject[ ] that person to personal jurisdiction in each State in which the information is accessed," *Young v. New Haven Advocate*, 315 F.3d 256, 263 (4th Cir. 2002). And so, "[s]omething more than posting and accessibility is needed to indicate that [a defendant] purposefully . . . directed [its] activity in a substantial way to the forum state," and that a defendant's Internet or streaming activity must be examined to determine whether the defendant "manifested an intent to direct [its] . . . content" to a Maryland audience specifically, as opposed to a national or global one. *Young*, 315 F.3d at 263–64.

## IV. ANALYSIS

The Distributor Defendants, Defendant Umbrella and Defendant Vertical have each moved to dismiss the claims brought against them in the first amended complaint, pursuant to Fed. R. Civ. P. 12(b)(2) and (b)(6), upon the following two grounds: (1) the Court lacks personal jurisdiction over the Defendants and (2) the Plaintiff fails to state plausible claims for defamation, negligence, gross negligence and invasion of privacy in the first amended complaint. ECF No. 47-1 at 6-21; ECF No. 49-1 at 11-30; ECF No. 60-1 at 3-11. In addition, Defendant Vertical argues that dismissal of the Plaintiff's defamation claim against it is also warranted, because this claim is time-barred under Maryland's one-year statute of limitations. ECF No. 60-1 at 8-10. And so, the Defendants request that the Court dismiss the claims brought against them in Counts I, III, IV and V of the first amended complaint. ECF No. 47-1 at 21; ECF No. 49-1 at 30; ECF No. 60-1 at 11.

The Plaintiff counters in his responses in opposition to the Defendants' motions to dismiss, that the Court should not dismiss these claims, because the factual allegations in the first amended complaint show that: (1) the Court may exercise personal jurisdiction over the Defendants and (2) he has sufficiently pled claims for defamation, negligence, gross negligence, and invasion of privacy in this case. ECF Nos. 83, 84 and 85. And so, the Plaintiff requests that the Court deny the Defendants' motions. ECF Nos. 83, 84 and 85.

For the reasons that follow, a careful reading of the first amended complaint shows that the Plaintiff has not met his burden to show that the Court may exercise personal jurisdiction over the Distributor Defendants, Defendant Umbrella and Defendant Vertical. And so, the Court: (1) GRANTS-in-PART the Distributor Defendants' motion to dismiss (ECF No. 49); (2) GRANTS-in-PART Defendant Umbrella's motion to dismiss (ECF No. 47); (3) GRANTS-in-PART Defendant Vertical's motion to dismiss (ECF No. 60); and (4) DISMISSES Counts I, III, IV and V of the first amended complaint as to these Defendants. Fed. R. Civ. P. 12(b)(2).

### A. The Plaintiff Has Not Established Personal Jurisdiction Over The Defendants

The Plaintiff has not met his burden to show that the Court may exercise personal jurisdiction over the Defendants. To establish personal jurisdiction over a non-resident defendant, the Plaintiff must establish either general or specific jurisdiction. *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 396 (4th Cir. 2003). General jurisdiction

arises from contacts with the forum so continuous and systematic as to render the defendant "at home" there. *Ark. Nursing Home Acquisitions, LLC v. CFG Cmty. Bank*, 460 F. Supp. 3d 621, 639 (D. Md. 2020). And so, the Defendants' place of incorporation and/or principal place of business are paradigm bases for exercising general jurisdiction. *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014) (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 924 (2011)).

In this case, it is undisputed that general personal jurisdiction cannot be established for the Distributor Defendants, Defendant Vertical and Defendant Umbrella, because none of these Defendants are incorporated, or have a principal place of business, in the State of Maryland. ECF No. 13 (Hulu); ECF No. 10 (Disney); ECF No. 49-23 at ¶ 4 (Glinsky Decl.) (Apple); ECF No. 47-2 at ¶¶ 3-4 (Harrison Decl.) (Umbrella); ECF No. 60-1 at 7 (citing Jarowey Decl. at ¶ 3) (Vertical); *see also Daimler AG*, 571 U.S.at 137 (a corporation's place of incorporation and principal place of business are the paradigm bases for exercising general jurisdiction). Given this, the Court next considers whether the exercise of specific personal jurisdiction over these Defendants is warranted in this case.

**1. The Plaintiff Has Not Established Specific Personal Jurisdiction Over The Distributor Defendants**

A careful reading of the complaint and the undisputed evidence before the Court shows that the Plaintiff has not met his burden to show that the Court may exercise specific personal jurisdiction over the Distributor Defendants. To establish specific personal jurisdiction, the Plaintiff must make two showings: (1) the exercise of jurisdiction must be authorized under Maryland's long-arm statute and (2) it must comport with the due process requirements of the Fourteenth Amendment. *Carefirst of Md., Inc.*, 334 F.3d at 396. In this regard, the Fourth Circuit has held that Maryland's long-arm statute is coextensive with the limits of due process. Given this, the statutory and constitutional inquiries "necessarily merge . . . into one." *Id.* at 396; *Stover*, 84 F.3d at 135-36. The Plaintiff fails to satisfy these requirements with regards to the Distributor Defendants for several reasons.

First, as the Plaintiff appears to acknowledge, the exercise of specific personal jurisdiction cannot be established under subsection (5) of Maryland's long-arm statute, because there are no factual allegations in the complaint to show that any of Distributor Defendants has an interest in,

uses, or possesses real property in Maryland. *See generally* ECF No. 37; *see also* Md. Code Ann. § 6-103(b)(5).

The exercise of specific personal jurisdiction under subsection (3) of Maryland's long-arm statute is also not warranted with regards to these Defendants, because the alleged tortious conduct in this case—the distribution, licensing, marketing, streaming and advertising of the Documentary (ECF No. 37 at ¶¶ 54–57 and 77)—occurred when these Defendants undertook actions outside of the State of Maryland. Md. Code Ann. § 6-103(b)(3) (authorizing the exercise of specific personal jurisdiction over a defendant who, among other things, causes tortious injury in the State by an act or omission in the State.). Here, it is undisputed that each of the Distributor Defendants conduct their respective businesses in locations outside of Maryland. *See* ECF No. 10 (stating that Hulu's principal place of business is in California); ECF No. 49-23 (Glinsky Decl.) at ¶ 4 (stating that Apple's principal place of business is in California). And so, the alleged tortious acts in this case did not occur in Maryland.

The Court also agrees withe the Defendants that specific personal jurisdiction cannot be established under subsection (4) of Maryland's long-arm statute, because the Distributor Defendants do not regularly do business, or engage in a persistent course of conduct in Maryland. Md. Code Ann. § 6-103(b)(4) (authorizing specific personal jurisdiction over a defendant who, among other things: causes tortious injury in the State by an act or omission outside the State, where the defendant regularly does or solicits business, engages in a persistent course of conduct, or derives substantial revenue from goods or services consumed in the State.).

In this regard, the undisputed evidence before the Court shows that Defendants Hulu and Disney made the Documentary available to their subscribers throughout the United States and that approximately 1.2% of the viewers of the Documentary on their platforms are located in Maryland. ECF No. 49-1 at 15 (citing Sanqui Decl. at ¶¶ 10 and 14-15 (stating Hulu licensed the Documentary for distribution to subscribers nationwide, and that only 1.2% of users who accessed the Documentary had Maryland addresses)). The unrebutted evidence before the Court also shows that Defendant Apple made the Documentary available for purchase or rental, nationally in the United States and that approximately 48 of its customers who rented or bought the Documentary have Maryland-billing-addresses. ECF No. 49-1 at 21-22 (citing Glinsky Decl. at ¶ 15 (stating the Documentary was rented or bought through the Apple TV app by 48 accounts with Maryland credit card billing addresses)). It is also undisputed that Defendant Apple did not

undertake any Maryland-directed promotion of the Documentary. *Id.* (citing Glinsky Decl. at ¶¶ 15-16) ((stating Apple undertook no promotion, marketing, or advertising of the Documentary)).

Given these facts, the Court agrees with the Distributor Defendants that their actions with regards to the distribution of the Documentary had a national focus and they did not specifically target the State of Maryland, or Maryland viewers. The fact that the Plaintiff happens to reside in Maryland and that he was interviewed in connection with the Documentary in Maryland does not alter this conclusion. *Walden*, 571 U.S. at 289; *ESAB Grp., Inc. v. Centricut, Inc.*, 126 F.3d 617, 626 (4th Cir. 1997). And so, the Plaintiff has not shown that any of the Distributor Defendants engaged in the "regular," "persistent," or "substantial" revenue-generating conduct in Maryland to warrant the exercise of specific personal jurisdiction. *See, e.g.*, *Fielding v. Hubert Burda Media, Inc.*, 415 F.3d 419, 426 (5th Cir. 2005); *Noonan v. Winston Co.*, 135 F.3d 85, 91 (1st Cir. 1998); *Chaiken v. VV Pub. Corp.*, 119 F.3d 1018, 1029 (2d Cir. 1997).

The other factors that the Court considers under *Carefirst of Md., Inc.* also do not support the exercise of specific personal jurisdiction over the Distributor Defendant's. When determining whether the exercise of personal jurisdiction over a defendant is appropriate, the Court also considers: (1) the extent to which the defendant purposefully availed itself of the privilege of conducting activities in Maryland; (2) whether the plaintiff's claims arise out of activities directed at Maryland; and (3) whether the exercise of jurisdiction would be constitutionally reasonable. *Carefirst of Md., Inc.*, 334 F.3d at 397. As discussed above, the undisputed evidence before the Court shows that the Distributor Defendants did not purposefully avail themselves of the privilege of conducting business in Maryland, because they distributed the Documentary nationally and any distribution of this film in Maryland was simply a by-product of that national distribution. Given this, the Plaintiff's argument that the Distributor Defendants specifically targeted Maryland viewers, by using certain algorithms is unconvincing, because such algorithms would have also been employed to other individuals nationally. *See Young*, 315 F.3d at 263–64.[3]

A careful reading of the complaint also makes clear that the Plaintiff's claims do not arise out of any Maryland-directed activity by these Defendants. As discussed above, the Plaintiffs'

---

[3] In addition, the fact that some of the Distributor Defendants are registered to do business in Maryland is also not sufficient to show purposeful availment. *See Tradepoint Atl., LLC v. Env't Liab. Transfer, Inc.*, No. 21-1238, 2022 WL 4564633, at *8 (D. Md. Sep. 29, 2022)

claims in this case arise from the distribution and licensing of the Documentary, which occurred outside of the State of Maryland. Given this, the Court agrees with the Distributor Defendants that these Defendants had no reason to anticipate being haled into a Maryland court to defend this action, and that due process does not support the exercise of personal jurisdiction over them in this case. *Carefirst of Md., Inc.*, 334 F.3d at 396. And so, the Court GRANTS the Distributor Defendants' motion to dismiss on the ground of lack of personal jurisdiction and DISMISSES the Plaintiff's claims against these Defendants. Fed. R. Civ. P. 12(b)(2).

**2. The Plaintiff Has Not Established Specific Personal Jurisdiction Over Defendant Umbrella**

For similar reasons, the Plaintiff has not met his burden to establish that the Court may exercise specific personal jurisdiction over Defendant Umbrella. Like the Distributor Defendants, there is no dispute that Defendant Umbrella does not have an office, own property, or have any employees, bank accounts, or tax filings in Maryland. ECF No. 47-2 (Harrison Decl.) at ¶¶ 21-25 (stating Umbrella has no office, owns no property, and has no employees, bank accounts, or tax filings in Maryland or anywhere else in the United States); *see also* Md. Code Ann. § 6-103(b)(5). In addition, there is no dispute that the alleged tortious conduct of Defendant Umbrella, the licensing and distribution of the Documentary, occurred outside of Maryland, because Defendant Umbrella licensed and distributed the Documentary in Australia and New Zealand. ECF No. 47-1 at 8 (citing Harrison Decl. at ¶¶ 10-13 (stating Umbrella licensed the Documentary to Netflix Australia and Apple Australia for streaming solely in Australia and New Zealand, with all of Umbrella's distribution work occurring there)); *see generally* ECF No. 84; *see also* Md. Code Ann. § 6-103(b)(3).

The undisputed evidence before the Court also shows Defendant Umbrella does not regularly do business, or engage in a persistent course of conduct, in Maryland, because the company conducts its business in Australia and New Zealand. ECF No. 47-2 (Harrison Decl.) at ¶¶ 10–13 (stating that Defendant Umbrella licensed the Documentary to Netflix Australia and Apple Australia for streaming solely within those countries). The Plaintiff's argument that Defendant Umbrella specifically targeted viewers in Maryland, by promoting a trailer for the Documentary on its YouTube page and social media, is also belied by the undisputed fact the trailer at issue was nationally and internationally available through these platforms. ECF No. 47-2 (Harrison Decl.) at ¶¶ 15–17 (stating the Documentary's trailer was promoted on Umbrella's

website, social media, and YouTube page, all accessible worldwide, but that the full Documentary remained geo-blocked outside Australia and New Zealand); *see also* ECF No. 84 at 9 (conceding that, "[w]hile the Speedway Murders, in full, is not available for viewing by persons within the United States, including Maryland," only the trailer is accessible).[4] And so, the Plaintiff has also not shown that the exercise of specific personal jurisdiction over the Umbrella Defendants is warranted under Maryland's long-arm statute.

The evidence before the Court similarly shows that Defendant Umbrella did not purposefully avail itself of the privilege of doing business in the State of Maryland, because it licensed and distributed the Documentary in Australia and New Zealand and there is also no dispute that the entire Documentary is not accessible in the United States through any platform that Defendant Umbrella controls. ECF No. 47-2 (Harrison Decl.) at ¶¶ 10–13 and 15–17 (stating Umbrella licensed the Documentary only to Netflix Australia and Apple Australia, that all of its distribution work occurred in Australia, and that the Documentary is geo-blocked and unavailable in the United States through any Umbrella-controlled platform). Given this, the Court agrees with Defendant Umbrella that the online promotion and worldwide accessibility of the trailer for the Documentary on its platforms is not sufficient to show that it "manifested an intent to direct [its] . . . content," specifically, to a Maryland audience. *Young*, 315 F.3d at 263–64. The complaint also makes clear that the Plaintiff's claims against the Defendant Umbrella do not arise out of any Maryland-directed activity by Defendant Umbrella and, as discussed above, the Plaintiff's residence, and alleged injury, in Maryland, alone, cannot supply a sufficient link to Maryland to establish personal jurisdiction. *Walden*, 571 U.S. at 289; *ESAB Grp., Inc.*, 126 F.3d at 626.

Given this, the Court agrees with Defendant Umbrella that it had no reason to anticipate being haled into a Maryland court, and that due process does not support the exercise of personal jurisdiction in this case. And so, the Court also GRANTS Defendant Umbrella's motion to

---

[4] The Plaintiff also argues that Defendant Umbrella targeted Maryland viewers, because some Blu-ray discs of the Documentary that bear its name have been resold on Amazon.com. ECF No. 84-1 at (Kimberlin Decl.) at ¶¶ 4-6 (stating the Plaintiff brought the Documentary on Blu-ray discs through Amazon.com). But the resales at issue were made by independent third-party sellers. ECF No. 90-1 (Second Harrison Decl.) at ¶¶ 14–16 and 18 (stating that any Blu-ray resales on Amazon.com occurred through independent third-party sellers outside Umbrella's control or authorization, and that Umbrella has not distributed, marketed, or sold the Documentary to audiences in Maryland or elsewhere in the United States). And so, this conduct does not show that Defendant Umbrella targeted Maryland or Maryland viewers in connection with the distribution of the Documentary.

dismiss on the ground of lack of personal jurisdiction and DISMISSES the Plaintiff's claims against Defendant Umbrella. Fed. R. Civ. P. 12(b)(2).

### 3. The Plaintiff Has Not Established Specific Personal Jurisdiction Over Defendant Vertical

As a final matter, the Plaintiff has not met his burden to establish that the Court may exercise specific personal jurisdiction over Defendant Vertical for the same reasons discussed above. Again, there are no factual allegations in the complaint to show that Defendant Vertical has an interest in, uses, or possesses real property in Maryland. *See generally* ECF No. 37; ECF No. 60-1 at 7 (citing Jarowey Decl. at ¶ 3); *see also* Md. Code Ann. § 6-103(b)(5). Nor can the Plaintiff show that Defendant Vertical caused the alleged tortious injury in Maryland by an act or omission in the State, because it is undisputed that Defendant Vertical's licensing of the Documentary occurred in California. *See* ECF No. 60-1 at 7 (citing Jarowey Decl. ¶ 3 (Vertical is a California company)); *see id.* (citing Jarowey Decl. at ¶¶ 8–9 (Vertical obtained the license from an Australian producer and sub-licensed to California-based Hulu and Apple)).

In addition, as with the Distributor Defendants and Defendant Umbrella, the undisputed evidence before the Court shows that Defendant Vertical does not regularly do business, or engage in a persistent course of conduct, in Maryland. Notably, it is undisputed that Defendant Vertical obtained the rights to license the Documentary from Ringleader Film Pty. Ltd., which is an Australian production company, and that Defendant Vertical was not involved in the creation or production of the Documentary. ECF No. 60-1 at 7 (citing Jarowey Decl. at ¶¶ 8 and 10 (stating Vertical obtained the license to the Documentary from Ringleader Film Pty. Ltd., an Australian production company, and was not involved in the Documentary's creation or production)). It is also undisputed that Defendant Vertical sub-licensed the Documentary to Defendants Hulu and Apple for distribution to a nationwide audience in the United States and that Defendant Vertical also posted a trailer for the Documentary on its YouTube channel and Facebook page, which both are accessible nation-wide *via* the Internet. *Id.* (citing Jarowey Decl. at ¶¶ 9 and 11 (stating Vertical sub-licensed the Documentary to Hulu and Apple for nationwide U.S. distribution and posted a trailer on its YouTube channel and Facebook page, both accessible nationwide)). Given this, Defendant Vertical did not specifically target Maryland, or Maryland viewers, in connection with the licensing and distribution of the Documentary.

For similar reasons, the evidence before the Court shows that Defendant Vertical did not purposefully avail itself of the privilege of doing business in Maryland. Again, the evidence before the Court makes clear that Defendant Vertical licensed the Documentary to Defendants Hulu and Apple for nationwide distribution on their platforms and that Defendant Vertical took no action in this regard that was specifically directed at Maryland. ECF No. 60-1 at 7 (citing Jarowey Decl. at ¶¶ 8–9 (stating Vertical licensed the Documentary from Ringleader and sub-licensed it to Hulu and Apple for nationwide distribution, with no action directed specifically at Maryland)). And so, Defendant Vertical's role in the national distribution of a trailer of the Documentary, *via* online platforms that are accessible worldwide, is not sufficient to show that Defendant Vertical targeted Maryland viewers. *See Young*, 315 F.3d at 263–64; ECF No. 60-1 at 8 (citing *Wood v. Netflix, Inc.*, 2025 WL 918078, at *20 (M.D. Fla. Mar. 26, 2025), and *Alexander v. Avenue*, 473 F. Supp. 3d 551, 558 (E.D. Va. 2020)).

In addition, as discussed above, the Plaintiff's claims in this case do not arise out of any Maryland-directed activity, and he cannot rely upon his residence in Maryland, or the fact that the interview for the Documentary was filmed in Maryland, to establish specific personal jurisdiction over Defendant Vertical. *Walden*, 571 U.S. at 289; ECF No. 60-1 at 9 (citing *Adewami*, 2024 WL 316746, at *4).

Given this, the evidence before the Court shows that Defendant Vertical had no reason to anticipate being haled into court in Maryland and that due process does not support the exercise of personal jurisdiction over this Defendant. And so, the Court also GRANTS Defendant Vertical's motion to dismiss on the ground of lack of personal jurisdiction and DISMISSES the Plaintiff's claims against Defendant Vertical in this case. Fed. R. Civ. P. 12(b)(2).[5]

## V. CONCLUSION

For the foregoing reasons, the Court:

(1) **GRANTS-in-PART** the Distributor Defendants' motion to dismiss (ECF No. 49);

(2) **GRANTS-in-PART** Defendant Umbrella's motion to dismiss (ECF No. 47);

(3) **GRANTS-in-PART** Defendant Vertical's motion to dismiss (ECF No. 60); and

[5] Because the Court concludes that it is not appropriate to exercise personal jurisdiction over the Distributor Defendants, Defendant Umbrella, and Defendant Vertical, the Court does not reach the remaining arguments raised in the Defendants' respective motions to dismiss.

(4) **DISMISSES** Counts I, III, IV and V of the first amended complaint as to these Defendants. Fed. R. Civ. P. 12(b)(2).

The Court issued an Order consistent with this Memorandum Opinion on September 10, 2026.

**IT IS SO ORDERED.**

s/Lydia Kay Griggsby
LYDIA KAY GRIGGSBY
United States District Judge